**Fill in this information to identify the case:**

Debtor 1    ORBIT ENERGY & POWER, LLC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:  NEW JERSEY District of CAMDEN

Case number   22-19628-AVA

Official Form 410

# Proof of Claim

04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1:    Identify the Claim

| | |
|---|---|
| 1. Who is the current creditor? | GLOBAL MERCHANT CASH, INC. <br> Name of the current creditor (the person or entity to be paid for this claim) <br><br> Other names the creditor used with the debtor  Wall Funding |
| 2. Has this claim been acquired from someone else? | ☑ No <br> ☐ Yes. From whom? _____ |

| 3. Where should notices and payments to the creditor be sent? <br><br> Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
|---|---|---|
| | Jonathan S. Hawkins <br> Name <br><br> 10050 Innovation Drive, #400 <br> Number      Street <br><br> Miamisburg         OH        45342 <br> City            State          ZIP Code <br><br> Contact phone  937-443-6860 <br><br> Contact email  jonathan.hawkins@thompsonhine.cor | Name <br><br> Number      Street <br><br> City         State        ZIP Code <br><br> Contact phone _____ <br><br> Contact email _____ |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one): <br><br> __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ | |

| | |
|---|---|
| 4. Does this claim amend one already filed? | ☑ No <br> ☐ Yes.  Claim number on court claims registry (if known) _____    Filed on _____ <br>                                                                                          MM / DD  / YYYY |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No <br> ☐ Yes.  Who made the earlier filing? _____ |

**Part 2:    Give Information About the Claim as of the Date the Case Was Filed**

| | | |
|---|---|---|
| 6. | **Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____  ____  ____  ____ |

7. **How much is the claim?**    $_____541,965.56. **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Unpaid Accounts

9. **Is all or part of the claim secured?**

☐ No

☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☑ Other. Describe:    All assets

**Basis for perfection:**    UCC-1 financing statements

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**    $_____

**Amount of the claim that is secured:**    $_____

**Amount of the claim that is unsecured:**    $_____    (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

10. **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

11. **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:    Sign Below**

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    02/03/2023
                    MM / DD / YYYY

/s/Jonathan S. Hawkins
Signature

Print the name of the person who is completing and signing this claim:

Name        Jonathan S. Hawkins
            First name        Middle name        Last name

Title        Partner

Company     Thompson Hine LLP
            Identify the corporate servicer as the company if the authorized agent is a servicer.

Address     10050 Innovation Drive, #400
            Number        Street

            Miamisburg                          OH        45342
            City                                State     ZIP Code

Contact phone    937-443-6860            Email jonathan.hawkins@thompsonhine.com

---

# Wall Funding

Payment summary for **ORBIT ENERGY & POWER LLC, Orbit Energy & Power: Renewal_Resubmission**

| | | | |
|---|---|---|---|
| Address: | 106 MANTUA AVE<br>MANTUA, NJ 08051 | Statement Begins: | 05/17/2022 |
| | | Statement Ends: | 11/16/2022 |
| Phone: | ▓▓▓▓ | Funded Amount: | $1,400,000.00 |
| Email: | ▓▓▓▓ | Receipts Purchased: | $1,841,000.00 |
| Installment: | 4 | Ending Balance (with Fees): | $541,965.56 |

| Date | Total Receipts Collected to Date | Receipts Collected | Receipts Due |
|---|---|---|---|
| 05/17/2022 | $0.00 | $0.00 | $1,841,000.00 |
| 05/18/2022 | $0.00 | $0.00 | $1,841,000.00 |
| 05/19/2022 | $0.00 | $0.00 | $1,841,000.00 |
| 05/20/2022 | $54,147.06 | $54,147.06 | $1,786,852.94 |
| 05/21/2022 | $54,147.06 | $0.00 | $1,786,852.94 |
| 05/22/2022 | $54,147.06 | $0.00 | $1,786,852.94 |
| 05/23/2022 | $54,147.06 | $0.00 | $1,786,852.94 |
| 05/24/2022 | $54,147.06 | $0.00 | $1,786,852.94 |
| 05/25/2022 | $54,147.06 | $0.00 | $1,786,852.94 |
| 05/26/2022 | $54,147.06 | $0.00 | $1,786,852.94 |
| 05/27/2022 | $108,294.12 | $54,147.06 | $1,732,705.88 |
| 05/28/2022 | $108,294.12 | $0.00 | $1,732,705.88 |
| 05/29/2022 | $108,294.12 | $0.00 | $1,732,705.88 |
| 05/30/2022 | $108,294.12 | $0.00 | $1,732,705.88 |
| 05/31/2022 | $108,294.12 | $0.00 | $1,732,705.88 |
| 06/01/2022 | $108,294.12 | $0.00 | $1,732,705.88 |
| 06/02/2022 | $108,294.12 | $0.00 | $1,732,705.88 |
| 06/03/2022 | $162,441.18 | $54,147.06 | $1,678,558.82 |
| 06/04/2022 | $162,441.18 | $0.00 | $1,678,558.82 |
| 06/05/2022 | $162,441.18 | $0.00 | $1,678,558.82 |
| 06/06/2022 | $162,441.18 | $0.00 | $1,678,558.82 |
| 06/07/2022 | $162,441.18 | $0.00 | $1,678,558.82 |
| 06/08/2022 | $162,441.18 | $0.00 | $1,678,558.82 |
| 06/09/2022 | $162,441.18 | $0.00 | $1,678,558.82 |
| 06/10/2022 | $216,588.24 | $54,147.06 | $1,624,411.76 |
| 06/11/2022 | $216,588.24 | $0.00 | $1,624,411.76 |
| 06/12/2022 | $216,588.24 | $0.00 | $1,624,411.76 |
| 06/13/2022 | $216,588.24 | $0.00 | $1,624,411.76 |
| 06/14/2022 | $216,588.24 | $0.00 | $1,624,706.76 |
| 06/15/2022 | $216,588.24 | $0.00 | $1,624,706.76 |
| 06/16/2022 | $216,588.24 | $0.00 | $1,624,706.76 |
| 06/17/2022 | $270,735.30 | $54,147.06 | $1,570,559.70 |
| 06/18/2022 | $270,735.30 | $0.00 | $1,570,559.70 |

| Date | Total Receipts Collected to Date | Receipts Collected | Receipts Due |
|------|---------------------------------:|-------------------:|-------------:|
| 06/19/2022 | $270,735.30 | $0.00 | $1,570,559.70 |
| 06/20/2022 | $270,735.30 | $0.00 | $1,570,559.70 |
| 06/21/2022 | $270,735.30 | $0.00 | $1,570,559.70 |
| 06/22/2022 | $270,735.30 | $0.00 | $1,570,559.70 |
| 06/23/2022 | $270,735.30 | $0.00 | $1,570,559.70 |
| 06/24/2022 | $324,882.36 | $54,147.06 | $1,516,412.64 |
| 06/25/2022 | $324,882.36 | $0.00 | $1,516,412.64 |
| 06/26/2022 | $324,882.36 | $0.00 | $1,516,412.64 |
| 06/27/2022 | $324,882.36 | $0.00 | $1,516,412.64 |
| 06/28/2022 | $324,882.36 | $0.00 | $1,516,412.64 |
| 06/29/2022 | $324,882.36 | $0.00 | $1,516,412.64 |
| 06/30/2022 | $324,882.36 | $0.00 | $1,516,412.64 |
| 07/01/2022 | $379,029.42 | $54,147.06 | $1,462,265.58 |
| 07/02/2022 | $379,029.42 | $0.00 | $1,462,265.58 |
| 07/03/2022 | $379,029.42 | $0.00 | $1,462,265.58 |
| 07/04/2022 | $379,029.42 | $0.00 | $1,462,265.58 |
| 07/05/2022 | $379,029.42 | $0.00 | $1,462,265.58 |
| 07/06/2022 | $379,029.42 | $0.00 | $1,462,265.58 |
| 07/07/2022 | $379,029.42 | $0.00 | $1,462,265.58 |
| 07/08/2022 | $433,176.48 | $54,147.06 | $1,408,118.52 |
| 07/09/2022 | $433,176.48 | $0.00 | $1,408,118.52 |
| 07/10/2022 | $433,176.48 | $0.00 | $1,408,118.52 |
| 07/11/2022 | $433,176.48 | $0.00 | $1,408,118.52 |
| 07/12/2022 | $433,176.48 | $0.00 | $1,408,118.52 |
| 07/13/2022 | $433,176.48 | $0.00 | $1,408,118.52 |
| 07/14/2022 | $433,176.48 | $0.00 | $1,408,118.52 |
| 07/15/2022 | $487,323.54 | $54,147.06 | $1,353,971.46 |
| 07/16/2022 | $487,323.54 | $0.00 | $1,353,971.46 |
| 07/17/2022 | $487,323.54 | $0.00 | $1,353,971.46 |
| 07/18/2022 | $487,323.54 | $0.00 | $1,353,971.46 |
| 07/19/2022 | $487,323.54 | $0.00 | $1,353,971.46 |
| 07/20/2022 | $487,323.54 | $0.00 | $1,353,971.46 |
| 07/21/2022 | $487,323.54 | $0.00 | $1,353,971.46 |
| 07/22/2022 | $541,470.60 | $54,147.06 | $1,299,824.40 |
| 07/23/2022 | $541,470.60 | $0.00 | $1,299,824.40 |
| 07/24/2022 | $541,470.60 | $0.00 | $1,299,824.40 |
| 07/25/2022 | $541,470.60 | $0.00 | $1,299,824.40 |
| 07/26/2022 | $541,470.60 | $0.00 | $1,299,824.40 |
| 07/27/2022 | $541,470.60 | $0.00 | $1,299,824.40 |
| 07/28/2022 | $541,470.60 | $0.00 | $1,299,824.40 |
| 07/29/2022 | $595,617.66 | $54,147.06 | $1,245,677.34 |
| 07/30/2022 | $595,617.66 | $0.00 | $1,245,677.34 |
| 07/31/2022 | $595,617.66 | $0.00 | $1,245,677.34 |
| 08/01/2022 | $595,617.66 | $0.00 | $1,245,677.34 |

| Date | Total Receipts Collected to Date | Receipts Collected | Receipts Due |
|------|-------------------------------|-------------------|-------------|
| 08/02/2022 | $595,617.66 | $0.00 | $1,245,677.34 |
| 08/03/2022 | $595,617.66 | $0.00 | $1,245,677.34 |
| 08/04/2022 | $595,617.66 | $0.00 | $1,245,677.34 |
| 08/05/2022 | $649,764.72 | $54,147.06 | $1,191,530.28 |
| 08/06/2022 | $649,764.72 | $0.00 | $1,191,530.28 |
| 08/07/2022 | $649,764.72 | $0.00 | $1,191,530.28 |
| 08/08/2022 | $649,764.72 | $0.00 | $1,191,530.28 |
| 08/09/2022 | $649,764.72 | $0.00 | $1,191,530.28 |
| 08/10/2022 | $649,764.72 | $0.00 | $1,191,530.28 |
| 08/11/2022 | $649,764.72 | $0.00 | $1,191,530.28 |
| 08/12/2022 | $703,911.78 | $54,147.06 | $1,137,383.22 |
| 08/13/2022 | $703,911.78 | $0.00 | $1,137,383.22 |
| 08/14/2022 | $703,911.78 | $0.00 | $1,137,383.22 |
| 08/15/2022 | $703,911.78 | $0.00 | $1,137,383.22 |
| 08/16/2022 | $703,911.78 | $0.00 | $1,137,383.22 |
| 08/17/2022 | $703,911.78 | $0.00 | $1,137,383.22 |
| 08/18/2022 | $703,911.78 | $0.00 | $1,137,383.22 |
| 08/19/2022 | $758,058.84 | $54,147.06 | $1,083,236.16 |
| 08/20/2022 | $758,058.84 | $0.00 | $1,083,236.16 |
| 08/21/2022 | $758,058.84 | $0.00 | $1,083,236.16 |
| 08/22/2022 | $758,058.84 | $0.00 | $1,083,236.16 |
| 08/23/2022 | $758,058.84 | $0.00 | $1,083,236.16 |
| 08/24/2022 | $758,058.84 | $0.00 | $1,083,236.16 |
| 08/25/2022 | $758,058.84 | $0.00 | $1,083,236.16 |
| 08/26/2022 | $812,205.90 | $54,147.06 | $1,029,089.10 |
| 08/27/2022 | $812,205.90 | $0.00 | $1,029,089.10 |
| 08/28/2022 | $812,205.90 | $0.00 | $1,029,089.10 |
| 08/29/2022 | $812,205.90 | $0.00 | $1,029,089.10 |
| 08/30/2022 | $812,205.90 | $0.00 | $1,029,089.10 |
| 08/31/2022 | $812,205.90 | $0.00 | $1,029,089.10 |
| 09/01/2022 | $812,205.90 | $0.00 | $1,029,089.10 |
| 09/02/2022 | $866,352.96 | $54,147.06 | $974,942.04 |
| 09/03/2022 | $866,352.96 | $0.00 | $974,942.04 |
| 09/04/2022 | $866,352.96 | $0.00 | $974,942.04 |
| 09/05/2022 | $866,352.96 | $0.00 | $974,942.04 |
| 09/06/2022 | $866,352.96 | $0.00 | $974,942.04 |
| 09/07/2022 | $866,352.96 | $0.00 | $974,942.04 |
| 09/08/2022 | $866,352.96 | $0.00 | $974,942.04 |
| 09/09/2022 | $920,500.02 | $54,147.06 | $920,794.98 |
| 09/10/2022 | $920,500.02 | $0.00 | $920,794.98 |
| 09/11/2022 | $920,500.02 | $0.00 | $920,794.98 |
| 09/12/2022 | $920,500.02 | $0.00 | $920,794.98 |
| 09/13/2022 | $920,500.02 | $0.00 | $920,794.98 |
| 09/14/2022 | $920,500.02 | $0.00 | $920,794.98 |

| Date | Total Receipts Collected to Date | Receipts Collected | Receipts Due |
|---|---|---|---|
| 09/15/2022 | $920,500.02 | $0.00 | $920,794.98 |
| 09/16/2022 | $974,647.08 | $54,147.06 | $866,647.92 |
| 09/17/2022 | $974,647.08 | $0.00 | $866,647.92 |
| 09/18/2022 | $974,647.08 | $0.00 | $866,647.92 |
| 09/19/2022 | $974,647.08 | $0.00 | $866,647.92 |
| 09/20/2022 | $974,647.08 | $0.00 | $866,647.92 |
| 09/21/2022 | $974,647.08 | $0.00 | $866,647.92 |
| 09/22/2022 | $974,647.08 | $0.00 | $866,647.92 |
| 09/23/2022 | $1,028,794.14 | $54,147.06 | $812,500.86 |
| 09/24/2022 | $1,028,794.14 | $0.00 | $812,500.86 |
| 09/25/2022 | $1,028,794.14 | $0.00 | $812,500.86 |
| 09/26/2022 | $1,028,794.14 | $0.00 | $812,500.86 |
| 09/27/2022 | $1,028,794.14 | $0.00 | $812,500.86 |
| 09/28/2022 | $1,028,794.14 | $0.00 | $812,500.86 |
| 09/29/2022 | $1,028,794.14 | $0.00 | $812,500.86 |
| 09/30/2022 | $1,082,941.20 | $54,147.06 | $758,353.80 |
| 10/01/2022 | $1,082,941.20 | $0.00 | $758,353.80 |
| 10/02/2022 | $1,082,941.20 | $0.00 | $758,353.80 |
| 10/03/2022 | $1,082,941.20 | $0.00 | $758,353.80 |
| 10/04/2022 | $1,082,941.20 | $0.00 | $758,353.80 |
| 10/05/2022 | $1,082,941.20 | $0.00 | $758,353.80 |
| 10/06/2022 | $1,082,941.20 | $0.00 | $758,353.80 |
| 10/07/2022 | $1,137,088.26 | $54,147.06 | $704,206.74 |
| 10/08/2022 | $1,137,088.26 | $0.00 | $704,206.74 |
| 10/09/2022 | $1,137,088.26 | $0.00 | $704,206.74 |
| 10/10/2022 | $1,137,088.26 | $0.00 | $704,206.74 |
| 10/11/2022 | $1,137,088.26 | $0.00 | $704,206.74 |
| 10/12/2022 | $1,137,088.26 | $0.00 | $704,206.74 |
| 10/13/2022 | $1,137,088.26 | $0.00 | $704,206.74 |
| 10/14/2022 | $1,191,235.32 | $54,147.06 | $650,059.68 |
| 10/15/2022 | $1,191,235.32 | $0.00 | $650,059.68 |
| 10/16/2022 | $1,191,235.32 | $0.00 | $650,059.68 |
| 10/17/2022 | $1,191,235.32 | $0.00 | $650,059.68 |
| 10/18/2022 | $1,191,235.32 | $0.00 | $650,059.68 |
| 10/19/2022 | $1,191,235.32 | $0.00 | $650,059.68 |
| 10/20/2022 | $1,191,235.32 | $0.00 | $650,059.68 |
| 10/21/2022 | $1,245,382.38 | $54,147.06 | $595,912.62 |
| 10/22/2022 | $1,245,382.38 | $0.00 | $595,912.62 |
| 10/23/2022 | $1,245,382.38 | $0.00 | $595,912.62 |
| 10/24/2022 | $1,245,382.38 | $0.00 | $595,912.62 |
| 10/25/2022 | $1,245,382.38 | $0.00 | $595,912.62 |
| 10/26/2022 | $1,245,382.38 | $0.00 | $595,912.62 |
| 10/27/2022 | $1,245,382.38 | $0.00 | $595,912.62 |
| 10/28/2022 | $1,299,529.44 | $54,147.06 | $541,765.56 |

| Date | Total Receipts Collected to Date | Receipts Collected | Receipts Due |
|---|---|---|---|
| 10/29/2022 | $1,299,529.44 | $0.00 | $541,765.56 |
| 10/30/2022 | $1,299,529.44 | $0.00 | $541,765.56 |
| 10/31/2022 | $1,299,529.44 | $0.00 | $541,765.56 |
| 11/01/2022 | $1,299,529.44 | $0.00 | $541,765.56 |
| 11/02/2022 | $1,299,529.44 | $0.00 | $541,765.56 |
| 11/03/2022 | $1,299,529.44 | $0.00 | $541,765.56 |
| 11/04/2022 | $1,299,529.44 | $0.00 | $541,765.56 |
| 11/05/2022 | $1,299,529.44 | $0.00 | $541,765.56 |
| 11/06/2022 | $1,299,529.44 | $0.00 | $541,765.56 |
| 11/07/2022 | $1,299,529.44 | $0.00 | $541,765.56 |
| 11/08/2022 | $1,299,529.44 | $0.00 | $541,865.56 |
| 11/09/2022 | $1,299,529.44 | $0.00 | $541,865.56 |
| 11/10/2022 | $1,299,529.44 | $0.00 | $541,865.56 |
| 11/11/2022 | $1,299,529.44 | $0.00 | $541,865.56 |
| 11/12/2022 | $1,299,529.44 | $0.00 | $541,865.56 |
| 11/13/2022 | $1,299,529.44 | $0.00 | $541,865.56 |
| 11/14/2022 | $1,299,529.44 | $0.00 | $541,865.56 |
| 11/15/2022 | $1,299,529.44 | $0.00 | $541,865.56 |
| 11/16/2022 | $1,299,529.44 | $0.00 | $541,965.56 |

| Date | Fee Type | Fee Amount |
|---|---|---|
| 06/14/2022 | UCC1 | $295.00 |
| 11/08/2022 | Stop_Payment | $100.00 |
| 11/16/2022 | Stop_Payment | $100.00 |

# Agreement for the Purchase and Sale of Future Receipts

**Seller's Legal Name:** ORBIT ENERGY & POWER LLC        **D/B/A:** ORBIT ENERGY & POWER

**Form of Business Entity:** [ ] Corporation; [x] Limited Liability Company; [ ] Partnership; [ ] Limited Partnership; [ ] Limited Liability Partnership; [ ] Sole Proprietorship; [ ]Other: _____

**Street Address:** 106 MANTUA AVE        , City: MANTUA        , State: NJ    ; Zip: 08051

**Mailing Address:** 106 MANTUA AVE        , City: MANTUA        , State: NJ    ; Zip: 08051

**Primary Contact Name:** SEAN ANGELINI        Title: OWNER

**Federal Tax ID Number:** ▓▓▓▓▓▓▓

**Purchase Price:** $ 450,000.00    **Purchased Amount:** $ 562,500.00    **Average Monthly Sales:** $ 2,977,048.39

**Specified Percentage:** 10%    %  **Origination Fee:** $ 9,000.00    (to be deducted from the Purchase Price)

**Weekly Amount:** $ 14,062.50    (Average Monthly Sales x Specified Percentage / Average Business Days in a Calendar Month)

**Account for the Deposit of All Future Receipts:** Bank: REPUBLIC BANK

Account No: ▓▓▓▓        Account No: _____

Account No: _____    Account No: _____

Effective, _____01/25_____, 20 21    Seller, identified above, hereby sells, assigns and transfers to Global Merchant Cash, Inc., located at 30 Broad Street – 14th Fl., New York, New York 10004 ("Buyer"), without recourse, the Specified Percentage of the proceeds of each future sale made by Seller (collectively "Future Receipts") until Seller has received the Purchased Amount. "Future Receipts" includes all payments made by cash, check, ACH or other electronic transfer, credit card, debit card, bank card, charge card (each such card shall be referred to herein as a "Payment Card") or other form of monetary payment in the ordinary course of Seller's business. As payment for the Purchased Amount, Buyer will deliver to Seller the Purchase Price, shown above, minus any Origination Fee shown above. Seller acknowledges that it has no right to repurchase the Purchased Amount from Buyer.

Both parties agree that the obligation of Buyer under this Agreement will not be effective unless and until Buyer has completed its review of the Seller and has accepted this Agreement by delivering the Purchase Price, minus any Origination Fee. Prior to accepting this Agreement, Buyer may conduct a processing trial to confirm its access to the Account and the ability to withdraw the Initial Weekly Amount. If the processing trial is not completed to the satisfaction of Buyer, Buyer will refund to Seller all funds that were obtained by Buyer during the processing trial.

Initials: *SA*        1        207458v13

**Agreement of Seller:** By signing below Seller agrees to the terms and conditions contained in this Agreement, including those terms and conditions on the following pages, and further agrees that this transaction is for business purposes and not for personal, family, or household purposes.

**FOR THE SELLER (#1)**

By: SEAN ANGELINI _____
    (Print Name and Title)

*DocuSigned by:*
*Sean Angelini*
302F3097103B4C6...
_____ (Signature)

**FOR THE SELLER (#2)**

By: _____
    (Print Name and Title)
_____ (Signature)

**OWNER #1**

By: SEAN ANGELINI _____
    (Print Name and Title)

*DocuSigned by:*
*Sean Angelini*
302F3097103B4C6...
_____ (Signature)

**OWNER #2**

By: _____
    (Print Name and Title)
_____ (Signature)

**GLOBAL MERCHANT CASH, INC.**

By: _____
    (Company Officer)

Sales Associate Name _____ (Signature)

**Agreement of Each Owner:** Each Owner (each, a "Validity Guarantor") signing below agrees to the terms of the Credit Report Authorization below.

SEAN ANGELINI _____
(print name)

*DocuSigned by:*
*Sean Angelini*
302F3097103B4C6...
_____; (Signature)

_____
(print name)
_____ (Signature)

1. **Delivery of Purchased Amount:** Seller must deposit all Future Receipts into the single business banking account specified above, which may not be used for any personal, family or household purposes (the "Account") and must instruct Seller's credit card processor, which must be approved by Buyer (the "Processor") to deposit all Payment Card receipts of Seller into the Account. Seller agrees not to change the Account or add an additional Account without the express written consent of Buyer. Seller authorizes Buyer to debit the Weekly Amount (as such Weekly Amount is adjusted from time to time in accordance with Section 2 hereof) from the Account each business day by either ACH or electronic check. Seller will provide Buyer with all required access codes and agrees not to change them without prior written consent from Buyer. Seller will provide an appropriate ACH authorization to Buyer substantially in the form attached hereto as <u>Exhibit A</u>, provided that such form is acceptable to the Bank at which the Account is maintained. Seller understands that it is responsible for either ensuring that the Weekly Amount is available in the Account each business day or advising Buyer prior to each weekly withdrawal of a shortage of funds. Otherwise, Seller will be responsible for any fees incurred by Buyer resulting from a rejected electronic check or ACH debit attempt, as set forth on <u>Appendix A</u>. Buyer is not responsible for any overdrafts or rejected transactions that may result from Buyer's debiting any amount authorized under the terms of this Agreement. Seller understands that the foregoing ACH

Initials: *SA*

2

authorization is a fundamental condition to induce Buyer to accept the Agreement. Consequently, such authorization is intended to be irrevocable.

2. **Seller May Request Changes to the Weekly Amount:** The initial Weekly Amount is intended to represent the Specified Percentage of Seller's weekly Future Receipts. For as long as no Event of Default has occurred, once each calendar month, Seller may request that Buyer adjust the Weekly Amount to more closely reflect the Seller's actual Future Receipts times the Specified Percentage. Seller agrees to provide Buyer any information requested by Buyer to assist in this reconciliation. No more often than once a month, Buyer may adjust the Weekly Amount on a going-forward basis to more closely reflect the Seller's actual Future Receipts times the Specified Percentage. Buyer will give Seller notice five business days prior to any such adjustment. After each adjustment made pursuant to this paragraph, the new dollar amount shall be deemed the Weekly Amount until any subsequent adjustment.

3. **Weekly Amount Upon Default.** Upon the occurrence of an Event of Default, the Weekly Amount shall equal 100% of all Future Receipts.

4. **Sale of Future Receipts (THIS IS NOT A LOAN):** Seller is selling a portion of a future revenue stream to Buyer at a discount, not borrowing money from Buyer. There is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by Buyer. If Future Receipts are remitted more slowly than Buyer may have anticipated or projected because Seller's business has slowed down, or if the full Purchased Amount is never remitted because Seller's business went bankrupt or otherwise ceased operations in the ordinary course of business, and Seller has not breached this Agreement, Seller would not owe anything to Buyer and would not be in breach of or default under this Agreement. Buyer is buying the Purchased Amount of Future Receipts knowing the risks that Seller's business may slow down or fail, and Buyer assumes these risks based on Seller's representations, warranties and covenants in this Agreement that are designed to give Buyer a reasonable and fair opportunity to receive the benefit of its bargain. By this Agreement, Seller transfers to Buyer full and complete ownership of the Purchased Amount of Future Receipts and Seller retains no legal or equitable interest therein. Seller agrees that it will treat the Purchase Price and Purchased Amount in a manner consistent with a sale in its accounting records and tax returns. Seller agrees that Buyer is entitled to audit Seller's accounting records upon reasonable Notice in order to verify compliance. Seller waives any rights of privacy, confidentiality or taxpayer privilege in any such litigation or arbitration in which Seller asserts that this transaction is anything other than a sale of future receipts.

5. **Power of Attorney.** Seller irrevocably appoints Buyer as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to Buyer from Seller, or in the case of a violation by Seller of this Agreement or the occurrence of an Event of Default under Section 15 hereof by Seller, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Future Receipts; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Seller's name on any invoice, bill of lading, or assignment directing customers or account debtors to direct payables to Buyer; (v) to file any claims or take any action or institute any proceeding which Buyer may deem necessary for the collection of any of the remaining Purchased Amount of the Future Receipts, or otherwise to enforce its rights with respect to delivery of the Purchased Amount; and/or (vi) to contact any Processor of Seller and to direct such Processor(s) to deliver directly to Buyer all or any portion of the amounts received by such Processor(s) and to provide any information regarding Seller requested by Buyer. Each Processor may rely on the previous sentence as written authorization of Seller to provide any information requested by Buyer. Each Processor is hereby irrevocably authorized and directed by Seller to follow any instruction of Buyer without inquiry as to Buyer's right or authority to give such instructions. Seller acknowledges the terms of the preceding sentence and agrees not to (a) interfere with Buyer's instructions or a Processor's compliance with this Agreement or (b) request any modification thereto without Buyer's prior written consent. The Seller also hereby grants to the Buyer full and complete power of attorney over the Account pursuant to which power the Buyer is authorized to withdraw all funds on deposit in such Account, to disburse such funds in the manner set forth herein, and to have access to all information, statements and reports pertaining to the Account, whether issued by the banking institution at which such account is maintained, the Internal Revenue Service, another governmental agency, or otherwise. This authorization may only be revoked with the prior written consent of the Buyer. The Seller hereby acknowledges and agrees that it shall be responsible for any debits that are bounced for any reason including, but not limited to, insufficient funds in the Account. Additionally, Seller shall be responsible for any monthly maintenance fees and any other fees due the bank as a result of maintaining the Account, including, but not limited to, Processor fees. Seller authorizes Buyer to maintain a $50.00 reserve (the "reserve") in the Account at all times, which reserve will initially be built up from the first several batches credited to the Account commencing during the Processing Trial. If at any time during the Agreement, the reserve drops below $50.00, Buyer is authorized to replenish the reserve out of the next credits to the Account in an amount of up to $50.00. In any instance where there are not enough funds

Initials: ___

3

DocuSign Envelope ID: E47E7CCF-568F-435F-AE4D-F8B05696A761

in the reserve or the Account to cover fees or debits, Buyer shall have the right to withdraw these from Seller's Future Receipts that are thereafter deposited into the Account in order to satisfy the debits or fees and rebuild the reserve. Should there be no funds in the Account to cover the fees said fees will be added to the cash advance balance due Buyer.

6. **Fees and Charges:** Other than the Origination Fee, if any, set forth above, Buyer is NOT CHARGING ANY ORIGINATION OR BROKER FEES to Seller. If Seller is charged another such fee, it is not being charged by Buyer. A list of all fees and charges applicable under this Agreement is contained in Appendix A.

7. **Credit Report and Other Authorizations:** Seller and each of the Owners signing above authorize Buyer, its agents and representatives, and any credit reporting agency engaged by Buyer, to (i) investigate any references given or any other statements or data obtained from or about Seller or any of its Owners for the purpose of this Agreement, (ii) obtain consumer and business credit reports on the Seller and any of its Owners, and (iii) to contact personal and business references provided by the Seller in the Application, at any time now or for so long as Seller and/or Owners continue to have any obligation owed to Buyer as a consequence of this Agreement or for Buyer's ability to determine Seller's eligibility to enter into any future agreement with Buyer.

8. **Authorization to Contact Current and Prior Banks:** Seller hereby authorizes Buyer to contact any current or prior bank of the Seller in order to obtain whatever information it may require regarding Seller's transactions with any such bank. Such information may include but is not limited to, information necessary to verify the amount of Future Receipts previously processed on behalf of Seller and any fees that may have been charged by the bank. In addition, Seller authorizes Buyer to contact any current or prior bank of the Seller for collections and in order to confirm that Seller is exclusively using the Account identified above, or any other account approved by Buyer, for the deposit of all business receipts.

9. **Financial Information**. Seller authorizes Buyer and its agents to investigate its financial responsibility and history, and will promptly provide to Buyer any authorizations, bank or financial statements, tax returns, etc., as Buyer deems necessary in its sole discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed acceptable as an authorization for release of financial and credit information. Buyer is authorized to update such information and financial and credit profiles from time to time as it deems appropriate. Seller waives, to the maximum extent permitted by law, any claim for damages against Buyer or any of its affiliates relating to any investigation undertaken by or on behalf of Buyer as permitted by this Agreement or disclosure of information as permitted by this Agreement.

10. **Transactional History**. Seller authorizes all of its banks and brokers and Payment Card processors to provide Buyer with Seller's banking, brokerage and/or processing history to determine qualification or continuation in this program, or for collections upon an Event of Default.

11. **Publicity**. Seller hereby authorizes Buyer to use its name in listings of clients and in advertising and marketing materials.

12. **Application of Amounts Received by Buyer.** Buyer reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to Buyer from Seller prior to applying such amounts to reduce the amount of any outstanding Purchased Amount.

13. **Representations, Warranties and Covenants of Seller:**

   13.1. **Good Faith, Best Efforts and Due Diligence**. Seller will conduct its business in good faith and will use its best efforts to continue its business at least at its current level, to ensure that Buyer obtains the Purchased Amount.

   13.2. **Stacking Prohibited**. Seller shall not enter into any Seller cash advance or any loan agreement that relates to or involves its Future Receipts with any party other than Buyer for the duration of this Agreement without the express prior written consent of Buyer.   Breach of this covenant will result in default, in which event Seller will be immediately be liable for the full balance owed to Buyer plus a default fee of $2,500 or 25% of the amount sold, whichever is greater. Buyer may share information regarding this Agreement with any third party in order to determine whether Seller is in compliance with this provision.

   13.3. **Financial Condition and Financial Information**. Any bank statements and financial statements of Seller that have been furnished to Buyer, and future statements that will be furnished to Buyer, fairly represent the financial condition of Seller at such dates, and Seller will notify Buyer immediately if there are material adverse changes, financial or otherwise, in the

Initials:

4

DocuSign Envelope ID: E47E7CCF-568F-425F-AE4D-F8B05696A761

condition or operation of Seller or any change in the ownership of Seller. Buyer may request statements at any time during the performance of this Agreement and the Seller shall provide them to Buyer within five business days. Furthermore, Seller represents that all documents, forms and recorded interviews provided to or with Buyer are true, accurate and complete in all respects, and accurately reflect Seller's financial condition and results of operations. Seller further agrees to authorize the release of any past or future tax returns to Seller.

13.4.    **Governmental Approvals**. Seller is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

13.5.    **Authority to Enter Into This Agreement**. Seller and the person(s) signing this Agreement on behalf of Seller, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

13.6.    **Change of Name or Location or Sale or Closing of Business**. Seller will not conduct Seller's businesses under any name other than as disclosed to Buyer or change any of its places of business without prior written consent of Buyer. Seller will not sell, dispose, transfer or otherwise convey all or substantially all of its business or assets without (i) the express prior written consent of Buyer, and (ii) the written agreement of any purchaser or transferee assuming all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Buyer. Except as disclosed to Buyer in writing, Seller has no current plans to close its business either temporarily, whether for renovations, repairs or any other purpose, or permanently. Seller agrees that until Buyer has received all of the Purchased Amount Seller will not voluntarily close its business on a temporarily basis for renovations, repairs, or any other purposes. This provision, however, does not prohibit Seller from closing its business temporarily if such closing is required to conduct renovations or repairs that are required by local ordinance or other legal order, such as from a health or fire inspector, or if otherwise forced to do so by circumstances outside of the control of Seller. Prior to any such closure, Seller will provide Buyer ten business days' notice to the extent practicable.

13.7.    **Lease Effectiveness.**  Seller agrees that by signing this Agreement, it is agreeing to take all steps necessary to maintain in full force and effect and not terminate its lease, or vacate the current premises at the address listed in this Agreement before the Buyer is paid back in full.  If Seller intends to vacate, actually vacates or if landlord requires Seller to vacate before it has completed the payback to Buyer, then Seller and its principals shall provide Buyer with prompt notice thereof, and they shall be personally, jointly and severally liable for the outstanding balance.

13.8.    **No Change of Control.**  Seller shall not undertake any transaction involving the sale, transfer or other conveyance of the Seller's business or its assets, either by an issuance, sale or transfer of ownership interests in the business that results in a change in ownership or voting control of the Seller's business, or by a sale or transfer of substantially all of the assets of the business without the express prior written consent of the Buyer;

13.9.    **No Pending or Contemplated Bankruptcy.** As of the date Seller executes this Agreement, Seller is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Seller. Seller represents that it has not consulted with a bankruptcy attorney within six months prior to the date of this Agreement. Seller further warrants that it does not anticipate filing a bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

13.10.    **Seller to Maintain Insurance.** Seller will possess and maintain insurance in such amounts and against such risks as are necessary to protect its business and will provide proof of such insurance to Buyer upon demand.

13.11.    **Seller to Pay Taxes Promptly.** Seller will promptly pay all necessary taxes, including but not limited to employment and sales and use taxes.

13.12.    **Seller to Maintain Sufficient Funds on Deposit in the Account.**  The Seller shall maintain funds in the Account at all times in an amount that is sufficient to pay the Specified Percentage, any monthly maintenance fees and any other fees due the bank as a result of maintaining the Account, including, but not limited to, Processor fees, and the $50 reserve.

13.13.    **No Violation of Prior Agreements.** Seller's execution and performance of this Agreement will not conflict with any other agreement, obligation, promise, court order, administrative order or decree, law or regulation to which Seller is subject, including any agreement the prohibits the sale or pledge of Seller's future receipts.

Initials:

5

13.14. **No Diversion of Receipts; No Stop Payment.** Seller will not permit any event to occur that could cause a diversion of any of Seller's Future Receipts from the Account to any other entity, and Seller shall not attempt to place a Stop Payment on any debit by Buyer of the Specified Percentage or any other fees due to Buyer hereunder.

13.15. **No Payment Default.** Neither the Seller, nor any of its affiliates, is in default of any of its payment obligations under any agreement or instrument to the Buyer or any third party to which it is a party, nor is any third party attempting to collect funds from the Seller or any of its affiliates.

13.16. **Seller's Knowledge and Representation.** Seller represents warrants and agrees that it is a sophisticated business entity familiar with the kind of transaction covered by the Agreement; it was represented by counsel or had full opportunity to consult with counsel.

13.17. **No Fraud.** Seller shall not commit fraud.

**14. Rights of Buyer:**

14.1. **Financing Statements and Security Interest.** As security for Buyer's obligations hereunder, and under any other agreement between Buyer, on the one hand, and Seller or any affiliate of seller, on the other hand, Seller grants Buyer and/or its assignees or designees, if any, a continuing security interest, in the following property of the Seller: a security interest in all of (a) all of Seller's now owned and hereafter acquired accounts (including, without limitation, the Account), contract rights, chattel paper, tax refunds, documents, licenses, equipment, furniture, fixtures, general intangibles, instruments and inventory, wherever located, now or hereafter owned or acquired by the Seller; (b) all intellectual property including, without limitation, patents, trademarks and copyrights, trade names, service marks, logos and other sources of business identifiers (and applications for all of the foregoing), and all registrations, recordings and applications with the U.S. Patent and Trademark Office and all renewals, reissues and extensions thereof (collectively "Trademarks") whether now owned or hereafter acquired, together with any written agreements granting any right to use any Trademarks; and (c) all proceeds, as that term is defined in Article 9 of the Uniform Commercial Code ("UCC") (all such security interests, the "Collateral"). Wherever the term, "accounts receivable" appears herein, it shall have the same meaning as the term, "account", as defined under Section 9-101(a)(2) of Article 9 of the UCC. The security interest granted by Seller includes all accessions, attachments, accessories, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof, all proceeds of proceeds, and all records and data relating thereto.  Seller authorizes Buyer to file one or more UCC-1 forms consistent with the Uniform Commercial Code ("UCC") in order to give notice of this security interest, to give notice that the Purchased Amount of Future Receipts is the sole property of Buyer, and to give notice of Buyer's security interest in the assets of Seller, and/or any affiliate of Seller, which arise out of any agreement entered into between any or all of them and Buyer. The UCC filing may state that such sale is intended to be a sale and not an assignment for security and may state that the Seller is prohibited from obtaining any financing that impairs the value of the Future Receipts or Buyer's right to collect same.  Seller authorizes Buyer to debit the Account for all costs incurred by Buyer associated with the filing, amendment or termination of any UCC filings.

14.2. **Additional Collateral.**  As further security to secure Validity Guarantor's payment and performance obligations to Buyer under the Guaranty, the Validity Guarantor hereby grants Buyer a security interest in _____

ORBIT 67 MAIN LLC
_____

(the "Additional Collateral").  Validity Guarantor understands that Buyer will have a security interest in the aforesaid Additional Collateral upon execution of this Agreement.

Merchant and Validity Guarantor each acknowledge and agree that any security interest granted to Buyer under any other agreement between Merchant or Validity Guarantor and Buyer (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement.



Initials:

Merchant and Validity Guarantor each agrees to execute any documents or take any action in connection with this Agreement as Buyer deems necessary to perfect or maintain Buyer's first priority security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements. Merchant and Validity Guarantor each hereby authorizes Buyer to file any financing statements deemed necessary by Buyer to perfect or maintain Buyer's security interest, which financing statement may contain notification that Merchant and/or Validity Guarantor have granted a negative pledge to Buyer with respect to Collateral and Additional Collateral, and that any subsequent lienor may be tortuously interfering the Buyer's rights.  Merchant and Validity Guarantor shall be liable for, and Buyer may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by Buyer in protecting, preserving and enforcing Buyer's security interest and rights.

14.3.  **Negative Pledge**.  Merchant and Validity Guarantor each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

14.4.  **Right of Access.** In order to ensure that Seller is complying with the terms of this Agreement, Buyer shall have the right to (i) enter, without notice, the premises of Seller's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and or batch Seller's weekly receipts to the Processor and to ensure that Seller has not violated any other provision of this Agreement, and (ii) Seller shall provide access to its employees and records and all other items as requested by Buyer, and (iii) have Seller provide information about its business operations, banking relationships, vendors, landlord and other information to allow Buyer to interview any relevant parties.

14.5. **Recording, and Solicitations; Monitoring.**

(i)  <u>Authorization to Contact Seller by Phone; Monitoring</u>. Seller agrees that (i) it has an established business relationship with Buyer, its employees and agents and that Seller may be contacted from time-to-time regarding this or other business transactions; and (ii) that such communications and contacts are not unsolicited or inconvenient.   Seller authorizes Buyer, its affiliates, agents and independent contractors to contact Seller at any telephone number Seller provides to Buyer or from which Seller places a call to Buyer, or any telephone number where Buyer believes it may reach Seller, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Seller incurs charges for receiving such communications.  Seller further agrees that any such call between Buyer and Seller, and their agents and employees may be recorded or monitored.

(ii)  <u>Authorization to Contact Seller by Other Means</u>. Seller also agree that Buyer, its affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Seller. Seller expressly consents to conduct business by electronic means.

15.  **Events of Default**. The occurrence of any of the following events shall constitute an "Event of Default": (a) Seller interferes with Buyer's right to collect the Weekly Amount; (b) Seller violates any representation, warranty or covenant in this Agreement; (c) Seller uses multiple depository accounts other than the Account without the prior written consent of Buyer; (d) Seller changes its Account or its Processor without the prior written consent of Buyer; or (e) Seller fails to provide timely notice to Buyer such that in any given calendar month there are two or more ACH transactions attempted by Buyer are rejected by Seller's bank, or six or more ACH transactions attempted by Buyer are rejected by Seller's bank over any three month period.

16.  **Remedies**. If any Event of Default occurs, Buyer may proceed to protect and enforce its rights including, but not limited to, the following:

16.1.  The Specified Percentage shall equal 100%. The full uncollected Purchased Amount due under this Agreement will become due and payable in full immediately.

16.2. Buyer shall be entitled to recover from Seller all "Costs of Collection" which means any and all expenses and costs,

including attorneys' fees and court or arbitration costs, incurred by Buyer in connection with the defense, protection or enforcement of Buyer's rights under this Agreement (including, without limitation, in connection with any bankruptcy proceeding).

16.3.   Buyer may exercise any and all remedies available under Article 9 of the Uniform Commercial Code of any applicable jurisdiction as a secured creditor as it applies to the sale of accounts.

16.4.   Buyer may rescind this Agreement in its entirety, in which case Buyer shall be entitled to all remedies accorded to a party that successfully enforces a judicial rescission remedy.

16.5.   In addition to the foregoing, in the event of Seller's breach of any of the representations, warranties or covenants set forth in this Agreement, Seller agrees that Buyer shall be entitled to, but not limited to, damages equal to the amount by which the cash attributable to the Purchased Amount exceeds the amount of collections received by Buyer from Future Receipts.   The Seller hereby agrees that the Buyer may automatically debit such damages from Seller's depository accounts wherever situated, including the Account, via ACH debit or wire transfer.   Seller acknowledges that, in the event of a default by any Validity Guarantor, Validity Guarantors agree that Buyer may report such default to one or more credit bureaus.

16.6.   Buyer may enforce the provisions of the Validity Guaranty against each Validity Guarantor.

16.7.   Buyer may proceed to protect and enforce its rights and remedies by arbitration or lawsuit. In any such arbitration or lawsuit, under which Buyer shall recover Judgment against Seller, Seller shall be liable for all of Buyer's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs. However, the rights of Buyer under this provision shall be limited as provided in the arbitration provision set forth below.

16.8.   Buyer may debit Seller's depository accounts wherever situated by means of ACH debit or email or facsimile signature on a computer-generated check drawn on Seller's bank account or otherwise for all sums due to Buyer (including, without limitation, all Costs of Collection).

16.9. Buyer shall otherwise be entitled to all remedies available to it under law including, without limitation, the right to non-judicial foreclosure.

16.10. All rights, powers and remedies of Buyer in connection with this Agreement may be exercised at any time by Buyer after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

17.   **Modifications; Agreements**. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by Buyer.

18.   **Assignment by Buyer**. Buyer may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part, with or without prior written notice to Seller.

19.   **Notices**.

19.1. Notices from Buyer to Seller. Buyer may send any notices, disclosures, terms and conditions, other documents, and any future changes to Seller by regular mail or by e-mail, at Buyer's option and Seller consents to such electronic delivery. Notices sent by e-mail are effective when sent. Notices sent by regular mail become effective upon mailing to Seller's address set forth in this Agreement.

19.2. Notices from Seller to Buyer. Seller may send any notices to Buyer by e-mail only upon the prior written consent of Buyer, which consent may be withheld or revoked at any time in Buyer's sole discretion. Otherwise, any notices or other communications from Seller to Buyer must be delivered by certified mail, return receipt requested, to Buyer's address set forth in this Agreement. Notices sent to Buyer shall become effective only upon receipt by Buyer.

20.   **Survival of Representation, etc**. All representations, warranties and covenants herein shall survive the execution and delivery of

Initials: SA

8

this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full.

21. **Interpretation**. All Parties hereto have reviewed this Agreement with an attorney of their own choosing and have relied only on their own attorney's guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

22. **No Waiver.** There shall be effected no waiver by failure on the part of Buyer to exercise, or delay in exercising, any right under this Agreement, nor shall any single or partial exercise by Buyer of any right under this Agreement preclude any other future exercise of any right, The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

23. **Entire Agreement and Severability**. This Agreement embodies the entire agreement between Seller and Buyer and supersedes all prior agreements and understandings relating to the subject matter hereof. In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

24. **Email or Facsimile Acceptance**. Email or facsimile signatures hereon, or other electronic means reflecting the party's signature hereto, shall be deemed acceptable for all purposes as if they were originally executed signatures.

25. **Confidentiality**: The terms and conditions of this Agreement are proprietary and confidential unless required by law. Seller shall not disclose this information to anyone other than its attorney, accountant or similar service provider and then only to the extent such person uses the information solely for purpose of advising Seller and first agrees in writing to be bound by the terms of this Section. A breach entitles Buyer to damages and legal fees as well as temporary restraining order and preliminary injunction without bond.

26. **Further Assurances.** Seller agrees that it shall, from time to time, promptly execute and deliver all instruments and documents, and take all further action, that may be necessary or appropriate, or that Buyer may request, to perfect against Seller and all third parties the sale of the Specified Percentage of Future Receipts hereunder or to enable Buyer to exercise and enforce its rights and remedies hereunder.

27. **Binding Effect; No Assignment by Seller.** This Agreement shall be binding upon and inure to the benefit of Seller, Buyer and their respective successors and assigns, except that Seller shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Buyer which consent may be withheld in Buyer's sole discretion.

28. **Counterparts and Electronic Signatures.** This Agreement may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement. Facsimile signatures or electronic signatures shall be deemed to be original signatures and each party hereto may rely on a facsimile signature or an electronic signature as an original for purposes of enforcing this Agreement. The words "execution," "signed," "signature," and words of like import in this Agreement and any amendments thereof shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

29. **Governing Law.**  THIS AGREEMENT AND ALL TRANSACTIONS IT CONTEMPLATES, INCLUDING ALL ISSUES CONCERNING THE VALIDITY OF THE AGREEMENT AND ANY TRANSACTIONS IT CONTEMPLATES, THE CONSTRUCTION OF ITS TERMS, AND THE INTERPRETATION, PERFORMANCE AND ENFORCEMENT OF THE RIGHTS AND DUTIES OF THE PARTIES SHALL BE GOVERNED BY AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS THAT WOULD REQUIRE THE APPLICATION OF ANY OTHER LAW. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE PARTIES AGREE THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN THE ENTIRE RELATIONSHIP BETWEEN AND AMONG THE PARTIES, INCLUDING WITHOUT LIMITATION, ALL ISSUES OR CLAIMS ARISING OUT OF, RELATING TO, IN CONNECTION WITH, OR INCIDENT TO THIS AGREEMENT AND ANY TRANSACTIONS IT CONTEMPLATES, WHETHER SUCH CLAIMS ARE BASED IN TORT, CONTRACT, OR ARISE UNDER STATUTE OR IN EQUITY. AS USED HEREIN, THE PHRASE "LAWS OF THE STATE OF NEW YORK" INCLUDES NEW YORK LAW WITH RESPECT TO, AMONG OTHER THINGS, ANY APPLICABLE STATUTE OF LIMITATIONS, LACHES, OR SIMILAR TIME- BASED DEFENSE. THE PARTIES ACKNOWLEDGE AND AGREE THAT THIS AGREEMENT IS MADE AND PERFORMED IN THE STATE OF NEW YORK.

Initials: _SA_

9

30. **Jurisdiction.** Seller and Validity Guarantor(s) further irrevocably and unconditionally consent and submit to the jurisdiction of any state or federal court sitting in the County of New York, State of New York, to resolve any suit, action, controversy, or proceeding of any kind (whether in contract, tort, statute, equity or otherwise) between or among the Parties, arising out of, related to, in connection with, or incident to this Agreement or any of the transactions it contemplates. Seller and Validity Guarantor(s) hereby agree that any of the above-named courts shall be a convenient forum for any such suit, action, controversy, or proceeding of any kind between or among the Parties, arising out of, related to, in connection with, or incident to this Agreement or any of the transactions it contemplates. Seller and Validity Guarantor(s) waive, to the fullest extent permitted by law, (i) any objection that Seller or Validity Guarantor(s) may now or later have to the laying of venue of any suit, action, controversy, or proceeding arising out of, relating to, in connection with, or incident to this Agreement or any of the transactions it contemplates in any of the above- named courts, (ii) any objection to personal jurisdiction applying in any such court, and (iii) any claim that any such suit, action, controversy or proceeding brought in any such court has been brought in an inconvenient forum. Seller and Validity Guarantor(s) agree that service of process in any such suit, action, controversy, or proceeding may be served on any of them by mailing or delivering a copy of the process to any of the addresses set forth in this Agreement or any other address Seller or Validity Guarantor(s) has provided to Buyer.  Nothing set forth in this Section affects the right to serve process in any other manner permitted by law.

31. **Arbitration Agreement; Class Action Waiver.** This Arbitration Clause is an agreement between Seller, Validity Guarantors and Buyer to arbitrate disputes.  "Disputes" is deemed to have the broadest possible meaning, and includes, without limitation, any and all disputes, claims or controversies, in law and in equity, between Seller and/or Validity Guarantors on the one hand, and Buyer on the other hand, arising out of or relating to this Agreement and/or (i) any claims of breach of contract, tort, misrepresentation, conversion, fraud, or unfair and deceptive trade practices, or (ii) any claim of a violation of any local, state or federal statute, regulation or ordinance, etc.  At the request of either Seller and Validity Guarantor(s), on the one hand, or Buyer, on the other hand, any Dispute shall be settled exclusively and finally by arbitration conducted in the County of New York, State of New York under the commercial arbitration rules of the Commercial Panel of the American Arbitration Association (the "AAA"), such arbitration to apply the laws of the State of New York (without giving effect to conflict of laws principles). The Parties agree that, once any of them has elected to arbitrate, binding arbitration is the exclusive method for resolving any and all Disputes, and that, under this Arbitration Clause, all Parties are waving the right to a jury trial and the right to bring or participate in any class action in court or through arbitration (this is referred to below as the "Class Action Waiver").  Seller, Validity Guarantor(s) and Buyer hereby agree that the above-named forum shall be a convenient forum for any such arbitration proceeding or other controversy arising out of, related to, in connection with, or incident to this Agreement or any of the transactions it contemplates. Seller, Validity Guarantor(s) and Buyer waive, to the fullest extent permitted by law, (i) any objection that they may now or later have to such laying of venue, (ii) any objection to personal jurisdiction applying in any such venue, and (iii) any claim that any such arbitration proceeding or other controversy brought in such venue has been brought in an inconvenient forum.

The arbitrator at such arbitration shall not be entitled to award punitive damages to any Party, and the costs and fees of such arbitration shall be borne by the losing Party. The Parties hereto acknowledge and agree that no class arbitration or other representative action may be undertaken or participating in by the arbitrators. The Parties shall jointly agree upon an AAA arbitrator or, if they cannot agree, the AAA shall select a neutral arbitrator from the AAA's Commercial Panel.  The arbitration award shall be in writing, but without a supporting opinion unless such an opinion is requested by a Party.

Nothing in this Arbitration Clause shall be deemed to limit the right of Buyer (a) to exercise self-help remedies such as, without limitation, setoff, (b) to foreclose against any real or personal property collateral, or (c) to obtain from a court provisional or ancillary remedies such as, without limitation, injunctive relief, writ of possession or the appointment of a receiver.  Buyer may exercise such self-help rights, foreclose upon such property, or obtain such provisional or ancillary remedies before, during or after the pendency of any arbitration proceeding brought pursuant to this Agreement.  Neither this exercise of self-help remedies, nor the institution or maintenance of an action for foreclosure or provisional ancillary remedies, shall constitute a waiver of the right of any Party, including the claimant in any such action, to arbitrate the merits of the controversy or claim which prompted Buyer to resort to such remedies.

If a Party to this Agreement seeks to initiate arbitration, and another Party hereto refuses to arbitrate, the Party seeking to initiate arbitration may seek a court order enforcing this provision under which Buyer, Seller and Validity Guarantor(s) have agreed to arbitrate.  In such event, the court shall determine any issues regarding the enforceability of this Arbitration Clause, including the validity and effect of the Class Action Waiver, but all other issues shall be decided by the arbitrator.  If any Party fails to arbitrate as required under this Arbitration Clause, the Party electing arbitration shall, unless prohibited by applicable law, be entitled to recover its/their attorneys' fees and costs incurred in compelling the other Party to arbitrate the Dispute.  All statutes

of limitation that otherwise would apply to an action brought in court will apply in arbitration.

The Parties acknowledge and agree that the Federal Arbitration Act (9 U.S.C. § 1 et seq.) shall govern any arbitration under this Arbitration Clause.

If any part of this Arbitration Clause conflicts with the terms of any other document or agreement between the Parties or the rules of the AAA, the terms of this Arbitration Clause shall govern.  If any part of this Arbitration Clause other than the Class Action Waiver shall be deemed or found unenforceable for any reason, the remainder of the Arbitration Clause shall remain enforceable.  If the Class Action Waiver shall be deemed or found unenforceable for any reason, the remainder of the Arbitration Clause shall be unenforceable.

The Parties agree that the mutual promises in this Arbitration Clause constitute the consideration necessary to make this Arbitration Clause enforceable even if the Parties do not enter into any further agreements.  This Arbitration Clause shall survive the termination, rescission or payment in full of this Agreement.

Seller and the Validity Guarantor(s) may opt out of this Arbitration Clause by notifying Buyer in writing of their intent to do so. Such election to opt out must be mailed by first class mail postmarked no later than ten (10) days from the date of this Agreement and addressed to Buyer at:

> GLOBAL MERCHANT CASH, INC.
> 30 Broad Street – 14th Fl.
> New York, New York 10004

If more than one Seller and/or Validity Guarantor is a Party to this Agreement, all such Sellers and Validity Guarantors must elect arbitration or elect to opt out in order for the arbitration election or the opt out election to be effective.

32. **LIMITATION OF LIABILITY.**  SELLER AGREES THAT, REGARDLESS OF ANY CLAIMS SELLER MAY HAVE AGAINST BUYER, SELLER'S SOLE REMEDY WILL BE AN ACTION AT LAW FOR ACTUAL MONEY DAMAGES THAT WILL NOT EXCEED THE GREATER OF (I) THE AMOUNT OF FUNDS OVERPAID TO BUYER OR (II) $1,000, AND THAT SELLER WILL NOT BE ENTITLED TO, AND HEREBY WAIVES ANY AND ALL CLAIMS FOR, PUNITIVE, EXEMPLARY, CONSEQUENTIAL, LOST PROFITS, STATUTORY, OR SPECIAL DAMAGES OF ANY KIND.  IF SELLER FILES AN ACTION AGAINST BUYER AND THE MATTER IS DISMISSED OR BUYER PREVAILS IN THE MATTER, SELLER AGREES TO PAY ALL OF BUYER'S ATTORNEYS' FEES AND COSTS INCURRED IN THE MATTER, WHETHER IN COURT OR ARBITRATION.

33. **SERVICE OF PROCESS.** IN ADDITION TO THE METHODS OF SERVICE ALLOWED BY THE NEW YORK STATE CIVIL PRACTICE LAW & RULES ("CPLR"), SELLER HEREBY CONSENTS TO SERVICE OF PROCESS UPON IT BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, SERVICE HEREUNDER SHALL BE COMPLETE UPON SELLER'S ACTUAL RECEIPT OF PROCESS OR UPON BUYER'S RECEIPT OF THE RETURN THEREOF BY THE UNITED STATES POSTAL SERVICE AS REFUSED OR UNDELIVERABLE. SELLER MUST PROMPTLY NOTIFY BUYER, IN WRITING, OF EACH AND EVERY CHANGE OF ADDRESS TO WHICH SERVICE OF PROCESS CAN BE MADE. SERVICE BY BUYER TO THE LAST KNOWN ADDRESS SHALL BE SUFFICIENT. SELLER WILL HAVE (30) CALENDAR DAYS AFTER SERVICE HEREUNDER IS COMPLETE IN WHICH TO RESPOND. FURTHERMORE, SELLER EXPRESSLY CONSENTS THAT ANY AND ALL NOTICE(S), DEMAND(S), REQUEST(S) OR OTHER COMMUNICATION(S) UNDER AND PURSUANT TO THIS AGREEMENT FOR THE PURCHASE AND SALE OF FUTURE RECEIVABLES SHALL BE DELIVERED IN ACCORDANCE WITH THE PROVISIONS OF THIS AGREEMENT FOR THE PURCHASE AND SALE OF FUTURE RECEIVABLES.

34. **Indemnity.** Seller hereby indemnifies, defends and holds Buyer harmless from and against any and all direct and third-party suits, costs, causes of action, judgments, complaints, orders, and claims including, without limitation, reasonable attorneys' fees (each a "Claim") arising from or relating to any claim that Seller has breached this Agreement or that any representation, warranty, or statement Seller has made is not accurate in any respect.  Buyer shall notify Seller of any claim for indemnity hereunder, select counsel of Buyer's choice and Seller shall promptly pay all defense costs and satisfy any judgments. Buyer shall not settle any Claims that require Seller's payment of funds to any third party without Seller's approval, which approval shall not be unreasonably withheld or delayed.

35. **Validity Guaranty; Confession of Judgment.**  In consideration of the Buyer entering into this Agreement, and in order to induce the Buyer to enter into this Agreement, each of the undersigned Seller and principal(s) of Seller (such principals, whether officers, shareholders, partners, other owners or others are referred to herein as the "Validity Guarantors"), hereby personally assumes and, jointly and severally, guarantees, the truth, accuracy and completeness of all of the Seller's the representations, warranties and covenants set forth in this Agreement (collectively, the "Guaranteed Obligations").  In such instance, Validity Guarantors shall perform under this Agreement, including, without limitation, paying, or causing to be paid, any amounts that Buyer would otherwise be entitled to collect from Seller under the terms of this Agreement, immediately, upon notice from Buyer describing Seller's violation(s) of the representations, warranties and/or covenants set forth in this Agreement in summary form.  Validity Guarantors' joint and several obligation to perform includes, without limitation, upon Seller's breach of any representation, warranty and/or covenant, Buyer's right to damages equal to the amount by which the cash attributable to the Purchased Amount exceeds the amount of collections received by Buyer from Receivables pursuant to Section 16 of the Agreement, without any presentment or demand made by the Buyer. In the event of a default by any Validity Guarantor, each Validity Guarantor agrees that Buyer may report such default to one or more credit bureaus.  Each Validity Guarantor acknowledges that it will directly benefit from Buyer and Seller entering into the Purchase Agreement.

This Guaranty shall be a guarantee of performance of Seller's representations, warranties and covenants, and not a guarantee of collection.  Validity Guarantors hereby waive demand of payment, notice and presentment, and agree that Buyer may proceed to enforce its rights against each Validity Guarantor or any other guarantor of Seller's obligations from time to time, prior to, contemporaneously with or after any enforcement against Seller, or without any enforcement against Seller.  The obligations of Validity Guarantors are unconditional, absolute and irrevocable, and shall remain in full force and effect and without regard to, and shall not be released, discharged or in any way affected by, (a) any amendment to this Agreement; (b) any exercise or non-exercise of or delay in exercising any right, remedy, power or privilege under or in respect of this Agreement; (c) any bankruptcy, insolvency, arrangement, composition, assignment for the benefit of creditors, or similar proceeding commenced by or against the Seller or any of its officers, directors or principals; (d) defects in the formation or authority of Seller; or (e) any other circumstance that might otherwise constitute a legal or equitable discharge of a guarantor or surety.  Validity Guarantors each further jointly and severally guarantee payment of all costs, expenses and attorneys' fees and disbursements which may be incurred by Buyer in connection with the Guaranteed Obligations, or any Validity Guarantor's default of its obligations under this Agreement.  If payment of any sum by Seller is recovered as a preference of fraudulent conveyance under any bankruptcy or insolvency law, the liability of Validity Guarantors under this Guaranty shall continue and remain in full force and effect notwithstanding such recovery.

Each Validity Guarantor authorizes, acknowledges and agrees that, in connection with the execution of this Agreement, investigative and/or consumer reports may be obtained with respect to the Seller and Validity Guarantor(s). The reports Buyer obtains may include, but are not limited to, the Seller's or Validity Guarantors' respective credit histories or similar characteristics, employment and education verifications, social security verification, criminal and civil history, Department of Motor Vehicle records, any other public records, and any other information bearing on credit standing or credit capacity. Accordingly, each Validity Guarantor authorizes the Buyer, its agents and representatives and any credit reporting agency employed by the Buyer to investigate any references given or any other statements of data obtained from or about the Seller or any of its principals for the purpose of this Agreement and to obtain credit reports at any time now or in the future with respect to the Validity Guarantors. The Validity Guarantors to this Agreement are hereby notified that a negative credit report reflected on his/her credit record may be submitted to a credit reporting agency if the provisions of this Guaranty are triggered by a violation by the Seller.

In the Buyer's sole discretion, as security for the payments to be made hereinabove, the Seller and each of the Validity Guarantors shall duly execute and deliver to the Buyer an Affidavit of Confession of Judgment in form satisfactory to Buyer in the amount of $ 562,500.00 , with interest at nine (9%) percent per annum, plus expenses, costs and attorneys' fees as specified therein.  The Confession of Judgment shall be held by Buyer, and, if Seller breaches any of the representations, warranties and/or covenants given by Seller under the Agreement, Buyer, without notice to the Seller or the Validity Guarantors, is authorized to file the Confession of Judgment in the Court and to take the necessary steps to enter judgment against the Seller and the Validity Guarantors pursuant to the terms of the Confession of Judgment.  The Seller and the Validity Guarantors each hereby waive and surrender any and all procedural and substantive rights or defenses, including, but not limited to, claims, counterclaims, setoffs, demands or discharges, to the entry of the Confession of Judgment, except with respect to establishing that a default did not occur or that notice was not given in accordance with the Agreement.  Without limiting the generality of the foregoing, the Seller and the Validity Guarantors shall not assert, raise, plead or enforce against Buyer any defense of waiver, release, res judicata, statue of fraud, anti-deficiency statute, fraud, incapacity, minority, usury, illegality or unenforceability which may be available to the Seller and the Validity Guarantors or any other person or entity liable in respect of any or all of the obligations under this

Initials: _____

12

Agreement, or any setoff available against Buyer to the Validity Guarantors or any other such person, or entity whether or not on account of a related transaction.  Seller and Validity Guarantors shall also not assert, raise, plead or enforce against Buyer any time-based defenses, including, but not limited to, laches or any applicable statute of limitations, and Seller and Validity Guarantors hereby expressly waive any and all such defenses and hereby fully and expressly acknowledge the obligations and indebtedness stated herein.  Seller and Validity Guarantors further waive and relinquish any right to appeal from the entry of this Confession of Judgment.

The Seller and the Validity Guarantors shall cooperate and covenant not to oppose or contest the Buyer's docketing and entering the New York judgment in any court in New York, and/or in any other jurisdiction in which the Seller and/or any Validity Guarantor has assets.

Within thirty (30) days prior to the three-year anniversary of the date of the Affidavit of Confession of Judgment, the Seller and each Validity Guarantor shall each execute a new Affidavit of Confession of Judgment in the amount of $ 562,500.00  plus accrued interest and other charges and fees due hereunder and provide same to the Buyer, which shall be held pursuant to the terms hereof.  Upon the receipt of the new Affidavit of Confession of Judgment from the Seller and the Validity Guarantors by the Buyer, the Buyer shall return the earlier original Affidavit of Confession of Judgment within twenty (20) days.  The failure of Seller and each of the Validity Guarantors to provide such new Affidavit of Confession of Judgment shall be a breach of this Agreement and the Buyer shall be entitled to all its remedies provided hereunder.

Notwithstanding the foregoing, as long as the Seller and the Validity Guarantors are not in default under the Agreement, and timely renew their Confession of Judgment in accordance with the terms hereof, the Confession of Judgment shall not be entered or enforced.

Initials:

13

DocuSign Envelope ID: E47E7CCF-568F-425F-AE4D-F8B05696A761

36. **Cross-Default.** Any default in any of the terms of this Agreement shall constitute a default in any of the terms of any other agreement between the parties hereto, and any default in any other agreement between the parties hereto shall constitute a default in this Agreement.

**FOR THE SELLER (#1)**

By: SEAN ANGELINI _____ 

            (Print Name and Title)

DocuSigned by:

*Sean Angelini*

302F3097103B4C6...

            (Signature)

**FOR THE SELLER (#2)**

By: _____

            (Print Name and Title)

_____

            (Signature)

**OWNER #1**

By: SEAN ANGELINI _____

            (Print Name and Title)

DocuSigned by:

*Sean Angelini*

302F3097103B4C6...

            (Signature)

**OWNER #2**

By: _____

            (Print Name and Title)

_____

            (Signature)

**VALIDITY GUARANTOR #1 (if any)**

By: SEAN ANGELINI _____

            (Print Name and Title)

DocuSigned by:

*Sean Angelini*

302F3097103B4C6...

            (Signature)

**VALIDITY GUARANTOR #2 (if any)**

By: _____

            (Print Name and Title)

_____

            (Signature)

**GLOBAL MERCHANT CASH, INC.**

By: _____

            (Company Officer)

Sales Associate Name _____

            (Signature)

Initials: *SA*

**Appendix A – List of Fees and Charges and Contact Information**

A.      In addition to the Purchased Amount of Future Receipts, the Agreement provides that the following fees shall be applied:

1. **Non-Sufficient Funds (NSF) Fee -** 35.00 **each (Up to FOUR TIMES ONLY within any calendar month period before a default is declared, or SIX or more ACH transactions attempted by Buyer are rejected by Seller's bank over any three month period)**
2. **Stop Payment Fee - $100.00**
3. **Wire Fee -        $35.00**
4. **UCC Filing Fee-    $295.00**
5. **Default Fee -      $5,000.00**
6. **Financing Fee:**
   a. **$5,000  -   $9,999   = $_____**
   b. **$10,000  - $19,999  = $_____**
   c. **$20,000  - $49,999  = $_____**
   d. **$50,000  - $100,000 = $_____**
   e. **$100,001 - $249,999 = $_____**
   f. **$250,000 - $399,999 = $_____**
   g. **$400,000 - $699,999 = $_____**
   h. **$700,000 - $1,000,000 = $_____**
7. **Other:**

B.      SELLER'S CONTACT

Address            106 MANTUA AVE _____

                       MANTUA, NJ 08051 _____

Phone (Land)    █████████████ _____

Cell              █████████████ _____

Email Address   _____


Initials:

## EXHIBIT A

## AUTHORIZATION AGREEMENT
## FOR AUTOMATED CLEARING HOUSE TRANSACTIONS

[ ORBIT ENERGY & POWER LLC          ] ("Seller") hereby authorizes Buyer ("Buyer") to present automated clearing house (ACH) debits to the following checking account in the amount of fees and other obligations due to Buyer from Seller under the terms of that Agreement for the Purchase and Sale of Future Receipts (the "Agreement") entered into between Seller and Buyer, as it may be amended, supplemented or replaced from time to time. In addition, if an Event of Default (as defined in the Agreement) occurs, Seller authorizes Buyer to debit any and all accounts controlled by Seller or controlled by any entity with the same Federal Tax Identification Number as Seller up to the total amount, including but not limited to, all fees and charges, due to Buyer from Seller under the terms of the Agreement. This Authorization Agreement is irrevocable without the prior written consent of Buyer.

Transfer Funds To/From:        Name of Bank: REPUBLIC BANK

                               ABA Transit/Routing #: ██████

                               Checking Account #:    █████

This authorization is to remain in full force and effect until all obligations due to Buyer under the Agreement have been fulfilled.

Seller Information:            Seller's Name: ORBIT ENERGY & POWER LLC

                               Signature of Authorized Representative: *Sean Angelini*
                                                                        302F3097103B4C6...

                               Print Name: SEAN ANGELINI

                               Title: OWNER

                               Seller's Tax ID: ██████

                               Date: 01/25/2021

## [Attached Voided Check Here]

Initials: SA

Dear Seller,


    Please fill out the form below with the access information for your bank account, please write legibly and indicate lower/upper case sensitivity.

Legal Name/ DBA:  ORBIT ENERGY & POWER LLC / ORBIT ENERGY & POWER

Bank portal website: _____

Username: _____

Password: _____

Security Question/Answer 1:_____

Security Question/Answer 2:_____

Security Question/Answer 3:_____

Security Question/Answer 4:_____

Security Question/Answer 5:_____

Security Question/Answer 6:_____

Any other information necessary to access your account: _____

Initials: _____

# Global Merchant Cash

## ADDENDUM #1 TO THE PURCHASE AND SALE OF FUTURE RECEIVABLES AGREEMENT

This is an addendum to that Purchase and Sale of Future Receivables Agreement dated on the day of 01/25/2021   by and between, Global  Merchant Cash, Inc. hereinafter referred to as "Purchaser," and  ORBIT ENERGY & POWER LLC .
(The "Business") and  SEAN ANGELINI   (Owners), collectively hereinafter referred to as "Seller" (Purchase Agreement).

Now, therefore, in consideration of the premises and the mutual representations, covenants, undertakings, and agreement hereinafter contained Seller and Buy represent, Covenant, undertake and agree as follows:

Seller and Purchaser agree to discount the amount of the purchased price according to the following schedule.

| Early Repurchase Date | Discount RTR Amount |
|---|---|
| Calendar Days 1-30 | $ 490,500.00 |
| Calendar Days 31-60 | $ 499,500.00 |
| Calendar Days 61-90 | $ 513,000.00 |

RTR Must be received either in the manor described in the agreement or via wire transfer to the Purchasers Bank Account and funds cleared prior to 12 AM on the above-mentioned date.

Execution of this Addendum is made as of this 01/25/2021.

Purchaser:
By: Global Merchant Cash Inc
X._____

Seller:
By:  SEAN ANGELINI

X_____
DocuSigned by:
*Sean Angelini*
302F3097103B4C6...

1 of 1



## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: E17E7CCFE68F425FAE4DF8B0E696A761 | | Status: Completed |
| Subject: Please Complete and Sign DocuSign Contract for ORBIT ENERGY & POWER LLC ID# 79817 | | |
| Source Envelope: | | |
| Document Pages: 18 | Signatures: 8 | Envelope Originator: |
| Certificate Pages: 4 | Initials: 17 | Wall Funding |
| AutoNav: Enabled | | 30 Broad St |
| EnvelopeId Stamping: Enabled | | 14th Floor |
| Time Zone: (UTC-05:00) Eastern Time (US & Canada) | | New York, NY  10004 |
| | | Contracts@wallfunding.com |
| | | IP Address: ▇▇▇▇▇▇▇ |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Wall Funding | Location: DocuSign |
| 1/25/2021 2:58:47 PM | Contracts@wallfunding.com | |

## Signer Events

| Signer Events | Signature | Timestamp |
|---|---|---|
| Sean Angelini<br>sangelini@orbitenergy.us<br>President<br>ORBIT ENERGY & POWER, LLC<br>Security Level: Email, Account Authentication (None) | *DocuSigned by:*<br>*Sean Angelini*<br>302F3097103B4C6...<br>Signature Adoption: Pre-selected Style<br>Using IP Address: ▇▇▇▇▇▇▇ | Sent: 1/25/2021 2:58:49 PM<br>Viewed: 1/25/2021 3:02:46 PM<br>Signed: 1/25/2021 3:05:50 PM |
| **Electronic Record and Signature Disclosure:**<br>Accepted: 1/25/2021 3:02:46 PM<br>ID: 5ea2a89e-eeb8-4981-bc43-95c558d08126 | | |

## In Person Signer Events

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

## Editor Delivery Events

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

## Agent Delivery Events

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

## Intermediary Delivery Events

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

## Certified Delivery Events

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

## Carbon Copy Events

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

## Witness Events

| Witness Events | Signature | Timestamp |
|---|---|---|

## Notary Events

| Notary Events | Signature | Timestamp |
|---|---|---|

## Envelope Summary Events

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 1/25/2021 2:58:49 PM |
| Certified Delivered | Security Checked | 1/25/2021 3:02:46 PM |
| Signing Complete | Security Checked | 1/25/2021 3:05:50 PM |
| Completed | Security Checked | 1/25/2021 3:05:50 PM |

## Payment Events

| Payment Events | Status | Timestamps |
|---|---|---|

## Electronic Record and Signature Disclosure

Electronic Record and Signature Disclosure created on: 4/16/2017 4:06:53 PM
Parties agreed to: Sean Angelini

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Wall Street Funding (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through your DocuSign, Inc. (DocuSign) Express user account. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. For such copies, as long as you are an authorized user of the DocuSign system you will have the ability to download and print any documents we send to you through your DocuSign user account for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of your DocuSign account. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use your DocuSign Express user account to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through your DocuSign user account all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Wall Street Funding:**
You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
 To contact us by email send messages to: mikek@wallfunding.com


**To advise Wall Street Funding of your new e-mail address**
To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at mikek@wallfunding.com and in the body of such request you must state: your previous e-mail address, your new e-mail address. We must verify and validate your email address by sending you a message and receiving a response from you.
In addition, you must notify DocuSign, Inc to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in DocuSign.

**To request paper copies from Wall Street Funding**
To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to mikek@wallfunding.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Wall Street Funding**
To inform us that you no longer want to receive future notices and disclosures in electronic format you may:
      i. decline to sign a document from within your DocuSign account, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
      ii. send us an e-mail to mikek@wallfunding.com and in the body of such request you must state your e-mail, full name, IS Postal Address, telephone number, and account number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..


**Required hardware and software**

| | |
|---|---|
| Operating Systems: | Windows2000? or WindowsXP? |
| Browsers (for SENDERS): | Internet Explorer 6.0? or above |
| Browsers (for SIGNERS): | Internet Explorer 6.0?, Mozilla FireFox 1.0, NetScape 7.2 (or above) |
| Email: | Access to a valid email account |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | •Allow per session cookies  •Users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection |

** These minimum requirements are subject to change. If these requirements change, we will provide you with an email message at the email address we have on file for you at that time providing you with the revised hardware and software requirements, at which time you will

have the right to withdraw your consent.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I Agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify Wall Street Funding as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by  Wall Street Funding during the course of my relationship with you.

# Agreement for the Purchase and Sale of Future Receipts

**Seller's Legal Name:** ORBIT ENERGY & POWER LLC                **D/B/A:** ORBIT ENERGY & POWER

**Form of Business Entity**: [ ] Corporation; [x] Limited Liability Company; [ ] Partnership; [ ] Limited Partnership; [ ] Limited Liability Partnership; [ ] Sole Proprietorship; [ ]Other: _____

**Street Address:** 106 MANTUA AVE                , City: MANTUA          , State: NJ      ; Zip: 08051

**Mailing Address:** 106 MANTUA AVE                , City: MANTUA          , State: NJ      ; Zip: 08051

**Primary Contact Name:** SEAN ANGELINI                                **Title:** OWNER

**Federal Tax ID Number:** <span style="color:red">redacted</span>

**Purchase Price:** $ 1,000,000.00      **Purchased Amount:** $ 1,250,000.00      **Average Monthly Sales:** $ 3,543,691.20

**Specified Percentage:** 10%      %  **Origination Fee:** $ 25,000.00      (to be deducted from the Purchase Price)

**Weekly Amount**: $ 26,041.67          (Average Monthly Sales x Specified Percentage / Average Business Days in a Calendar Month)

**Account for the Deposit of All Future Receipts:** Bank: REPUBLIC BANK

Account No: █████              Account No: _____

Account No: _____              Account No: _____

Effective,_____11/30_____, 20_21_  Seller, identified above, hereby sells, assigns and transfers to Global Merchant Cash, Inc., located at 30 Broad Street – 14th Fl., New York, New York 10004 ("Buyer"), without recourse, the Specified Percentage of the proceeds of each future sale made by Seller (collectively "Future Receipts") until Buyer has received the Purchased Amount. "Future Receipts" includes all payments made by cash, check, ACH or other electronic transfer, credit card, debit card, bank card, charge card (each such card shall be referred to herein as a "Payment Card") or other form of monetary payment in the ordinary course of Seller's business. As payment for the Purchased Amount, Buyer will deliver to Seller the Purchase Price, shown above, minus any Origination Fee shown above. Seller acknowledges that it has no right to repurchase the Purchased Amount from Buyer.

Both parties agree that the obligation of Buyer under this Agreement will not be effective unless and until Buyer has completed its review of the Seller and has accepted this Agreement by delivering the Purchase Price, minus any Origination Fee. Prior to accepting this Agreement, Buyer may conduct a processing trial to confirm its access to the Account and the ability to withdraw the Initial Weekly Amount. If the processing trial is not completed to the satisfaction of Buyer, Buyer will refund to Seller all funds that were obtained by Buyer during the processing trial.

Initials: _SA_                1                207458v13

**Agreement of Seller:** By signing below Seller agrees to the terms and conditions contained in this Agreement, including those terms and conditions on the following pages, and further agrees that this transaction is for business purposes and not for personal, family, or household purposes.

**FOR THE SELLER (#1)**

By: SEAN ANGELINI OWNER _____

DocuSigned by:

*Sean Angelini*

302F3097103B4C6...

(Print Name and Title)                    (Signature)

**FOR THE SELLER (#2)**

By: _____

(Print Name and Title)                    (Signature)

**OWNER #1**

By: SEAN ANGELINI OWNER _____

DocuSigned by:

*Sean Angelini*

302F3097103B4C6...

(Print Name and Title)                    (Signature)

**OWNER #2**

By: _____

(Print Name and Title)                    (Signature)

**GLOBAL MERCHANT CASH, INC.**

By: _____

(Company Officer)        Sales Associate Name _____ (Signature)

**Agreement of Each Owner:** Each Owner (each, a "Validity Guarantor") signing below agrees to the terms of the Credit Report Authorization below.

SEAN ANGELINI OWNER _____

DocuSigned by:

*Sean Angelini*

302F3097103B4C6...

(print name)                    (Signature)

_____

(print name)                    (Signature)

1. **Delivery of Purchased Amount:** Seller must deposit all Future Receipts into the single business banking account specified above, which may not be used for any personal, family or household purposes (the "Account") and must instruct Seller's credit card processor, which must be approved by Buyer (the "Processor") to deposit all Payment Card receipts of Seller into the Account. Seller agrees not to change the Account or add an additional Account without the express written consent of Buyer. Seller authorizes Buyer to debit the Weekly Amount (as such Weekly Amount is adjusted from time to time in accordance with Section 2 hereof) from the Account each business day by either ACH or electronic check. Seller will provide Buyer with all required access codes and agrees not to change them without prior written consent from Buyer. Seller will provide an appropriate ACH authorization to Buyer substantially in the form attached hereto as Exhibit A, provided that such form is acceptable to the Bank at which the Account is maintained. Seller understands that it is responsible for either ensuring that the Weekly Amount is available in the Account each business day or advising Buyer prior to each weekly withdrawal of a shortage of funds. Otherwise, Seller will be responsible for any fees incurred by Buyer resulting from a rejected electronic check or ACH debit attempt, as set forth on Appendix A. Buyer is not responsible for any overdrafts or rejected transactions that may result from Buyer's debiting any amount authorized under the terms of this Agreement. Seller understands that the foregoing ACH

Initials: *SA*

2

authorization is a fundamental condition to induce Buyer to accept the Agreement. Consequently, such authorization is intended to be irrevocable.

2.  **Seller May Request Changes to the Weekly Amount:**  The initial Weekly Amount is intended to represent the Specified Percentage of Seller's weekly Future Receipts. For as long as no Event of Default has occurred, once each calendar month, Seller may request that Buyer adjust the Weekly Amount to more closely reflect the Seller's actual Future Receipts times the Specified Percentage. Seller agrees to provide Buyer any information requested by Buyer to assist in this reconciliation. No more often than once a month, Buyer may adjust the Weekly Amount on a going-forward basis to more closely reflect the Seller's actual Future Receipts times the Specified Percentage. Buyer will give Seller notice five business days prior to any such adjustment. After each adjustment made pursuant to this paragraph, the new dollar amount shall be deemed the Weekly Amount until any subsequent adjustment.

3.  **Weekly Amount Upon Default.** Upon the occurrence of an Event of Default, the Weekly Amount shall equal 100% of all Future Receipts.

4.  **Sale of Future Receipts (THIS IS NOT A LOAN):** Seller is selling a portion of a future revenue stream to Buyer at a discount, not borrowing money from Buyer. There is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by Buyer. If Future Receipts are remitted more slowly than Buyer may have anticipated or projected because Seller's business has slowed down, or if the full Purchased Amount is never remitted because Seller's business went bankrupt or otherwise ceased operations in the ordinary course of business, and Seller has not breached this Agreement, Seller would not owe anything to Buyer and would not be in breach of or default under this Agreement. Buyer is buying the Purchased Amount of Future Receipts knowing the risks that Seller's business may slow down or fail, and Buyer assumes these risks based on Seller's representations, warranties and covenants in this Agreement that are designed to give Buyer a reasonable and fair opportunity to receive the benefit of its bargain. By this Agreement, Seller transfers to Buyer full and complete ownership of the Purchased Amount of Future Receipts and Seller retains no legal or equitable interest therein. Seller agrees that it will treat the Purchase Price and Purchased Amount in a manner consistent with a sale in its accounting records and tax returns. Seller agrees that Buyer is entitled to audit Seller's accounting records upon reasonable Notice in order to verify compliance. Seller waives any rights of privacy, confidentiality or taxpayer privilege in any such litigation or arbitration in which Seller asserts that this transaction is anything other than a sale of future receipts.

5.  **Power of Attorney.** Seller irrevocably appoints Buyer as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to Buyer from Seller, or in the case of a violation by Seller of this Agreement or the occurrence of an Event of Default under Section 15 hereof by Seller, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Future Receipts; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Seller's name on any invoice, bill of lading, or assignment directing customers or account debtors to direct payables to Buyer; (v) to file any claims or take any action or institute any proceeding which Buyer may deem necessary for the collection of any of the remaining Purchased Amount of the Future Receipts, or otherwise to enforce its rights with respect to delivery of the Purchased Amount; and/or (vi) to contact any Processor of Seller and to direct such Processor(s) to deliver directly to Buyer all or any portion of the amounts received by such Processor(s) and to provide any information regarding Seller requested by Buyer. Each Processor may rely on the previous sentence as written authorization of Seller to provide any information requested by Buyer. Each Processor is hereby irrevocably authorized and directed by Seller to follow any instruction of Buyer without inquiry as to Buyer's right or authority to give such instructions. Seller acknowledges the terms of the preceding sentence and agrees not to (a) interfere with Buyer's instructions or a Processor's compliance with this Agreement or (b) request any modification thereto without Buyer's prior written consent.  The Seller also hereby grants to the Buyer full and complete power of attorney over the Account pursuant to which power the Buyer is authorized to withdraw all funds on deposit in such Account, to disburse such funds in the manner set forth herein, and to have access to all information, statements and reports pertaining to the Account, whether issued by the banking institution at which such account is maintained, the Internal Revenue Service, another governmental agency, or otherwise. This authorization may only be revoked with the prior written consent of the Buyer. The Seller hereby acknowledges and agrees that it shall be responsible for any debits that are bounced for any reason including, but not limited to, insufficient funds in the Account. Additionally, Seller shall be responsible for any monthly maintenance fees and any other fees due the bank as a result of maintaining the Account, including, but not limited to, Processor fees. Seller authorizes Buyer to maintain a $50.00 reserve (the "reserve") in the Account at all times, which reserve will initially be built up from the first several batches credited to the Account commencing during the Processing Trial. If at any time during the Agreement, the reserve drops below $50.00, Buyer is authorized to replenish the reserve out of the next credits to the Account in an amount of up to $50.00. In any instance where there are not enough funds

in the reserve or the Account to cover fees or debits, Buyer shall have the right to withdraw these from Seller's Future Receipts that are thereafter deposited into the Account in order to satisfy the debits or fees and rebuild the reserve. Should there be no funds in the Account to cover the fees said fees will be added to the cash advance balance due Buyer.

6.  **Fees and Charges:** Other than the Origination Fee, if any, set forth above, Buyer is NOT CHARGING ANY ORIGINATION OR BROKER FEES to Seller. If Seller is charged another such fee, it is not being charged by Buyer. A list of all fees and charges applicable under this Agreement is contained in <u>Appendix A</u>.

7.  **Credit Report and Other Authorizations:** Seller and each of the Owners signing above authorize Buyer, its agents and representatives and any credit reporting agency engaged by Buyer, to (i) investigate any references given or any other statements or data obtained from or about Seller or any of its Owners for the purpose of this Agreement, (ii) obtain consumer and business credit reports on the Seller and any of its Owners, and (iii) to contact personal and business references provided by the Seller in the Application, at any time now or for so long as Seller and/or Owners continue to have any obligation owed to Buyer as a consequence of this Agreement or for Buyer's ability to determine Seller's eligibility to enter into any future agreement with Buyer.

8.  **Authorization to Contact Current and Prior Banks:** Seller hereby authorizes Buyer to contact any current or prior bank of the Seller in order to obtain whatever information it may require regarding Seller's transactions with any such bank. Such information may include but is not limited to, information necessary to verify the amount of Future Receipts previously processed on behalf of Seller and any fees that may have been charged by the bank. In addition, Seller authorizes Buyer to contact any current or prior bank of the Seller for collections and in order to confirm that Seller is exclusively using the Account identified above, or any other account approved by Buyer, for the deposit of all business receipts.

9.  **Financial Information**. Seller authorizes Buyer and its agents to investigate its financial responsibility and history, and will promptly provide to Buyer any authorizations, bank or financial statements, tax returns, etc., as Buyer deems necessary in its sole discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed acceptable as an authorization for release of financial and credit information. Buyer is authorized to update such information and financial and credit profiles from time to time as it deems appropriate. Seller waives, to the maximum extent permitted by law, any claim for damages against Buyer or any of its affiliates relating to any investigation undertaken by or on behalf of Buyer as permitted by this Agreement or disclosure of information as permitted by this Agreement.

10. **Transactional History**. Seller authorizes all of its banks and brokers and Payment Card processors to provide Buyer with Seller's banking, brokerage and/or processing history to determine qualification or continuation in this program, or for collections upon an Event of Default.

11. **Publicity**. Seller hereby authorizes Buyer to use its name in listings of clients and in advertising and marketing materials.

12. **Application of Amounts Received by Buyer.** Buyer reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to Buyer from Seller prior to applying such amounts to reduce the amount of any outstanding Purchased Amount.

13. **Representations, Warranties and Covenants of Seller:**

    13.1.  **Good Faith, Best Efforts and Due Diligence**. Seller will conduct its business in good faith and will use its best efforts to continue its business at least at its current level, to ensure that Buyer obtains the Purchased Amount.

    13.2.  **Stacking Prohibited**. Seller shall not enter into any Seller cash advance or any loan agreement that relates to or involves its Future Receipts with any party other than Buyer for the duration of this Agreement without the express prior written consent of Buyer.   Breach of this covenant will result in default, in which event Seller will be immediately be liable for the full balance owed to Buyer plus a default fee of $2,500 or 25% of the amount sold, whichever is greater. Buyer may share information regarding this Agreement with any third party in order to determine whether Seller is in compliance with this provision.

    13.3.  **Financial Condition and Financial Information**. Any bank statements and financial statements of Seller that have been furnished to Buyer, and future statements that will be furnished to Buyer, fairly represent the financial condition of Seller at such dates, and Seller will notify Buyer immediately if there are material adverse changes, financial or otherwise, in the

Initials: _SA_

condition or operation of Seller or any change in the ownership of Seller. Buyer may request statements at any time during the performance of this Agreement and the Seller shall provide them to Buyer within five business days. Furthermore, Seller represents that all documents, forms and recorded interviews provided to or with Buyer are true, accurate and complete in all respects, and accurately reflect Seller's financial condition and results of operations. Seller further agrees to authorize the release of any past or future tax returns to Seller.

13.4.    **Governmental Approvals**. Seller is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

13.5.    **Authority to Enter Into This Agreement**. Seller and the person(s) signing this Agreement on behalf of Seller, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

13.6.    **Change of Name or Location or Sale or Closing of Business**. Seller will not conduct Seller's businesses under any name other than as disclosed to Buyer or change any of its places of business without prior written consent of Buyer. Seller will not sell, dispose, transfer or otherwise convey all or substantially all of its business or assets without (i) the express prior written consent of Buyer, and (ii) the written agreement of any purchaser or transferee assuming all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Buyer. Except as disclosed to Buyer in writing, Seller has no current plans to close its business either temporarily, whether for renovations, repairs or any other purpose, or permanently. Seller agrees that until Buyer has received all of the Purchased Amount Seller will not voluntarily close its business on a temporarily basis for renovations, repairs, or any other purposes. This provision, however, does not prohibit Seller from closing its business temporarily if such closing is required to conduct renovations or repairs that are required by local ordinance or other legal order, such as from a health or fire inspector, or if otherwise forced to do so by circumstances outside of the control of Seller. Prior to any such closure, Seller will provide Buyer ten business days' notice to the extent practicable.

13.7.    **Lease Effectiveness.**  Seller agrees that by signing this Agreement, it is agreeing to take all steps necessary to maintain in full force and effect and not terminate its lease, or vacate the current premises at the address listed in this Agreement before the Buyer is paid back in full.  If Seller intends to vacate, actually vacates or if landlord requires Seller to vacate before it has completed the payback to Buyer, then Seller and its principals shall provide Buyer with prompt notice thereof, and they shall be personally, jointly and severally liable for the outstanding balance.

13.8.    **No Change of Control.**  Seller shall not undertake any transaction involving the sale, transfer or other conveyance of the Seller's business or its assets, either by an issuance, sale or transfer of ownership interests in the business that results in a change in ownership or voting control of the Seller's business, or by a sale or transfer of substantially all of the assets of the business without the express prior written consent of the Buyer;

13.9.    **No Pending or Contemplated Bankruptcy.** As of the date Seller executes this Agreement, Seller is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Seller. Seller represents that it has not consulted with a bankruptcy attorney within six months prior to the date of this Agreement. Seller further warrants that it does not anticipate filing a bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

13.10.    **Seller to Maintain Insurance.** Seller will possess and maintain insurance in such amounts and against such risks as are necessary to protect its business and will provide proof of such insurance to Buyer upon demand.

13.11.    **Seller to Pay Taxes Promptly.** Seller will promptly pay all necessary taxes, including but not limited to employment and sales and use taxes.

13.12.    **Seller to Maintain Sufficient Funds on Deposit in the Account.**  The Seller shall maintain funds in the Account at all times in an amount that is sufficient to pay the Specified Percentage, any monthly maintenance fees and any other fees due the bank as a result of maintaining the Account, including, but not limited to, Processor fees, and the $50 reserve.

13.13.    **No Violation of Prior Agreements.** Seller's execution and performance of this Agreement will not conflict with any other agreement, obligation, promise, court order, administrative order or decree, law or regulation to which Seller is subject, including any agreement the prohibits the sale or pledge of Seller's future receipts.

Initials:

5

13.14. **No Diversion of Receipts; No Stop Payment.** Seller will not permit any event to occur that could cause a diversion of any of Seller's Future Receipts from the Account to any other entity, and Seller shall not attempt to place a Stop Payment on any debit by Buyer of the Specified Percentage or any other fees due to Buyer hereunder.

13.15. **No Payment Default.** Neither the Seller, nor any of its affiliates, is in default of any of its payment obligations under any agreement or instrument to the Buyer or any third party to which it is a party, nor is any third party attempting to collect funds from the Seller or any of its affiliates.

13.16. **Seller's Knowledge and Representation.** Seller represents warrants and agrees that it is a sophisticated business entity familiar with the kind of transaction covered by the Agreement; it was represented by counsel or had full opportunity to consult with counsel.

13.17. **No Fraud.** Seller shall not commit fraud.

**14. Rights of Buyer:**

14.1. **Financing Statements and Security Interest.** As security for Buyer's obligations hereunder, and under any other agreement between Buyer, on the one hand, and Seller or any affiliate of seller, on the other hand, Seller grants Buyer and/or its assignees or designees, if any, a continuing security interest, in the following property of the Seller: a security interest in all of (a) all of Seller's now owned and hereafter acquired accounts (including, without limitation, the Account), contract rights, chattel paper, tax refunds, documents, licenses, equipment, furniture, fixtures, general intangibles, instruments and inventory, wherever located, now or hereafter owned or acquired by the Seller; (b) all intellectual property including, without limitation, patents, trademarks and copyrights, trade names, service marks, logos and other sources of business identifiers (and applications for all of the foregoing), and all registrations, recordings and applications with the U.S. Patent and Trademark Office and all renewals, reissues and extensions thereof (collectively "Trademarks") whether now owned or hereafter acquired, together with any written agreements granting any right to use any Trademarks; and (c) all proceeds, as that term is defined in Article 9 of the Uniform Commercial Code ("UCC") (all such security interests, the "Collateral"). Wherever the term, "accounts receivable" appears herein, it shall have the same meaning as the term, "account", as defined under Section 9-101(a)(2) of Article 9 of the UCC. The security interest granted by Seller includes all accessions, attachments, accessories, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof, all proceeds of proceeds, and all records and data relating thereto. Seller authorizes Buyer to file one or more UCC-1 forms consistent with the Uniform Commercial Code ("UCC") in order to give notice of this security interest, to give notice that the Purchased Amount of Future Receipts is the sole property of Buyer, and to give notice of Buyer's security interest in the assets of Seller, and/or any affiliate of Seller, which arise out of any agreement entered into between any or all of them and Buyer. The UCC filing may state that such sale is intended to be a sale and not an assignment for security and may state that the Seller is prohibited from obtaining any financing that impairs the value of the Future Receipts or Buyer's right to collect same. Seller authorizes Buyer to debit the Account for all costs incurred by Buyer associated with the filing, amendment or termination of any UCC filings.

14.2. **Additional Collateral.** As further security to secure Validity Guarantor's payment and performance obligations to Buyer under the Guaranty, the Validity Guarantor hereby grants Buyer a security interest in _____
ORBIT 67 MAIN LLC _____
(the "Additional Collateral"). Validity Guarantor understands that Buyer will have a security interest in the aforesaid Additional Collateral upon execution of this Agreement.

Merchant and Validity Guarantor each acknowledge and agree that any security interest granted to Buyer under any other agreement between Merchant or Validity Guarantor and Buyer (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement.



Initials: _____

6

Merchant and Validity Guarantor each agrees to execute any documents or take any action in connection with this Agreement as Buyer deems necessary to perfect or maintain Buyer's first priority security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements. Merchant and Validity Guarantor each hereby authorizes Buyer to file any financing statements deemed necessary by Buyer to perfect or maintain Buyer's security interest, which financing statement may contain notification that Merchant and/or Validity Guarantor have granted a negative pledge to Buyer with respect to Collateral and Additional Collateral, and that any subsequent lienor may be tortuously interfering the Buyer's rights.  Merchant and Validity Guarantor shall be liable for, and Buyer may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by Buyer in protecting, preserving and enforcing Buyer's security interest and rights.

14.3.  **Negative Pledge**.  Merchant and Validity Guarantor each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

14.4.  **Right of Access.** In order to ensure that Seller is complying with the terms of this Agreement, Buyer shall have the right to (i) enter, without notice, the premises of Seller's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and or batch Seller's weekly receipts to the Processor and to ensure that Seller has not violated any other provision of this Agreement, and (ii) Seller shall provide access to its employees and records and all other items as requested by Buyer, and (iii) have Seller provide information about its business operations, banking relationships, vendors, landlord and other information to allow Buyer to interview any relevant parties.

14.5. **Recording, and Solicitations; Monitoring.**

(i)     <u>Authorization to Contact Seller by Phone; Monitoring</u>. Seller agrees that (i) it has an established business relationship with Buyer, its employees and agents and that Seller may be contacted from time-to-time regarding this or other business transactions; and (ii) that such communications and contacts are not unsolicited or inconvenient.   Seller authorizes Buyer, its affiliates, agents and independent contractors to contact Seller at any telephone number Seller provides to Buyer or from which Buyer places a call to Buyer, or any telephone number where Buyer believes it may reach Seller, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Seller incurs charges for receiving such communications.  Seller further agrees that any such call between Buyer and Seller, and their agents and employees may be recorded or monitored.

(ii)    <u>Authorization to Contact Seller by Other Means</u>. Seller also agree that Buyer, its affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Seller. Seller expressly consents to conduct business by electronic means.

15.  **Events of Default**. The occurrence of any of the following events shall constitute an "Event of Default": (a) Seller interferes with Buyer's right to collect the Weekly Amount; (b) Seller violates any representation, warranty or covenant in this Agreement; (c) Seller uses multiple depository accounts other than the Account without the prior written consent of Buyer; (d) Seller changes its Account or its Processor without the prior written consent of Buyer; or (e) Seller fails to provide timely notice to Buyer such that in any given calendar month there are two or more ACH transactions attempted by Buyer are rejected by Seller's bank, or six or more ACH transactions attempted by Buyer are rejected by Seller's bank over any three month period.

16.  **Remedies**. If any Event of Default occurs, Buyer may proceed to protect and enforce its rights including, but not limited to, the following:

16.1.  The Specified Percentage shall equal 100%. The full uncollected Purchased Amount due under this Agreement will become due and payable in full immediately.

16.2.  Buyer shall be entitled to recover from Seller all "Costs of Collection" which means any and all expenses and costs,

including attorneys' fees and court or arbitration costs, incurred by Buyer in connection with the defense, protection or enforcement of Buyer's rights under this Agreement (including, without limitation, in connection with any bankruptcy proceeding).

16.3.    Buyer may exercise any and all remedies available under Article 9 of the Uniform Commercial Code of any applicable jurisdiction as a secured creditor as it applies to the sale of accounts.

16.4.    Buyer may rescind this Agreement in its entirety, in which case Buyer shall be entitled to all remedies accorded to a party that successfully enforces a judicial rescission remedy.

16.5.    In addition to the foregoing, in the event of Seller's breach of any of the representations, warranties or covenants set forth in this Agreement, Seller agrees that Buyer shall be entitled to, but not limited to, damages equal to the amount by which the cash attributable to the Purchased Amount exceeds the amount of collections received by Buyer from Future Receipts.   The Seller hereby agrees that the Buyer may automatically debit such damages from Seller's depository accounts wherever situated, including the Account, via ACH debit or wire transfer.  Seller acknowledges that, in the event of a default by any Validity Guarantor, Validity Guarantors agree that Buyer may report such default to one or more credit bureaus.

16.6.    Buyer may enforce the provisions of the Validity Guaranty against each Validity Guarantor.

16.7.    Buyer may proceed to protect and enforce its rights and remedies by arbitration or lawsuit. In any such arbitration or lawsuit, under which Buyer shall recover Judgment against Seller, Seller shall be liable for all of Buyer's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs. However, the rights of Buyer under this provision shall be limited as provided in the arbitration provision set forth below.

16.8.    Buyer may debit Seller's depository accounts wherever situated by means of ACH debit or email or facsimile signature on a computer-generated check drawn on Seller's bank account or otherwise for all sums due to Buyer (including, without limitation, all Costs of Collection).

16.9. Buyer shall otherwise be entitled to all remedies available to it under law including, without limitation, the right to non-judicial foreclosure.

16.10. All rights, powers and remedies of Buyer in connection with this Agreement may be exercised at any time by Buyer after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

17.  **Modifications; Agreements**. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by Buyer.

18.  **Assignment by Buyer**. Buyer may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part, with or without prior written notice to Seller.

19.  **Notices**.

19.1. Notices from Buyer to Seller. Buyer may send any notices, disclosures, terms and conditions, other documents, and any future changes to Seller by regular mail or by e-mail, at Buyer's option and Seller consents to such electronic delivery. Notices sent by e-mail are effective when sent. Notices sent by regular mail become effective upon mailing to Seller's address set forth in this Agreement.

19.2. Notices from Seller to Buyer. Seller may send any notices to Buyer by e-mail only upon the prior written consent of Buyer, which consent may be withheld or revoked at any time in Buyer's sole discretion. Otherwise, any notices or other communications from Seller to Buyer must be delivered by certified mail, return receipt requested, to Buyer's address set forth in this Agreement. Notices sent to Buyer shall become effective only upon receipt by Buyer.

20.  **Survival of Representation, etc**. All representations, warranties and covenants herein shall survive the execution and delivery of

Initials: _SM_

8

this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full.

21. **Interpretation**. All Parties hereto have reviewed this Agreement with an attorney of their own choosing and have relied only on their own attorney's guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

22. **No Waiver.** There shall be effected no waiver by failure on the part of Buyer to exercise, or delay in exercising, any right under this Agreement, nor shall any single or partial exercise by Buyer of any right under this Agreement preclude any other future exercise of any right, The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

23. **Entire Agreement and Severability**. This Agreement embodies the entire agreement between Seller and Buyer and supersedes all prior agreements and understandings relating to the subject matter hereof. In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

24. **Email or Facsimile Acceptance**. Email or facsimile signatures hereon, or other electronic means reflecting the party's signature hereto, shall be deemed acceptable for all purposes as if they were originally executed signatures.

25. **Confidentiality**: The terms and conditions of this Agreement are proprietary and confidential unless required by law. Seller shall not disclose this information to anyone other than its attorney, accountant or similar service provider and then only to the extent such person uses the information solely for purpose of advising Seller and first agrees in writing to be bound by the terms of this Section. A breach entitles Buyer to damages and legal fees as well as temporary restraining order and preliminary injunction without bond.

26. **Further Assurances.** Seller agrees that it shall, from time to time, promptly execute and deliver all instruments and documents, and take all further action, that may be necessary or appropriate, or that Buyer may request, to perfect against Seller and all third parties the sale of the Specified Percentage of Future Receipts hereunder or to enable Buyer to exercise and enforce its rights and remedies hereunder.

27. **Binding Effect; No Assignment by Seller.** This Agreement shall be binding upon and inure to the benefit of Seller, Buyer and their respective successors and assigns, except that Seller shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Buyer which consent may be withheld in Buyer's sole discretion.

28. **Counterparts and Electronic Signatures.** This Agreement may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement. Facsimile signatures or electronic signatures shall be deemed to be original signatures and each party hereto may rely on a facsimile signature or an electronic signature as an original for purposes of enforcing this Agreement. The words "execution," "signed," "signature," and words of like import in this Agreement and any amendments thereof shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

29. **Governing Law.**  THIS AGREEMENT AND ALL TRANSACTIONS IT CONTEMPLATES, INCLUDING ALL ISSUES CONCERNING THE VALIDITY OF THE AGREEMENT AND ANY TRANSACTIONS IT CONTEMPLATES, THE CONSTRUCTION OF ITS TERMS, AND THE INTERPRETATION, PERFORMANCE AND ENFORCEMENT OF THE RIGHTS AND DUTIES OF THE PARTIES SHALL BE GOVERNED BY AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS THAT WOULD REQUIRE THE APPLICATION OF ANY OTHER LAW. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE PARTIES AGREE THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN THE ENTIRE RELATIONSHIP BETWEEN AND AMONG THE PARTIES, INCLUDING WITHOUT LIMITATION, ALL ISSUES OR CLAIMS ARISING OUT OF, RELATING TO, IN CONNECTION WITH, OR INCIDENT TO THIS AGREEMENT AND ANY TRANSACTIONS IT CONTEMPLATES, WHETHER SUCH CLAIMS ARE BASED IN TORT, CONTRACT, OR ARISE UNDER STATUTE OR IN EQUITY. AS USED HEREIN, THE PHRASE "LAWS OF THE STATE OF NEW YORK" INCLUDES NEW YORK LAW WITH RESPECT TO, AMONG OTHER THINGS, ANY APPLICABLE STATUTE OF LIMITATIONS, LACHES, OR SIMILAR TIME- BASED DEFENSE. THE PARTIES ACKNOWLEDGE AND AGREE THAT THIS AGREEMENT IS MADE AND PERFORMED IN THE STATE OF NEW YORK.

Initials:

30. **Jurisdiction.**  Seller and Validity Guarantor(s) further irrevocably and unconditionally consent and submit to the jurisdiction of any state or federal court sitting in the County of New York, State of New York, to resolve any suit, action, controversy, or proceeding of any kind (whether in contract, tort, statute, equity or otherwise) between or among the Parties, arising out of, related to, in connection with, or incident to this Agreement or any of the transactions it contemplates.  Seller and Validity Guarantor(s) hereby agree that any of the above-named courts shall be a convenient forum for any such suit, action, controversy, or proceeding of any kind between or among the Parties, arising out of, related to, in connection with, or incident to this Agreement or any of the transactions it  contemplates.  Seller and Validity Guarantor(s) waive, to the fullest extent permitted by law, (i) any objection that Seller or Validity Guarantor(s) may now or later have to the laying of venue of any suit, action, controversy, or proceeding arising out of, relating to, in connection with, or incident to this Agreement or any of the transactions it contemplates in any of the above- named courts, (ii) any objection to personal jurisdiction applying in any such court, and (iii) any claim that any such suit, action, controversy or proceeding brought in any such court has been brought in an inconvenient forum. Seller and Validity Guarantor(s) agree that service of process in any such suit, action, controversy, or proceeding may be served on any of them by mailing or delivering a copy of the process to any of the addresses set forth in this Agreement or any other address Seller or Validity Guarantor(s) has provided to Buyer.  Nothing set forth in this Section affects the right to serve process in any other manner permitted by law.

31. **Arbitration Agreement; Class Action Waiver.**  This Arbitration Clause is an agreement between Seller, Validity Guarantors and Buyer to arbitrate disputes.  "Disputes" is deemed to have the broadest possible meaning, and includes, without limitation, any and all disputes, claims or controversies, in law and in equity, between Seller and/or Validity Guarantors on the one hand, and Buyer on the other hand, arising out of or relating to this Agreement and/or (i) any claims of breach of contract, tort, misrepresentation, conversion, fraud, or unfair and deceptive trade practices, or (ii) any claim of a violation of any local, state or federal statute, regulation or ordinance, etc.  At the request of either Seller and Validity Guarantor(s), on the one hand, or Buyer, on the other hand, any Dispute shall be settled exclusively and finally by arbitration conducted in the County of New York, State of New York under the commercial arbitration rules of the Commercial Panel of the American Arbitration Association (the "AAA"), such arbitration to apply the laws of the State of New York (without giving effect to conflict of laws principles). The Parties agree that, once any of them has elected to arbitrate, binding arbitration is the exclusive method for resolving any and all Disputes, and that, under this Arbitration Clause, all Parties are waving the right to a jury trial and the right to bring or participate in any class action in court or through arbitration (this is referred to below as the "Class Action Waiver").  Seller, Validity Guarantor(s) and Buyer hereby agree that the above-named forum shall be a convenient forum for any such arbitration proceeding or other controversy arising out of, related to, in connection with, or incident to this Agreement or any of the transactions it contemplates. Seller, Validity Guarantor(s) and Buyer waive, to the fullest extent permitted by law, (i) any objection that they may now or later have to such laying of venue, (ii) any objection to personal jurisdiction applying in any such venue and (iii) any claim that any such arbitration proceeding or other controversy brought in such venue has been brought in an inconvenient forum.

The arbitrator at such arbitration shall not be entitled to award punitive damages to any Party, and the costs and fees of such arbitration shall be borne by the losing Party. The Parties hereto acknowledge and agree that no class arbitration or other representative action may be undertaken or participating in by the arbitrators. The Parties shall jointly agree upon an AAA arbitrator or, if they cannot agree, the AAA shall select a neutral arbitrator from the AAA's Commercial Panel.  The arbitration award shall be in writing, but without a supporting opinion unless such an opinion is requested by a Party.

Nothing in this Arbitration Clause shall be deemed to limit the right of Buyer (a) to exercise self-help remedies such as, without limitation, setoff, (b) to foreclose against any real or personal property collateral, or (c) to obtain from a court provisional or ancillary remedies such as, without limitation, injunctive relief, writ of possession or the appointment of a receiver.  Buyer may exercise such self-help rights, foreclose upon such property, or obtain such provisional or ancillary remedies before, during or after the pendency of any arbitration proceeding brought pursuant to this Agreement.  Neither this exercise of self-help remedies, nor the institution or maintenance of an action for foreclosure or provisional ancillary remedies, shall constitute a waiver of the right of any Party, including the claimant in any such action, to arbitrate the merits of the controversy or claim which prompted Buyer to resort to such remedies.

If a Party to this Agreement seeks to initiate arbitration, and another Party hereto refuses to arbitrate, the Party seeking to initiate arbitration may seek a court order enforcing this provision under which Buyer, Seller and Validity Guarantor(s) have agreed to arbitrate.  In such event, the court shall determine any issues regarding the enforceability of this Arbitration Clause, including the validity and effect of the Class Action Waiver, but all other issues shall be decided by the arbitrator.  If any Party fails to arbitrate as required under this Arbitration Clause, the Party electing arbitration shall, unless prohibited by applicable law, be entitled to recover its/their attorneys' fees and costs incurred in compelling the other Party to arbitrate the Dispute.  All statutes

Initials: _____

10

of limitation that otherwise would apply to an action brought in court will apply in arbitration.

The Parties acknowledge and agree that the Federal Arbitration Act (9 U.S.C. § 1 et seq.) shall govern any arbitration under this Arbitration Clause.

If any part of this Arbitration Clause conflicts with the terms of any other document or agreement between the Parties or the rules of the AAA, the terms of this Arbitration Clause shall govern.  If any part of this Arbitration Clause other than the Class Action Waiver shall be deemed or found unenforceable for any reason, the remainder of the Arbitration Clause shall remain enforceable.  If the Class Action Waiver shall be deemed or found unenforceable for any reason, the remainder of the Arbitration Clause shall be unenforceable.

The Parties agree that the mutual promises in this Arbitration Clause constitute the consideration necessary to make this Arbitration Clause enforceable even if the Parties do not enter into any further agreements.  This Arbitration Clause shall survive the termination, rescission or payment in full of this Agreement.

Seller and the Validity Guarantor(s) may opt out of this Arbitration Clause by notifying Buyer in writing of their intent to do so. Such election to opt out must be mailed by first class mail postmarked no later than ten (10) days from the date of this Agreement and addressed to Buyer at:

> GLOBAL MERCHANT CASH, INC.
> 30 Broad Street – 14th Fl.
> New York, New York 10004

If more than one Seller and/or Validity Guarantor is a Party to this Agreement, all such Sellers and Validity Guarantors must elect arbitration or elect to opt out in order for the arbitration election or the opt out election to be effective.

32. **LIMITATION OF LIABILITY.**  SELLER AGREES THAT, REGARDLESS OF ANY CLAIMS SELLER MAY HAVE AGAINST BUYER, SELLER'S SOLE REMEDY WILL BE AN ACTION AT LAW FOR ACTUAL MONEY DAMAGES THAT WILL NOT EXCEED THE GREATER OF (I) THE AMOUNT OF FUNDS OVERPAID TO BUYER OR (II) $1,000, AND THAT SELLER WILL NOT BE ENTITLED TO, AND HEREBY WAIVES ANY AND ALL CLAIMS FOR, PUNITIVE, EXEMPLARY, CONSEQUENTIAL, LOST PROFITS, STATUTORY, OR SPECIAL DAMAGES OF ANY KIND.  IF SELLER FILES AN ACTION AGAINST BUYER AND THE MATTER IS DISMISSED OR BUYER PREVAILS IN THE MATTER, SELLER AGREES TO PAY ALL OF BUYER'S ATTORNEYS' FEES AND COSTS INCURRED IN THE MATTER, WHETHER IN COURT OR ARBITRATION.

33. **SERVICE OF PROCESS.** IN ADDITION TO THE METHODS OF SERVICE ALLOWED BY THE NEW YORK STATE CIVIL PRACTICE LAW & RULES ("CPLR"), SELLER HEREBY CONSENTS TO SERVICE OF PROCESS UPON IT BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, SERVICE HEREUNDER SHALL BE COMPLETE UPON SELLER'S ACTUAL RECEIPT OF PROCESS OR UPON BUYER'S RECEIPT OF THE RETURN THEREOF BY THE UNITED STATES POSTAL SERVICE AS REFUSED OR UNDELIVERABLE. SELLER MUST PROMPTLY NOTIFY BUYER, IN WRITING, OF EACH AND EVERY CHANGE OF ADDRESS TO WHICH SERVICE OF PROCESS CAN BE MADE. SERVICE BY BUYER TO THE LAST KNOWN ADDRESS SHALL BE SUFFICIENT. SELLER WILL HAVE (30) CALENDAR DAYS AFTER SERVICE HEREUNDER IS COMPLETE IN WHICH TO RESPOND. FURTHERMORE, SELLER EXPRESSLY CONSENTS THAT ANY AND ALL NOTICE(S), DEMAND(S), REQUEST(S) OR OTHER COMMUNICATION(S) UNDER AND PURSUANT TO THIS AGREEMENT FOR THE PURCHASE AND SALE OF FUTURE RECEIVABLES SHALL BE DELIVERED IN ACCORDANCE WITH THE PROVISIONS OF THIS AGREEMENT FOR THE PURCHASE AND SALE OF FUTURE RECEIVABLES.

34. **Indemnity.** Seller hereby indemnifies, defends and holds Buyer harmless from and against any and all direct and third-party suits, costs, causes of action, judgments, complaints, orders, and claims including, without limitation, reasonable attorneys' fees (each a "Claim") arising from or relating to any claim that Seller has breached this Agreement or that any representation, warranty, or statement Seller has made is not accurate in any respect.  Buyer shall notify Seller of any claim for indemnity hereunder, select counsel of Buyer's choice and Seller shall promptly pay all defense costs and satisfy any judgments. Buyer shall not settle any Claims that require Seller's payment of funds to any third party without Seller's approval, which approval shall not be unreasonably withheld or delayed.

Initials: _SM_

11

35. **Validity Guaranty; Confession of Judgment.**  In consideration of the Buyer entering into this Agreement, and in order to induce the Buyer to enter into this Agreement, each of the undersigned Seller and principal(s) of Seller (such principals, whether officers, shareholders, partners, other owners or others are referred to herein as the "Validity Guarantors"), hereby personally assumes and, jointly and severally, guarantees, the truth, accuracy and completeness of all of the Seller's the representations, warranties and covenants set forth in this Agreement (collectively, the "Guaranteed Obligations").  In such instance, Validity Guarantors shall perform under this Agreement, including, without limitation, paying, or causing to be paid, any amounts that Buyer would otherwise be entitled to collect from Seller under the terms of this Agreement, immediately, upon notice from Buyer describing Seller's violation(s) of the representations, warranties and/or covenants set forth in this Agreement in summary form.  Validity Guarantors' joint and several obligation to perform includes, without limitation, upon Seller's breach of any representation, warranty and/or covenant, Buyer's right to damages equal to the amount by which the cash attributable to the Purchased Amount exceeds the amount of collections received by Buyer from Receivables pursuant to Section 16 of the Agreement, without any presentment or demand made by the Buyer. In the event of a default by any Validity Guarantor, each Validity Guarantor agrees that Buyer may report such default to one or more credit bureaus.  Each Validity Guarantor acknowledges that it will directly benefit from Buyer and Seller entering into the Purchase Agreement.

This Guaranty shall be a guarantee of performance of Seller's representations, warranties and covenants, and not a guarantee of collection.  Validity Guarantors hereby waive demand of payment, notice and presentment, and agree that Buyer may proceed to enforce its rights against each Validity Guarantor or any other guarantor of Seller's obligations from time to time, prior to, contemporaneously with or after any enforcement against Seller, or without any enforcement against Seller.  The obligations of Validity Guarantors are unconditional, absolute and irrevocable, and shall remain in full force and effect and without regard to, and shall not be released, discharged or in any way affected by, (a) any amendment to this Agreement; (b) any exercise or non-exercise of or delay in exercising any right, remedy, power or privilege under or in respect of this Agreement; (c) any bankruptcy, insolvency, arrangement, composition, assignment for the benefit of creditors, or similar proceeding commenced by or against the Seller or any of its officers, directors or principals; (d) defects in the formation or authority of Seller; or (e) any other circumstance that might otherwise constitute a legal or equitable discharge of a guarantor or surety.  Validity Guarantors each further jointly and severally guarantee payment of all costs, expenses and attorneys' fees and disbursements which may be incurred by Buyer in connection with the Guaranteed Obligations, or any Validity Guarantor's default of its obligations under this Agreement.  If payment of any sum by Seller is recovered as a preference of fraudulent conveyance under any bankruptcy or insolvency law, the liability of Validity Guarantors under this Guaranty shall continue and remain in full force and effect notwithstanding such recovery.

Each Validity Guarantor authorizes, acknowledges and agrees that, in connection with the execution of this Agreement, investigative and/or consumer reports may be obtained with respect to the Seller and Validity Guarantor(s). The reports Buyer obtains may include, but are not limited to, the Seller's or Validity Guarantors' respective credit histories or similar characteristics, employment and education verifications, social security verification, criminal and civil history, Department of Motor Vehicle records, any other public records, and any other information bearing on credit standing or credit capacity. Accordingly, each Validity Guarantor authorizes the Buyer, its agents and representatives and any credit reporting agency employed by the Buyer to investigate any references given or any other statements of data obtained from or about the Seller or any of its principals for the purpose of this Agreement and to obtain credit reports at any time now or in the future with respect to the Validity Guarantors. The Validity Guarantors to this Agreement are hereby notified that a negative credit report reflected on his/her credit record may be submitted to a credit reporting agency if the provisions of this Guaranty are triggered by a violation by the Seller.

In the Buyer's sole discretion, as security for the payments to be made hereinabove, the Seller and each of the Validity Guarantors shall duly execute and deliver to the Buyer an Affidavit of Confession of Judgment in form satisfactory to Buyer in the amount of $ 1,250,000.00, with interest at nine (9%) percent per annum, plus expenses, costs and attorneys' fees as specified therein.  The Confession of Judgment shall be held by Buyer, and, if Seller breaches any of the representations, warranties and/or covenants given by Seller under the Agreement, Buyer, without notice to the Seller or the Validity Guarantors, is authorized to file the Confession of Judgment in the Court and to take the necessary steps to enter judgment against the Seller and the Validity Guarantors pursuant to the terms of the Confession of Judgment.  The Seller and the Validity Guarantors each hereby waive and surrender any and all procedural and substantive rights or defenses, including, but not limited to, claims, counterclaims, setoffs, demands or discharges, to the entry of the Confession of Judgment, except with respect to establishing that a default did not occur or that notice was not given in accordance with the Agreement.  Without limiting the generality of the foregoing, the Seller and the Validity Guarantors shall not assert, raise, plead or enforce against Buyer any defense of waiver, release, res judicata, statue of fraud, anti-deficiency statute, fraud, incapacity, minority, usury, illegality or unenforceability which may be available to the Seller and the Validity Guarantors or any other person or entity liable in respect of any or all of the obligations under this

Agreement, or any setoff available against Buyer to the Validity Guarantors or any other such person, or entity whether or not on account of a related transaction.  Seller and Validity Guarantors shall also not assert, raise, plead or enforce against Buyer any time-based defenses, including, but not limited to, laches or any applicable statute of limitations, and Seller and Validity Guarantors hereby expressly waive any and all such defenses and hereby fully and expressly acknowledge the obligations and indebtedness stated herein.  Seller and Validity Guarantors further waive and relinquish any right to appeal from the entry of this Confession of Judgment.

The Seller and the Validity Guarantors shall cooperate and covenant not to oppose or contest the Buyer's docketing and entering the New York judgment in any court in New York, and/or in any other jurisdiction in which the Seller and/or any Validity Guarantor has assets.

Within thirty (30) days prior to the three-year anniversary of the date of the Affidavit of Confession of Judgment, the Seller and each Validity Guarantor shall each execute a new Affidavit of Confession of Judgment in the amount of $ 1,250,000.00 plus accrued interest and other charges and fees due hereunder and provide same to the Buyer, which shall be held pursuant to the terms hereof.  Upon the receipt of the new Affidavit of Confession of Judgment from the Seller and the Validity Guarantors by the Buyer, the Buyer shall return the earlier original Affidavit of Confession of Judgment within twenty (20) days.  The failure of Seller and each of the Validity Guarantors to provide such new Affidavit of Confession of Judgment shall be a breach of this Agreement and the Buyer shall be entitled to all its remedies provided hereunder.

Notwithstanding the foregoing, as long as the Seller and the Validity Guarantors are not in default under the Agreement, and timely renew their Confession of Judgment in accordance with the terms hereof, the Confession of Judgment shall not be entered or enforced.

**36.** **Cross-Default.** Any default in any of the terms of this Agreement shall constitute a default in any of the terms of any other agreement between the parties hereto, and any default in any other agreement between the parties hereto shall constitute a default in this Agreement.

**FOR THE SELLER (#1)**

By: <u>SEAN ANGELINI OWNER</u>  _____ *Sean Angelini*
          (Print Name and Title)       —302F3097103B4C6...    (Signature)

**FOR THE SELLER (#2)**

By: _____        _____
          (Print Name and Title)          (Signature)

**OWNER #1**

By: <u>SEAN ANGELINI OWNER</u>  _____ *Sean Angelini*
          (Print Name and Title)       —302F3097103B4C6...    (Signature)

**OWNER #2**

By: _____        _____
          (Print Name and Title)          (Signature)

**VALIDITY GUARANTOR #1 (if any)**

By: <u>SEAN ANGELINI OWNER</u>  _____ *Sean Angelini*
          (Print Name and Title)       —302F3097103B4C6...    (Signature)

**VALIDITY GUARANTOR #2 (if any)**

By: _____        _____
          (Print Name and Title)          (Signature)

<u>**GLOBAL MERCHANT CASH, INC.**</u>

By: _____    Sales Associate Name _____
        (Company Officer)                  (Signature)

Initials: *SA*

**Appendix A – List of Fees and Charges and Contact Information**

A.      In addition to the Purchased Amount of Future Receipts, the Agreement provides that the following fees shall be applied:

1.  **Non-Sufficient Funds (NSF) Fee -** 35.00 **each (Up to FOUR TIMES ONLY within any calendar month period before a default is declared, or SIX or more ACH transactions attempted by Buyer are rejected by Seller's bank over any three month period)**

2.  **Stop Payment Fee - $100.00**

3.  **Wire Fee -            $35.00**

4.  **UCC Filing Fee-      $295.00**

5.  **Default Fee -         $5,000.00**

6.  **Financing Fee:**
    a. **$5,000    -   $9,999      = $_____**
    b. **$10,000   -  $19,999     = $_____**
    c. **$20,000   -  $49,999     = $_____**
    d. **$50,000   -  $100,000   = $_____**
    e. **$100,001  -  $249,999   = $_____**
    f. **$250,000  -  $399,999   = $_____**
    g. **$400,000  -  $699,999   = $_____**
    h. **$700,000  -  $1,000,000 = $_____**

7.  **Other:**

B.      SELLER'S CONTACT

Address          106 MANTUA AVE_____

                 MANTUA, NJ 08051_____

Phone (Land)     ████████████████████████

Cell             ████████████████████████

Email Address    ████████████████████████



Initials:

**EXHIBIT A**

**AUTHORIZATION AGREEMENT**
**FOR AUTOMATED CLEARING HOUSE TRANSACTIONS**

[ ORBIT ENERGY & POWER LLC          ] ("Seller") hereby authorizes Buyer ("Buyer") to present automated clearing house (ACH) debits to the following checking account in the amount of fees and other obligations due to Buyer from Seller under the terms of that Agreement for the Purchase and Sale of Future Receipts (the "Agreement") entered into between Seller and Buyer, as it may be amended, supplemented or replaced from time to time. In addition, if an Event of Default (as defined in the Agreement) occurs, Seller authorizes Buyer to debit any and all accounts controlled by Seller or controlled by any entity with the same Federal Tax Identification Number as Seller up to the total amount, including but not limited to, all fees and charges, due to Buyer from Seller under the terms of the Agreement.  This Authorization Agreement is irrevocable without the prior written consent of Buyer.

Transfer Funds To/From:          Name of Bank:  REPUBLIC BANK

                                 ABA Transit/Routing #:  █████

                                 Checking Account #:      █████

This authorization is to remain in full force and effect until all obligations due to Buyer under the Agreement have been fulfilled.

Seller Information:              Seller's Name:  ORBIT ENERGY & POWER LLC

                                Signature of Authorized Representative:  *Sean Angelini*
                                                                         302F3097103B4C6...

                                Print Name:  SEAN ANGELINI

                                Title:  OWNER

                                Seller's Tax ID:  █████

                                Date:  11/30/2021


## [Attached Voided Check Here]

Initials:  SA

DocuSign Envelope ID: B70B21AA-A94E-4E44-ACE5-7B695DDA8D5D

Dear Seller,

Please fill out the form below with the access information for your bank account, please write legibly and indicate lower/upper case sensitivity.

Legal Name/ DBA: ___ORBIT ENERGY & POWER LLC / ORBIT ENERGY & POWER___

Bank portal website: _____

Username: _____

Password: _____

Security Question/Answer 1:_____

Security Question/Answer 2:_____

Security Question/Answer 3:_____

Security Question/Answer 4:_____

Security Question/Answer 5:_____

Security Question/Answer 6:_____

Any other information necessary to access your account: _____

Initials: _____

**DocuSign**

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: B70821AAA84E4E44ACC57B605DDA8D5D | | Status: Completed |
| Subject: Please Complete and Sign DocuSign Contract for ORBIT ENERGY & POWER LLC ID# 92905 | | |
| Source Envelope: | | |
| Document Pages: 17 | Signatures: 7 | Envelope Originator: |
| Certificate Pages: 4 | Initials: 17 | Wall Funding |
| AutoNav: Enabled | | 30 Broad St |
| EnvelopeId Stamping: Enabled | | 14th Floor |
| Time Zone: (UTC-05:00) Eastern Time (US & Canada) | | New York, NY  10004 |
| | | <span style="background:red">redacted</span> |
| | | IP Address: ▮▮▮▮▮ |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Wall Funding | Location: DocuSign |
| 11/30/2021 2:19:44 PM | <span style="background:red">redacted</span> | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Sean Angelini | *Sean Angelini* | Sent: 11/30/2021 2:19:46 PM |
| <span style="background:red">redacted</span> | —302F3097103B4C6... | Viewed: 11/30/2021 2:28:08 PM |
| President | | Signed: 11/30/2021 2:38:11 PM |
| ORBIT ENERGY & POWER, LLC | | |
| Security Level: Email, Account Authentication (None) | Signature Adoption: Pre-selected Style | |
| | Using IP Address: ▮▮▮▮▮ | |

Electronic Record and Signature Disclosure:
  Accepted: 11/30/2021 2:28:08 PM
  ID: 97322455-036e-4b14-8e35-28032d87651c

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 11/30/2021 2:19:46 PM |
| Certified Delivered | Security Checked | 11/30/2021 2:28:08 PM |
| Signing Complete | Security Checked | 11/30/2021 2:38:11 PM |
| Completed | Security Checked | 11/30/2021 2:38:11 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

## Electronic Record and Signature Disclosure

Electronic Record and Signature Disclosure created on: 4/16/2017 4:06:52 PM
Parties agreed to: Sean Angelini

**ELECTRONIC RECORD AND SIGNATURE DISCLOSURE**

From time to time, Wall Street Funding (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through your DocuSign, Inc. (DocuSign) Express user account. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. For such copies, as long as you are an authorized user of the DocuSign system you will have the ability to download and print any documents we send to you through your DocuSign user account for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of your DocuSign account. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use your DocuSign Express user account to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through your DocuSign user account all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Wall Street Funding:**
You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
 To contact us by email send messages to: mikek@wallfunding.com


**To advise Wall Street Funding of your new e-mail address**
To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at mikek@wallfunding.com and in the body of such request you must state: your previous e-mail address, your new e-mail address. We must verify and validate your email address by sending you a message and receiving a response from you.
In addition, you must notify DocuSign, Inc to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in DocuSign.

**To request paper copies from Wall Street Funding**
To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to mikek@wallfunding.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Wall Street Funding**
To inform us that you no longer want to receive future notices and disclosures in electronic format you may:
> i. decline to sign a document from within your DocuSign account, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
> ii. send us an e-mail to mikek@wallfunding.com and in the body of such request you must state your e-mail, full name, IS Postal Address, telephone number, and account number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..


**Required hardware and software**

| Operating Systems: | Windows2000? or WindowsXP? |
|---|---|
| Browsers (for SENDERS): | Internet Explorer 6.0? or above |
| Browsers (for SIGNERS): | Internet Explorer 6.0?, Mozilla FireFox 1.0, NetScape 7.2 (or above) |
| Email: | Access to a valid email account |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | •Allow per session cookies<br><br>•Users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection |

** These minimum requirements are subject to change. If these requirements change, we will provide you with an email message at the email address we have on file for you at that time providing you with the revised hardware and software requirements, at which time you will

have the right to withdraw your consent.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I Agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify Wall Street Funding as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by  Wall Street Funding during the course of my relationship with you.

# Agreement for the Purchase and Sale of Future Receipts

**Seller's Legal Name**: ORBIT ENERGY & POWER LLC          D/B/A: ORBIT ENERGY & POWER

**Form of Business Entity**: [ ] Corporation; [x] Limited Liability Company; [ ] Partnership; [ ] Limited Partnership; [ ] Limited Liability Partnership; [ ] Sole Proprietorship; [ ]Other: _____

**Street Address**: 106 MANTUA AVE                , City: MANTUA          , State: NJ      ; Zip: 08051

**Mailing Address**: 106 MANTUA AVE              , City: MANTUA          , State: NJ      ; Zip: 08051

**Primary Contact Name**: SEAN ANGELINI                          Title: OWNER

**Federal Tax ID Number**: ▮▮▮▮▮▮▮▮▮

**Purchase Price**: $ 500,000.00      **Purchased Amount**: $ 640,000.00      **Average Monthly Sales**: $ 3,761,156.53

**Specified Percentage**: 10          %  **Origination Fee**: $ 0.00          (to be deducted from the Purchase Price)

**Weekly Amount**: $ 16,000.00          (Average Monthly Sales x Specified Percentage / Average Business Days in a Calendar Month)

**Account for the Deposit of All Future Receipts**: Bank: REPUBLIC BANK

Account No: ▮▮▮▮▮          Account No: _____

Account No: _____          Account No: _____

Effective,_____02/25_____, 20 22    Seller, identified above, hereby sells, assigns and transfers to Global Merchant Cash, Inc., located at 30 Broad Street – 14th Fl., New York, New York 10004 ("Buyer"), without recourse, the Specified Percentage of the proceeds of each future sale made by Seller (collectively "Future Receipts") until Buyer has received the Purchased Amount. "Future Receipts" includes all payments made by cash, check, ACH or other electronic transfer, credit card, debit card, bank card, charge card (each such card shall be referred to herein as a "Payment Card") or other form of monetary payment in the ordinary course of Seller's business. As payment for the Purchased Amount, Buyer will deliver to Seller the Purchase Price, shown above, minus any Origination Fee shown above. Seller acknowledges that it has no right to repurchase the Purchased Amount from Buyer.

Both parties agree that the obligation of Buyer under this Agreement will not be effective unless and until Buyer has completed its review of the Seller and has accepted this Agreement by delivering the Purchase Price, minus any Origination Fee. Prior to accepting this Agreement, Buyer may conduct a processing trial to confirm its access to the Account and the ability to withdraw the Initial Weekly Amount. If the processing trial is not completed to the satisfaction of Buyer, Buyer will refund to Seller all funds that were obtained by Buyer during the processing trial.

Initials: SA

**Agreement of Seller:** By signing below Seller agrees to the terms and conditions contained in this Agreement, including those terms and conditions on the following pages, and further agrees that this transaction is for business purposes and not for personal, family, or household purposes.

**FOR THE SELLER (#1)**

By: _SEAN ANGELINI OWNER_____     DocuSigned by: *Sean Angelini*_____
        (Print Name and Title)                302F3097103B4C6...          (Signature)

**FOR THE SELLER (#2)**

By: _____     _____
        (Print Name and Title)                                    (Signature)

**OWNER #1**

By: _SEAN ANGELINI OWNER_____     DocuSigned by: *Sean Angelini*_____
        (Print Name and Title)                302F3097103B4C6...          (Signature)

**OWNER #2**

By: _____     _____
        (Print Name and Title)                                    (Signature)

**GLOBAL MERCHANT CASH, INC.**

By: _____     Sales Associate Name _____
        (Company Officer)                                    (Signature)

**Agreement of Each Owner:** Each Owner (each, a "Validity Guarantor") signing below agrees to the terms of the Credit Report Authorization below.

_SEAN ANGELINI OWNER_____     DocuSigned by: *Sean Angelini*_____;
(print name)                            302F3097103B4C6...          (Signature)

_____     _____
(print name)                                    (Signature)

1. **Delivery of Purchased Amount:** Seller must deposit all Future Receipts into the single business banking account specified above, which may not be used for any personal, family or household purposes (the "Account") and must instruct Seller's credit card processor, which must be approved by Buyer (the "Processor") to deposit all Payment Card receipts of Seller into the Account. Seller agrees not to change the Account or add an additional Account without the express written consent of Buyer. Seller authorizes Buyer to debit the Weekly Amount (as such Weekly Amount is adjusted from time to time in accordance with Section 2 hereof) from the Account each business day by either ACH or electronic check. Seller will provide Buyer with all required access codes and agrees not to change them without prior consent from Buyer.  Seller will provide an appropriate ACH authorization to Buyer substantially in the form attached hereto as <u>Exhibit A</u>, provided that such form is acceptable to the Bank at which the Account is maintained. Seller understands that it is responsible for either ensuring that the Weekly Amount is available in the Account each business day or advising Buyer prior to each weekly withdrawal of a shortage of funds. Otherwise, Seller will be responsible for any fees incurred by Buyer resulting from a rejected electronic check or ACH debit attempt, as set forth on <u>Appendix A</u>. Buyer is not responsible for any overdrafts or rejected transactions that may result from Buyer's debiting any amount authorized under the terms of this Agreement. Seller understands that the foregoing ACH

Initials: *SA*

authorization is a fundamental condition to induce Buyer to accept the Agreement. Consequently, such authorization is intended to be irrevocable.

2.  **Seller May Request Changes to the Weekly Amount:**  The initial Weekly Amount is intended to represent the Specified Percentage of Seller's weekly Future Receipts. For as long as no Event of Default has occurred, once each calendar month, Seller may request that Buyer adjust the Weekly Amount to more closely reflect the Seller's actual Future Receipts times the Specified Percentage. Seller agrees to provide Buyer any information requested by Buyer to assist in this reconciliation. No more often than once a month, Buyer may adjust the Weekly Amount on a going-forward basis to more closely reflect the Seller's actual Future Receipts times the Specified Percentage. Buyer will give Seller notice five business days prior to any such adjustment. After each adjustment made pursuant to this paragraph, the new dollar amount shall be deemed the Weekly Amount until any subsequent adjustment.

3.  **Weekly Amount Upon Default.** Upon the occurrence of an Event of Default, the Weekly Amount shall equal 100% of all Future Receipts.

4.  **Sale of Future Receipts (THIS IS NOT A LOAN):** Seller is selling a portion of a future revenue stream to Buyer at a discount, not borrowing money from Buyer. There is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by Buyer. If Future Receipts are remitted more slowly than Buyer may have anticipated or projected because Seller's business has slowed down, or if the full Purchased Amount is never remitted because Seller's business went bankrupt or otherwise ceased operations in the ordinary course of business, and Seller has not breached this Agreement, Seller would not owe anything to Buyer and would not be in breach of or default under this Agreement. Buyer is buying the Purchased Amount of Future Receipts knowing the risks that Seller's business may slow down or fail, and Buyer assumes these risks based on Seller's representations, warranties and covenants in this Agreement that are designed to give Buyer a reasonable and fair opportunity to receive the benefit of its bargain. By this Agreement, Seller transfers to Buyer full and complete ownership of the Purchased Amount of Future Receipts and Seller retains no legal or equitable interest therein. Seller agrees that it will treat the Purchase Price and Purchased Amount in a manner consistent with a sale in its accounting records and tax returns. Seller agrees that Buyer is entitled to audit Seller's accounting records upon reasonable Notice in order to verify compliance. Seller waives any rights of privacy, confidentiality or taxpayer privilege in any such litigation or arbitration in which Seller asserts that this transaction is anything other than a sale of future receipts.

5.  **Power of Attorney.** Seller irrevocably appoints Buyer as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to Buyer from Seller, or in the case of a violation by Seller of this Agreement or the occurrence of an Event of Default under Section 15 hereof by Seller, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Future Receipts; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Seller's name on any invoice, bill of lading, or assignment directing customers or account debtors to direct payables to Buyer; (v) to file any claims or take any action or institute any proceeding which Buyer may deem necessary for the collection of any of the remaining Purchased Amount of the Future Receipts, or otherwise to enforce its rights with respect to delivery of the Purchased Amount; and/or (vi) to contact any Processor of Seller and to direct such Processor(s) to deliver directly to Buyer all or any portion of the amounts received by such Processor(s) and to provide any information regarding Seller requested by Buyer. Each Processor may rely on the previous sentence as written authorization of Seller to provide any information requested by Buyer. Each Processor is hereby irrevocably authorized and directed by Seller to follow any instruction of Buyer without inquiry as to Buyer's right or authority to give such instructions. Seller acknowledges the terms of the preceding sentence and agrees not to (a) interfere with Buyer's instructions or a Processor's compliance with this Agreement or (b) request any modification thereto without Buyer's prior written consent.  The Seller also hereby grants to the Buyer full and complete power of attorney over the Account pursuant to which power the Buyer is authorized to withdraw all funds on deposit in such Account, to disburse such funds in the manner set forth herein, and to have access to all information, statements and reports pertaining to the Account, whether issued by the banking institution at which such account is maintained, the Internal Revenue Service, another governmental agency, or otherwise. This authorization may only be revoked with the prior written consent of the Buyer. The Seller hereby acknowledges and agrees that it shall be responsible for any debits that are bounced for any reason including, but not limited to, insufficient funds in the Account. Additionally, Seller shall be responsible for any monthly maintenance fees and any other fees due the bank as a result of maintaining the Account, including, but not limited to, Processor fees. Seller authorizes Buyer to maintain a $50.00 reserve (the "reserve") in the Account at all times, which reserve will initially be built up from the first several batches credited to the Account commencing during the Processing Trial. If at any time during the Agreement, the reserve drops below $50.00, Buyer is authorized to replenish the reserve out of the next credits to the Account in an amount of up to $50.00. In any instance where there are not enough funds

Initials:

3

in the reserve or the Account to cover fees or debits, Buyer shall have the right to withdraw these from Seller's Future Receipts that are thereafter deposited into the Account in order to satisfy the debits or fees and rebuild the reserve. Should there be no funds in the Account to cover the fees said fees will be added to the cash advance balance due Buyer.

6. **Fees and Charges:** Other than the Origination Fee, if any, set forth above, Buyer is NOT CHARGING ANY ORIGINATION OR BROKER FEES to Seller. If Seller is charged another such fee, it is not being charged by Buyer. A list of all fees and charges applicable under this Agreement is contained in Appendix A.

7. **Credit Report and Other Authorizations:** Seller and each of the Owners signing above authorize Buyer, its agents and representatives and any credit reporting agency engaged by Buyer, to (i) investigate any references given or any other statements or data obtained from or about Seller or any of its Owners for the purpose of this Agreement, (ii) obtain consumer and business credit reports on the Seller and any of its Owners, and (iii) to contact personal and business references provided by the Seller in the Application, at any time now or for so long as Seller and/or Owners continue to have any obligation owed to Buyer as a consequence of this Agreement or for Buyer's ability to determine Seller's eligibility to enter into any future agreement with Buyer.

8. **Authorization to Contact Current and Prior Banks:** Seller hereby authorizes Buyer to contact any current or prior bank of the Seller in order to obtain whatever information it may require regarding Seller's transactions with any such bank. Such information may include but is not limited to, information necessary to verify the amount of Future Receipts previously processed on behalf of Seller and any fees that may have been charged by the bank. In addition, Seller authorizes Buyer to contact any current or prior bank of the Seller for collections and in order to confirm that Seller is exclusively using the Account identified above, or any other account approved by Buyer, for the deposit of all business receipts.

9. **Financial Information**. Seller authorizes Buyer and its agents to investigate its financial responsibility and history, and will promptly provide to Buyer any authorizations, bank or financial statements, tax returns, etc., as Buyer deems necessary in its sole discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed acceptable as an authorization for release of financial and credit information. Buyer is authorized to update such information and financial and credit profiles from time to time as it deems appropriate. Seller waives, to the maximum extent permitted by law, any claim for damages against Buyer or any of its affiliates relating to any investigation undertaken by or on behalf of Buyer as permitted by this Agreement or disclosure of information as permitted by this Agreement.

10. **Transactional History**. Seller authorizes all of its banks and brokers and Payment Card processors to provide Buyer with Seller's banking, brokerage and/or processing history to determine qualification or continuation in this program, or for collections upon an Event of Default.

11. **Publicity**. Seller hereby authorizes Buyer to use its name in listings of clients and in advertising and marketing materials.

12. **Application of Amounts Received by Buyer.** Buyer reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to Buyer from Seller prior to applying such amounts to reduce the amount of any outstanding Purchased Amount.

13. **Representations, Warranties and Covenants of Seller:**

13.1. **Good Faith, Best Efforts and Due Diligence**. Seller will conduct its business in good faith and will use its best efforts to continue its business at least at its current level, to ensure that Buyer obtains the Purchased Amount.

13.2. **Stacking Prohibited**. Seller shall not enter into any Seller cash advance or any loan agreement that relates to or involves its Future Receipts with any party other than Buyer for the duration of this Agreement without the express prior written consent of Buyer. Breach of this covenant will result in default, in which event Seller will be immediately be liable for the full balance owed to Buyer plus a default fee of $2,500 or 25% of the amount sold, whichever is greater. Buyer may share information regarding this Agreement with any third party in order to determine whether Seller is in compliance with this provision.

13.3. **Financial Condition and Financial Information**. Any bank statements and financial statements of Seller that have been furnished to Buyer, and future statements that will be furnished to Buyer, fairly represent the financial condition of Seller at such dates, and Seller will notify Buyer immediately if there are material adverse changes, financial or otherwise, in the

Initials: _SA_

4

condition or operation of Seller or any change in the ownership of Seller. Buyer may request statements at any time during the performance of this Agreement and the Seller shall provide them to Buyer within five business days. Furthermore, Seller represents that all documents, forms and recorded interviews provided to or with Buyer are true, accurate and complete in all respects, and accurately reflect Seller's financial condition and results of operations. Seller further agrees to authorize the release of any past or future tax returns to Seller.

13.4.    **Governmental Approvals**. Seller is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

13.5.    **Authority to Enter Into This Agreement**. Seller and the person(s) signing this Agreement on behalf of Seller, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

13.6.    **Change of Name or Location or Sale or Closing of Business**. Seller will not conduct Seller's businesses under any name other than as disclosed to Buyer or change any of its places of business without prior written consent of Buyer. Seller will not sell, dispose, transfer or otherwise convey all or substantially all of its business or assets without (i) the express prior written consent of Buyer, and (ii) the written agreement of any purchaser or transferee assuming all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Buyer. Except as disclosed to Buyer in writing, Seller has no current plans to close its business either temporarily, whether for renovations, repairs or any other purpose, or permanently. Seller agrees that until Buyer has received all of the Purchased Amount Seller will not voluntarily close its business on a temporarily basis for renovations, repairs, or any other purposes. This provision, however, does not prohibit Seller from closing its business temporarily if such closing is required to conduct renovations or repairs that are required by local ordinance or other legal order, such as from a health or fire inspector, or if otherwise forced to do so by circumstances outside of the control of Seller. Prior to any such closure, Seller will provide Buyer ten business days' notice to the extent practicable.

13.7.    **Lease Effectiveness.**  Seller agrees that by signing this Agreement, it is agreeing to take all steps necessary to maintain in full force and effect and not terminate its lease, or vacate the current premises at the address listed in this Agreement before the Buyer is paid back in full.  If Seller intends to vacate, actually vacates or if landlord requires Seller to vacate before it has completed the payback to Buyer, then Seller and its principals shall provide Buyer with prompt notice thereof, and they shall be personally, jointly and severally liable for the outstanding balance.

13.8.    **No Change of Control.**  Seller shall not undertake any transaction involving the sale, transfer or other conveyance of the Seller's business or its assets, either by an issuance, sale or transfer of ownership interests in the business that results in a change in ownership or voting control of the Seller's business, or by a sale or transfer of substantially all of the assets of the business without the express prior written consent of the Buyer;

13.9.    **No Pending or Contemplated Bankruptcy.** As of the date Seller executes this Agreement, Seller is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Seller. Seller represents that it has not consulted with a bankruptcy attorney within six months prior to the date of this Agreement. Seller further warrants that it does not anticipate filing a bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

13.10.    **Seller to Maintain Insurance.** Seller will possess and maintain insurance in such amounts and against such risks as are necessary to protect its business and will provide proof of such insurance to Buyer upon demand.

13.11.    **Seller to Pay Taxes Promptly.** Seller will promptly pay all necessary taxes, including but not limited to employment and sales and use taxes.

13.12.    **Seller to Maintain Sufficient Funds on Deposit in the Account.**  The Seller shall maintain funds in the Account at all times in an amount that is sufficient to pay the Specified Percentage, any monthly maintenance fees and any other fees due the bank as a result of maintaining the Account, including, but not limited to, Processor fees, and the $50 reserve.

13.13.    **No Violation of Prior Agreements.** Seller's execution and performance of this Agreement will not conflict with any other agreement, obligation, promise, court order, administrative order or decree, law or regulation to which Seller is subject, including any agreement the prohibits the sale or pledge of Seller's future receipts.

Initials:

5

13.14.  **No Diversion of Receipts; No Stop Payment.** Seller will not permit any event to occur that could cause a diversion of any of Seller's Future Receipts from the Account to any other entity, and Seller shall not attempt to place a Stop Payment on any debit by Buyer of the Specified Percentage or any other fees due to Buyer hereunder.

13.15.  **No Payment Default.** Neither the Seller, nor any of its affiliates, is in default of any of its payment obligations under any agreement or instrument to the Buyer or any third party to which it is a party, nor is any third party attempting to collect funds from the Seller or any of its affiliates.

13.16.  **Seller's Knowledge and Representation.** Seller represents warrants and agrees that it is a sophisticated business entity familiar with the kind of transaction covered by the Agreement; it was represented by counsel or had full opportunity to consult with counsel.

13.17.  **No Fraud.** Seller shall not commit fraud.

**14.  Rights of Buyer:**

14.1. **Financing Statements and Security Interest.** As security for Buyer's obligations hereunder, and under any other agreement between Buyer, on the one hand, and Seller or any affiliate of seller, on the other hand, Seller grants Buyer and/or its assignees or designees, if any, a continuing security interest, in the following property of the Seller: a security interest in all of (a) all of Seller's now owned and hereafter acquired accounts (including, without limitation, the Account), contract rights, chattel paper, tax refunds, documents, licenses, equipment, furniture, fixtures, general intangibles, instruments and inventory, wherever located, now or hereafter owned or acquired by the Seller; (b) all intellectual property including, without limitation, patents, trademarks and copyrights, trade names, service marks, logos and other sources of business identifiers (and applications for all of the foregoing), and all registrations, recordings and applications with the U.S. Patent and Trademark Office and all renewals, reissues and extensions thereof (collectively "Trademarks") whether now owned or hereafter acquired, together with any written agreements granting any right to use any Trademarks; and (c) all proceeds, as that term is defined in Article 9 of the Uniform Commercial Code ("UCC") (all such security interests, the "Collateral"). Wherever the term, "accounts receivable" appears herein, it shall have the same meaning as the term, "account", as defined under Section 9-101(a)(2) of Article 9 of the UCC. The security interest granted by Seller includes all accessions, attachments, accessories, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof, all proceeds of proceeds, and all records and data relating thereto.  Seller authorizes Buyer to file one or more UCC-1 forms consistent with the Uniform Commercial Code ("UCC") in order to give notice of this security interest, to give notice that the Purchased Amount of Future Receipts is the sole property of Buyer, and to give notice of Buyer's security interest in the assets of Seller, and/or any affiliate of Seller, which arise out of any agreement entered into between any or all of them and Buyer. The UCC filing may state that such sale is intended to be a sale and not an assignment for security and may state that the Seller is prohibited from obtaining any financing that impairs the value of the Future Receipts or Buyer's right to collect same.  Seller authorizes Buyer to debit the Account for all costs incurred by Buyer associated with the filing, amendment or termination of any UCC filings.

14.2. **Additional Collateral.** As further security to secure Validity Guarantor's payment and performance obligations to Buyer under the Guaranty, the Validity Guarantor hereby grants Buyer a security interest in _____
ORBIT 67 MAIN LLC
_____
(the "Additional Collateral").  Validity Guarantor understands that Buyer will have a security interest in the aforesaid Additional Collateral upon execution of this Agreement.

Merchant and Validity Guarantor each acknowledge and agree that any security interest granted to Buyer under any other agreement between Merchant or Validity Guarantor and Buyer (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement.



Merchant and Validity Guarantor each agrees to execute any documents or take any action in connection with this Agreement as Buyer deems necessary to perfect or maintain Buyer's first priority security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements. Merchant and Validity Guarantor each hereby authorizes Buyer to file any financing statements deemed necessary by Buyer to perfect or maintain Buyer's security interest, which financing statement may contain notification that Merchant and/or Validity Guarantor have granted a negative pledge to Buyer with respect to Collateral and Additional Collateral, and that any subsequent lienor may be tortuously interfering the Buyer's rights. Merchant and Validity Guarantor shall be liable for, and Buyer may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by Buyer in protecting, preserving and enforcing Buyer's security interest and rights.

14.3.  **Negative Pledge**. Merchant and Validity Guarantor each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

14.4.  **Right of Access.** In order to ensure that Seller is complying with the terms of this Agreement, Buyer shall have the right to (i) enter, without notice, the premises of Seller's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and or batch Seller's weekly receipts to the Processor and to ensure that Seller has not violated any other provision of this Agreement, and (ii) Seller shall provide access to its employees and records and all other items as requested by Buyer, and (iii) have Seller provide information about its business operations, banking relationships, vendors, landlord and other information to allow Buyer to interview any relevant parties.

14.5. **Recording, and Solicitations; Monitoring.**

(i)  <u>Authorization to Contact Seller by Phone; Monitoring</u>. Seller agrees that (i) it has an established business relationship with Buyer, its employees and agents and that Seller may be contacted from time-to-time regarding this or other business transactions; and (ii) that such communications and contacts are not unsolicited or inconvenient.   Seller authorizes Buyer, its affiliates, agents and independent contractors to contact Seller at any telephone number Seller provides to Buyer or from which Seller places a call to Buyer, or any telephone number where Buyer believes it may reach Seller, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Seller incurs charges for receiving such communications.  Seller further agrees that any such call between Buyer and Seller, and their agents and employees may be recorded or monitored.

(ii)  <u>Authorization to Contact Seller by Other Means</u>. Seller also agree that Buyer, its affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Seller. Seller expressly consents to conduct business by electronic means.

15.  **Events of Default**. The occurrence of any of the following events shall constitute an "Event of Default": (a) Seller interferes with Buyer's right to collect the Weekly Amount; (b) Seller violates any representation, warranty or covenant in this Agreement; (c) Seller uses multiple depository accounts other than the Account without the prior written consent of Buyer; (d) Seller changes its Account or its Processor without the prior written consent of Buyer; or (e) Seller fails to provide timely notice to Buyer such that in any given calendar month there are two or more ACH transactions attempted by Buyer are rejected by Seller's bank, or six or more ACH transactions attempted by Buyer are rejected by Seller's bank over any three month period.

16.  **Remedies**. If any Event of Default occurs, Buyer may proceed to protect and enforce its rights including, but not limited to, the following:

16.1.  The Specified Percentage shall equal 100%. The full uncollected Purchased Amount due under this Agreement will become due and payable in full immediately.

16.2. Buyer shall be entitled to recover from Seller all "Costs of Collection" which means any and all expenses and costs,

including attorneys' fees and court or arbitration costs, incurred by Buyer in connection with the defense, protection or enforcement of Buyer's rights under this Agreement (including, without limitation, in connection with any bankruptcy proceeding).

16.3.    Buyer may exercise any and all remedies available under Article 9 of the Uniform Commercial Code of any applicable jurisdiction as a secured creditor as it applies to the sale of accounts.

16.4.    Buyer may rescind this Agreement in its entirety, in which case Buyer shall be entitled to all remedies accorded to a party that successfully enforces a judicial rescission remedy.

16.5.    In addition to the foregoing, in the event of Seller's breach of any of the representations, warranties or covenants set forth in this Agreement, Seller agrees that Buyer shall be entitled to, but not limited to, damages equal to the amount by which the cash attributable to the Purchased Amount exceeds the amount of collections received by Buyer from Future Receipts.    The Seller hereby agrees that the Buyer may automatically debit such damages from Seller's depository accounts wherever situated, including the Account, via ACH debit or wire transfer.    Seller acknowledges that, in the event of a default by any Validity Guarantor, Validity Guarantors agree that Buyer may report such default to one or more credit bureaus.

16.6.    Buyer may enforce the provisions of the Validity Guaranty against each Validity Guarantor.

16.7.    Buyer may proceed to protect and enforce its rights and remedies by arbitration or lawsuit. In any such arbitration or lawsuit, under which Buyer shall recover Judgment against Seller, Seller shall be liable for all of Buyer's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs. However, the rights of Buyer under this provision shall be limited as provided in the arbitration provision set forth below.

16.8.    Buyer may debit Seller's depository accounts wherever situated by means of ACH debit or email or facsimile signature on a computer-generated check drawn on Seller's bank account or otherwise for all sums due to Buyer (including, without limitation, all Costs of Collection).

16.9. Buyer shall otherwise be entitled to all remedies available to it under law including, without limitation, the right to non-judicial foreclosure.

16.10. All rights, powers and remedies of Buyer in connection with this Agreement may be exercised at any time by Buyer after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

17.    **Modifications; Agreements**. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by Buyer.

18.    **Assignment by Buyer**. Buyer may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part, with or without prior written notice to Seller.

19.    **Notices**.

19.1. Notices from Buyer to Seller. Buyer may send any notices, disclosures, terms and conditions, other documents, and any future changes to Seller by regular mail or by e-mail, at Buyer's option and Seller consents to such electronic delivery. Notices sent by e-mail are effective when sent. Notices sent by regular mail become effective upon mailing to Seller's address set forth in this Agreement.

19.2. Notices from Seller to Buyer. Seller may send any notices to Buyer by e-mail only upon the prior written consent of Buyer, which consent may be withheld or revoked at any time in Buyer's sole discretion. Otherwise, any notices or other communications from Seller to Buyer must be delivered by certified mail, return receipt requested, to Buyer's address set forth in this Agreement. Notices sent to Buyer shall become effective only upon receipt by Buyer.

20.    **Survival of Representation, etc**. All representations, warranties and covenants herein shall survive the execution and delivery of

Initials: _Sa_

8

this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full.

21. **Interpretation**. All Parties hereto have reviewed this Agreement with an attorney of their own choosing and have relied only on their own attorney's guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

22. **No Waiver.** There shall be effected no waiver by failure on the part of Buyer to exercise, or delay in exercising, any right under this Agreement, nor shall any single or partial exercise by Buyer of any right under this Agreement preclude any other future exercise of any right, The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

23. **Entire Agreement and Severability**. This Agreement embodies the entire agreement between Seller and Buyer and supersedes all prior agreements and understandings relating to the subject matter hereof. In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

24. **Email or Facsimile Acceptance**. Email or facsimile signatures hereon, or other electronic means reflecting the party's signature hereto, shall be deemed acceptable for all purposes as if they were originally executed signatures.

25. **Confidentiality**: The terms and conditions of this Agreement are proprietary and confidential unless required by law. Seller shall not disclose this information to anyone other than its attorney, accountant or similar service provider and then only to the extent such person uses the information solely for purpose of advising Seller and first agrees in writing to be bound by the terms of this Section. A breach entitles Buyer to damages and legal fees as well as temporary restraining order and preliminary injunction without bond.

26. **Further Assurances.** Seller agrees that it shall, from time to time, promptly execute and deliver all instruments and documents, and take all further action, that may be necessary or appropriate, or that Buyer may request, to perfect against Seller and all third parties the sale of the Specified Percentage of Future Receipts hereunder or to enable Buyer to exercise and enforce its rights and remedies hereunder.

27. **Binding Effect; No Assignment by Seller.** This Agreement shall be binding upon and inure to the benefit of Seller, Buyer and their respective successors and assigns, except that Seller shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Buyer which consent may be withheld in Buyer's sole discretion.

28. **Counterparts and Electronic Signatures.** This Agreement may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement. Facsimile signatures or electronic signatures shall be deemed to be original signatures and each party hereto may rely on a facsimile signature or an electronic signature as an original for purposes of enforcing this Agreement. The words "execution," "signed," "signature," and words of like import in this Agreement and any amendments thereof shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

29. **Governing Law.**  THIS AGREEMENT AND ALL TRANSACTIONS IT CONTEMPLATES, INCLUDING ALL ISSUES CONCERNING THE VALIDITY OF THE AGREEMENT AND ANY TRANSACTIONS IT CONTEMPLATES, THE CONSTRUCTION OF ITS TERMS, AND THE INTERPRETATION, PERFORMANCE AND ENFORCEMENT OF THE RIGHTS AND DUTIES OF THE PARTIES SHALL BE GOVERNED BY AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS THAT WOULD REQUIRE THE APPLICATION OF ANY OTHER LAW. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE PARTIES AGREE THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN THE ENTIRE RELATIONSHIP BETWEEN AND AMONG THE PARTIES, INCLUDING WITHOUT LIMITATION, ALL ISSUES OR CLAIMS ARISING OUT OF, RELATING TO, IN CONNECTION WITH, OR INCIDENT TO THIS AGREEMENT AND ANY TRANSACTIONS IT CONTEMPLATES, WHETHER SUCH CLAIMS ARE BASED IN TORT, CONTRACT, OR ARISE UNDER STATUTE OR IN EQUITY. AS USED HEREIN, THE PHRASE "LAWS OF THE STATE OF NEW YORK" INCLUDES NEW YORK LAW WITH RESPECT TO, AMONG OTHER THINGS, ANY APPLICABLE STATUTE OF LIMITATIONS, LACHES, OR SIMILAR TIME- BASED DEFENSE. THE PARTIES ACKNOWLEDGE AND AGREE THAT THIS AGREEMENT IS MADE AND PERFORMED IN THE STATE OF NEW YORK.

Initials:

30. **Jurisdiction.**  Seller and Validity Guarantor(s) further irrevocably and unconditionally consent and submit to the jurisdiction of any state or federal court sitting in the County of New York, State of New York, to resolve any suit, action, controversy, or proceeding of any kind (whether in contract, tort, statute, equity or otherwise) between or among the Parties, arising out of, related to, in connection with, or incident to this Agreement or any of the transactions it contemplates.  Seller and Validity Guarantor(s) hereby agree that any of the above-named courts shall be a convenient forum for any such suit, action, controversy, or proceeding of any kind between or among the Parties, arising out of, related to, in connection with, or incident to this Agreement or any of the transactions it  contemplates.  Seller and Validity Guarantor(s) waive, to the fullest extent permitted by law, (i) any objection that Seller or Validity Guarantor(s) may now or later have to the laying of venue of any suit, action, controversy, or proceeding arising out of, relating to, in connection with, or incident to this Agreement or any of the transactions it contemplates in any of the above- named courts, (ii) any objection to personal jurisdiction applying in any such court, and (iii) any claim that any such suit, action, controversy or proceeding brought in any such court has been brought in an inconvenient forum. Seller and Validity Guarantor(s) agree that service of process in any such suit, action, controversy, or proceeding may be served on any of them by mailing or delivering a copy of the process to any of the addresses set forth in this Agreement or any other address Seller or Validity Guarantor(s) has provided to Buyer.  Nothing set forth in this Section affects the right to serve process in any other manner permitted by law.

31. **Arbitration Agreement; Class Action Waiver.**  This Arbitration Clause is an agreement between Seller, Validity Guarantors and Buyer to arbitrate disputes.  "Disputes" is deemed to have the broadest possible meaning, and includes, without limitation, any and all disputes, claims or controversies, in law and in equity, between Seller and/or Validity Guarantors on the one hand, and Buyer on the other hand, arising out of or relating to this Agreement and/or (i) any claims of breach of contract, tort, misrepresentation, conversion, fraud, or unfair and deceptive trade practices, or (ii) any claim of a violation of any local, state or federal statute, regulation or ordinance, etc.  At the request of either Seller and Validity Guarantor(s), on the one hand, or Buyer, on the other hand, any Dispute shall be settled exclusively and finally by arbitration conducted in the County of New York, State of New York under the commercial arbitration rules of the Commercial Panel of the American Arbitration Association (the "AAA"), such arbitration to apply the laws of the State of New York (without giving effect to conflict of laws principles). The Parties agree that, once any of them has elected to arbitrate, binding arbitration is the exclusive method for resolving any and all Disputes, and that, under this Arbitration Clause, all Parties are waving the right to a jury trial and the right to bring or participate in any class action in court or through arbitration (this is referred to below as the "Class Action Waiver").  Seller, Validity Guarantor(s) and Buyer hereby agree that the above-named forum shall be a convenient forum for any such arbitration proceeding or other controversy arising out of, related to, in connection with, or incident to this Agreement or any of the transactions it contemplates. Seller, Validity Guarantor(s) and Buyer waive, to the fullest extent permitted by law, (i) any objection that they may now or later have to such laying of venue, (ii) any objection to personal jurisdiction applying in any such venue, and (iii) any claim that any such arbitration proceeding or other controversy brought in such venue has been brought in an inconvenient forum.

The arbitrator at such arbitration shall not be entitled to award punitive damages to any Party, and the costs and fees of such arbitration shall be borne by the losing Party. The Parties hereto acknowledge and agree that no class arbitration or other representative action may be undertaken or participating in by the arbitrators. The Parties shall jointly agree upon an AAA arbitrator or, if they cannot agree, the AAA shall select a neutral arbitrator from the AAA's Commercial Panel.  The arbitration award shall be in writing, but without a supporting opinion unless such an opinion is requested by a Party.

Nothing in this Arbitration Clause shall be deemed to limit the right of Buyer (a) to exercise self-help remedies such as, without limitation, setoff, (b) to foreclose against any real or personal property collateral, or (c) to obtain from a court provisional or ancillary remedies such as, without limitation, injunctive relief, writ of possession or the appointment of a receiver.  Buyer may exercise such self-help rights, foreclose upon such property, or obtain such provisional or ancillary remedies before, during or after the pendency of any arbitration proceeding brought pursuant to this Agreement.  Neither this exercise of self-help remedies, nor the institution or maintenance of an action for foreclosure or provisional ancillary remedies, shall constitute a waiver of the right of any Party, including the claimant in any such action, to arbitrate the merits of the controversy or claim which prompted Buyer to resort to such remedies.

If a Party to this Agreement seeks to initiate arbitration, and another Party hereto refuses to arbitrate, the Party seeking to initiate arbitration may seek a court order enforcing this provision under which Buyer, Seller and Validity Guarantor(s) have agreed to arbitrate.  In such event, the court shall determine any issues regarding the enforceability of this Arbitration Clause, including the validity and effect of the Class Action Waiver, but all other issues shall be decided by the arbitrator.  If any Party fails to arbitrate as required under this Arbitration Clause, the Party electing arbitration shall, unless prohibited by applicable law, be entitled to recover its/their attorneys' fees and costs incurred in compelling the other Party to arbitrate the Dispute.  All statutes

DocuSign Envelope ID: E7FB5A2B-485F-419A-93C5-E3AA90BG158A

of limitation that otherwise would apply to an action brought in court will apply in arbitration.

The Parties acknowledge and agree that the Federal Arbitration Act (9 U.S.C. § 1 et seq.) shall govern any arbitration under this Arbitration Clause.

If any part of this Arbitration Clause conflicts with the terms of any other document or agreement between the Parties or the rules of the AAA, the terms of this Arbitration Clause shall govern.  If any part of this Arbitration Clause other than the Class Action Waiver shall be deemed or found unenforceable for any reason, the remainder of the Arbitration Clause shall remain enforceable.  If the Class Action Waiver shall be deemed or found unenforceable for any reason, the remainder of the Arbitration Clause shall be unenforceable.

The Parties agree that the mutual promises in this Arbitration Clause constitute the consideration necessary to make this Arbitration Clause enforceable even if the Parties do not enter into any further agreements.  This Arbitration Clause shall survive the termination, rescission or payment in full of this Agreement.

Seller and the Validity Guarantor(s) may opt out of this Arbitration Clause by notifying Buyer in writing of their intent to do so.  Such election to opt out must be mailed by first class mail postmarked no later than ten (10) days from the date of this Agreement and addressed to Buyer at:

> GLOBAL MERCHANT CASH, INC.
> 30 Broad Street – 14th Fl.
> New York, New York 10004

If more than one Seller and/or Validity Guarantor is a Party to this Agreement, all such Sellers and Validity Guarantors must elect arbitration or elect to opt out in order for the arbitration election or the opt out election to be effective.

32. **LIMITATION OF LIABILITY.**  SELLER AGREES THAT, REGARDLESS OF ANY CLAIMS SELLER MAY HAVE AGAINST BUYER, SELLER'S SOLE REMEDY WILL BE AN ACTION AT LAW FOR ACTUAL MONEY DAMAGES THAT WILL NOT EXCEED THE GREATER OF (I) THE AMOUNT OF FUNDS OVERPAID TO BUYER OR (II) $1,000, AND THAT SELLER WILL NOT BE ENTITLED TO, AND HEREBY WAIVES ANY AND ALL CLAIMS FOR, PUNITIVE, EXEMPLARY, CONSEQUENTIAL, LOST PROFITS, STATUTORY, OR SPECIAL DAMAGES OF ANY KIND.  IF SELLER FILES AN ACTION AGAINST BUYER AND THE MATTER IS DISMISSED OR BUYER PREVAILS IN THE MATTER, SELLER AGREES TO PAY ALL OF BUYER'S ATTORNEYS' FEES AND COSTS INCURRED IN THE MATTER, WHETHER IN COURT OR ARBITRATION.

33. **SERVICE OF PROCESS.** IN ADDITION TO THE METHODS OF SERVICE ALLOWED BY THE NEW YORK STATE CIVIL PRACTICE LAW & RULES ("CPLR"), SELLER HEREBY CONSENTS TO SERVICE OF PROCESS UPON IT BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, SERVICE HEREUNDER SHALL BE COMPLETE UPON SELLER'S ACTUAL RECEIPT OF PROCESS OR UPON BUYER'S RECEIPT OF THE RETURN THEREOF BY THE UNITED STATES POSTAL SERVICE AS REFUSED OR UNDELIVERABLE. SELLER MUST PROMPTLY NOTIFY BUYER, IN WRITING, OF EACH AND EVERY CHANGE OF ADDRESS TO WHICH SERVICE OF PROCESS CAN BE MADE. SERVICE BY BUYER TO THE LAST KNOWN ADDRESS SHALL BE SUFFICIENT. SELLER WILL HAVE (30) CALENDAR DAYS AFTER SERVICE HEREUNDER IS COMPLETE IN WHICH TO RESPOND. FURTHERMORE, SELLER EXPRESSLY CONSENTS THAT ANY AND ALL NOTICE(S), DEMAND(S), REQUEST(S) OR OTHER COMMUNICATION(S) UNDER AND PURSUANT TO THIS AGREEMENT FOR THE PURCHASE AND SALE OF FUTURE RECEIVABLES SHALL BE DELIVERED IN ACCORDANCE WITH THE PROVISIONS OF THIS AGREEMENT FOR THE PURCHASE AND SALE OF FUTURE RECEIVABLES.

34. **Indemnity.** Seller hereby indemnifies, defends and holds Buyer harmless from and against any and all direct and third-party suits, costs, causes of action, judgments, complaints, orders, and claims including, without limitation, reasonable attorneys' fees (each a "Claim") arising from or relating to any claim that Seller has breached this Agreement or that any representation, warranty, or statement Seller has made is not accurate in any respect.  Buyer shall notify Seller of any claim for indemnity hereunder, select counsel of Buyer's choice and Seller shall promptly pay all defense costs and satisfy any judgments. Buyer shall not settle any Claims that require Seller's payment of funds to any third party without Seller's approval, which approval shall not be unreasonably withheld or delayed.

Initials: SA

11

35. **Validity Guaranty; Confession of Judgment.**  In consideration of the Buyer entering into this Agreement, and in order to induce the Buyer to enter into this Agreement, each of the undersigned Seller and principal(s) of Seller (such principals, whether officers, shareholders, partners, other owners or others are referred to herein as the "Validity Guarantors"), hereby personally assumes and, jointly and severally, guarantees, the truth, accuracy and completeness of all of the Seller's the representations, warranties and covenants set forth in this Agreement (collectively, the "Guaranteed Obligations").  In such instance, Validity Guarantors shall perform under this Agreement, including, without limitation, paying, or causing to be paid, any amounts that Buyer would otherwise be entitled to collect from Seller under the terms of this Agreement, immediately, upon notice from Buyer describing Seller's violation(s) of the representations, warranties and/or covenants set forth in this Agreement in summary form.  Validity Guarantors' joint and several obligation to perform includes, without limitation, upon Seller's breach of any representation, warranty and/or covenant, Buyer's right to damages equal to the amount by which the cash attributable to the Purchased Amount exceeds the amount of collections received by Buyer from Receivables pursuant to Section 16 of the Agreement, without any presentment or demand made by the Buyer. In the event of a default by any Validity Guarantor, each Validity Guarantor agrees that Buyer may report such default to one or more credit bureaus.  Each Validity Guarantor acknowledges that it will directly benefit from Buyer and Seller entering into the Purchase Agreement.

This Guaranty shall be a guarantee of performance of Seller's representations, warranties and covenants, and not a guarantee of collection.  Validity Guarantors hereby waive demand of payment, notice and presentment, and agree that Buyer may proceed to enforce its rights against each Validity Guarantor or any other guarantor of Seller's obligations from time to time, prior to, contemporaneously with or after any enforcement against Seller, or without any enforcement against Seller.  The obligations of Validity Guarantors are unconditional, absolute and irrevocable, and shall remain in full force and effect and without regard to, and shall not be released, discharged or in any way affected by, (a) any amendment to this Agreement; (b) any exercise or non-exercise of or delay in exercising any right, remedy, power or privilege under or in respect of this Agreement; (c) any bankruptcy, insolvency, arrangement, composition, assignment for the benefit of creditors, or similar proceeding commenced by or against the Seller or any of its officers, directors or principals; (d) defects in the formation or authority of Seller; or (e) any other circumstance that might otherwise constitute a legal or equitable discharge of a guarantor or surety.  Validity Guarantors each further jointly and severally guarantee payment of all costs, expenses and attorneys' fees and disbursements which may be incurred by Buyer in connection with the Guaranteed Obligations, or any Validity Guarantor's default of its obligations under this Agreement.  If payment of any sum by Seller is recovered as a preference of fraudulent conveyance under any bankruptcy or insolvency law, the liability of Validity Guarantors under this Guaranty shall continue and remain in full force and effect notwithstanding such recovery.

Each Validity Guarantor authorizes, acknowledges and agrees that, in connection with the execution of this Agreement, investigative and/or consumer reports may be obtained with respect to the Seller and Validity Guarantor(s). The reports Buyer obtains may include, but are not limited to, the Seller's or Validity Guarantors' respective credit histories or similar characteristics, employment and education verifications, social security verification, criminal and civil history, Department of Motor Vehicle records, any other public records, and any other information bearing on credit standing or credit capacity. Accordingly, each Validity Guarantor authorizes the Buyer, its agents and representatives and any credit reporting agency employed by the Buyer to investigate any references given or any other statements of data obtained from or about the Seller or any of its principals for the purpose of this Agreement and to obtain credit reports at any time now or in the future with respect to the Validity Guarantors. The Validity Guarantors to this Agreement are hereby notified that a negative credit report reflected on his/her credit record may be submitted to a credit reporting agency if the provisions of this Guaranty are triggered by a violation by the Seller.

In the Buyer's sole discretion, as security for the payments to be made hereinabove, the Seller and each of the Validity Guarantors shall duly execute and deliver to the Buyer an Affidavit of Confession of Judgment in form satisfactory to Buyer in the amount of $ 640,000.00 , with interest at nine (9%) percent per annum, plus expenses, costs and attorneys' fees as specified therein.  The Confession of Judgment shall be held by Buyer, and, if Seller breaches any of the representations, warranties and/or covenants given by Seller under the Agreement, Buyer, without notice to the Seller or the Validity Guarantors, is authorized to file the Confession of Judgment in the Court and to take the necessary steps to enter judgment against the Seller and the Validity Guarantors pursuant to the terms of the Confession of Judgment.  The Seller and the Validity Guarantors each hereby waive and surrender any and all procedural and substantive rights or defenses, including, but not limited to, claims, counterclaims, setoffs, demands or discharges, to the entry of the Confession of Judgment, except with respect to establishing that a default did not occur or that notice was not given in accordance with the Agreement.  Without limiting the generality of the foregoing, the Seller and the Validity Guarantors shall not assert, raise, plead or enforce against Buyer any defense of waiver, release, res judicata, statue of fraud, anti-deficiency statute, fraud, incapacity, minority, usury, illegality or unenforceability which may be available to the Seller and the Validity Guarantors or any other person or entity liable in respect of any or all of the obligations under this

Initials: _SU_

12

Agreement, or any setoff available against Buyer to the Validity Guarantors or any other such person, or entity whether or not on account of a related transaction.  Seller and Validity Guarantors shall also not assert, raise, plead or enforce against Buyer any time-based defenses, including, but not limited to, laches or any applicable statute of limitations, and Seller and Validity Guarantors hereby expressly waive any and all such defenses and hereby fully and expressly acknowledge the obligations and indebtedness stated herein.  Seller and Validity Guarantors further waive and relinquish any right to appeal from the entry of this Confession of Judgment.

The Seller and the Validity Guarantors shall cooperate and covenant not to oppose or contest the Buyer's docketing and entering the New York judgment in any court in New York, and/or in any other jurisdiction in which the Seller and/or any Validity Guarantor has assets.

Within thirty (30) days prior to the three-year anniversary of the date of the Affidavit of Confession of Judgment, the Seller and each Validity Guarantor shall each execute a new Affidavit of Confession of Judgment in the amount of $ 640,000.00  plus accrued interest and other charges and fees due hereunder and provide same to the Buyer, which shall be held pursuant to the terms hereof.  Upon the receipt of the new Affidavit of Confession of Judgment from the Seller and the Validity Guarantors by the Buyer, the Buyer shall return the earlier original Affidavit of Confession of Judgment within twenty (20) days.  The failure of Seller and each of the Validity Guarantors to provide such new Affidavit of Confession of Judgment shall be a breach of this Agreement and the Buyer shall be entitled to all its remedies provided hereunder.

Notwithstanding the foregoing, as long as the Seller and the Validity Guarantors are not in default under the Agreement, and timely renew their Confession of Judgment in accordance with the terms hereof, the Confession of Judgment shall not be entered or enforced.

Initials:

13

DocuSign Envelope ID: E7FB5A3B-485F-419A-93C5-E3AA90BG158A

**36. Cross-Default.** Any default in any of the terms of this Agreement shall constitute a default in any of the terms of any other agreement between the parties hereto, and any default in any other agreement between the parties hereto shall constitute a default in this Agreement.

**FOR THE SELLER (#1)**

By: SEAN ANGELINI OWNER _____    *DocuSigned by:* Sean Angelini
          (Print Name and Title)    —302F3097103B4C6...    (Signature)

**FOR THE SELLER (#2)**

By: _____    _____
          (Print Name and Title)    (Signature)

**OWNER #1**

By: SEAN ANGELINI OWNER _____    *DocuSigned by:* Sean Angelini
          (Print Name and Title)    —302F3097103B4C6...    (Signature)

**OWNER #2**

By: _____    _____
          (Print Name and Title)    (Signature)

**VALIDITY GUARANTOR #1 (if any)**

By: SEAN ANGELINI OWNER _____    *DocuSigned by:* Sean Angelini
          (Print Name and Title)    —302F3097103B4C6...    (Signature)

**VALIDITY GUARANTOR #2 (if any)**

By: _____    _____
          (Print Name and Title)    (Signature)

**GLOBAL MERCHANT CASH, INC.**

By: _____    Sales Associate Name _____
          (Company Officer)    (Signature)

Initials: [DS] SA

**Appendix A – List of Fees and Charges and Contact Information**

A.     In addition to the Purchased Amount of Future Receipts, the Agreement provides that the following fees shall be applied:

1. **Non-Sufficient Funds (NSF) Fee -** 35.00 **each (Up to FOUR TIMES ONLY within any calendar month period before a default is declared, or SIX or more ACH transactions attempted by Buyer are rejected by Seller's bank over any three month period)**
2. **Stop Payment Fee - $100.00**
3. **Wire Fee -          $35.00**
4. **UCC Filing Fee-     $295.00**
5. **Default Fee -       $5,000.00**
6. **Financing Fee:**
   a. **$5,000   -   $9,999    = $_____**
   b. **$10,000  -  $19,999    = $_____**
   c. **$20,000  -  $49,999    = $_____**
   d. **$50,000  -  $100,000   = $_____**
   e. **$100,001 - $249,999    = $_____**
   f. **$250,000 - $399,999    = $_____**
   g. **$400,000 - $699,999    = $_____**
   h. **$700,000 - $1,000,000  = $_____**
7. **Other:**

B.     SELLER'S CONTACT

Address            106 MANTUA AVE_____

                   MANTUA, NJ 08051_____

Phone (Land)    ███████████████████████

Cell            ███████████████████████

Email Address   ███████████████████████

Initials: _SA_

**EXHIBIT A**

**AUTHORIZATION AGREEMENT**
**FOR AUTOMATED CLEARING HOUSE TRANSACTIONS**

[ ORBIT ENERGY & POWER LLC ] ("Seller") hereby authorizes Buyer ("Buyer") to present automated clearing house (ACH) debits to the following checking account in the amount of fees and other obligations due to Buyer from Seller under the terms of that Agreement for the Purchase and Sale of Future Receipts (the "Agreement") entered into between Seller and Buyer, as it may be amended, supplemented or replaced from time to time. In addition, if an Event of Default (as defined in the Agreement) occurs, Seller authorizes Buyer to debit any and all accounts controlled by Seller or controlled by any entity with the same Federal Tax Identification Number as Seller up to the total amount, including but not limited to, all fees and charges, due to Buyer from Seller under the terms of the Agreement.  This Authorization Agreement is irrevocable without the prior written consent of Buyer.

Transfer Funds To/From:   Name of Bank: REPUBLIC BANK

ABA Transit/Routing #: ▮▮▮

Checking Account #: ▮▮▮

This authorization is to remain in full force and effect until all obligations due to Buyer under the Agreement have been fulfilled.

Seller Information:   Seller's Name: ORBIT ENERGY & POWER LLC

Signature of Authorized Representative: *Sean Angelini* 302F3097103B4C6...

Print Name: SEAN ANGELINI

Title: 

Seller's Tax ID: ▮▮▮

Date: 02/25/2022

## [Attached Voided Check Here]

Initials: SA

Dear Seller,


    Please fill out the form below with the access information for your bank account, please write legibly and indicate lower/upper case sensitivity.

Legal Name/ DBA:   ORBIT ENERGY & POWER LLC / ORBIT ENERGY & POWER

Bank portal website: _____

Username: _____

Password: _____

Security Question/Answer 1:_____

Security Question/Answer 2:_____

Security Question/Answer 3:_____

Security Question/Answer 4:_____

Security Question/Answer 5:_____

Security Question/Answer 6:_____

Any other information necessary to access your account: _____

Initials: ___

# Global Merchant Cash

### ADDENDUM #1 TO THE PURCHASE AND SALE OF FUTURE RECEIVABLES AGREEMENT

This is an addendum to that Purchase and Sale of Future Receivables Agreement dated on the day of 02/25/2022   by and between, Global Merchant Cash, Inc. hereinafter referred to as "Purchaser," and  ORBIT ENERGY & POWER LLC          . (The "Business") and  SEAN ANGELINI   (Owners), collectively hereinafter referred to as "Seller" (Purchase Agreement).

Now, therefore, in consideration of the premises and the mutual representations, covenants, undertakings, and agreemen hereinafter contained Seller and Buy represent, Covenant, undertake and agree as follows:

Seller and Purchaser agree to discount the amount of the purchased price according to the following schedule.

| Early Repurchase Date | Discount RTR Amount |
|---|---|
| Calendar Days 1-30 | $ 550,000.00 |
| Calendar Days 31-60 | $ 560,000.00 |
| Calendar Days 61-90 | $ 575,000.00 |

RTR Must be received either in the manor described in the agreement or via wire transfer to the Purchasers Bank Account and funds cleared prior to 12 AM on the above-mentioned date.

Execution of this Addendum is made as of this 02/25/2022.

Purchaser:
By: Global Merchant Cash Inc
X._____

Seller:
By:  SEAN ANGELINI          
X_____

*Sean Angelini*
DocuSigned by:
302F3097103B4C6...

**DocuSign**

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: E7FBFA2D495F419A93C5E3AA90BC158A | | Status: Completed |
| Subject: Please Complete and Sign DocuSign Contract for ORBIT ENERGY & POWER LLC ID# 107083 | | |
| Source Envelope: | | |
| Document Pages: 18 | Signatures: 8 | Envelope Originator: |
| Certificate Pages: 4 | Initials: 17 | Wall Funding |
| AutoNav: Enabled | | 30 Broad St |
| EnvelopeId Stamping: Enabled | | 14th Floor |
| Time Zone: (UTC-05:00) Eastern Time (US & Canada) | | New York, NY  10004 |
| | | <span style="background:black;color:red">redacted</span> |
| | | IP Address: ■■■■■■ |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Wall Funding | Location: DocuSign |
|    2/28/2022 10:20:04 AM |    Contracts@wallfunding.com | |

## Signer Events

| Signer Events | Signature | Timestamp |
|---|---|---|
| Sean Angelini<br><span style="background:black;color:red">redacted</span><br>President<br>ORBIT ENERGY & POWER, LLC<br>Security Level: Email, Account Authentication (None) | *Sean Angelini*<br>302F3097103B4C6...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: ■■■■■■ | Sent: 2/28/2022 10:20:05 AM<br>Viewed: 2/28/2022 11:03:37 AM<br>Signed: 2/28/2022 11:05:00 AM |
| **Electronic Record and Signature Disclosure:**<br>  Accepted: 2/28/2022 11:03:37 AM<br>  ID: 8b3f82ee-6199-43f4-8eeb-b9b2896c13c5 | | |

## In Person Signer Events

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

## Editor Delivery Events

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

## Agent Delivery Events

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

## Intermediary Delivery Events

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

## Certified Delivery Events

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

## Carbon Copy Events

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

## Witness Events

| Witness Events | Signature | Timestamp |
|---|---|---|

## Notary Events

| Notary Events | Signature | Timestamp |
|---|---|---|

## Envelope Summary Events

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 2/28/2022 10:20:05 AM |
| Certified Delivered | Security Checked | 2/28/2022 11:03:37 AM |
| Signing Complete | Security Checked | 2/28/2022 11:05:00 AM |
| Completed | Security Checked | 2/28/2022 11:05:00 AM |

## Payment Events

| Payment Events | Status | Timestamps |
|---|---|---|

## Electronic Record and Signature Disclosure

Electronic Record and Signature Disclosure created on: 4/16/2017 4:06:53 PM
Parties agreed to: Sean Angelini

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Wall Street Funding (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through your DocuSign, Inc. (DocuSign) Express user account. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. For such copies, as long as you are an authorized user of the DocuSign system you will have the ability to download and print any documents we send to you through your DocuSign user account for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of your DocuSign account. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use your DocuSign Express user account to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through your DocuSign user account all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Wall Street Funding:**
You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
 To contact us by email send messages to: mikek@wallfunding.com


**To advise Wall Street Funding of your new e-mail address**
To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at mikek@wallfunding.com and in the body of such request you must state: your previous e-mail address, your new e-mail address. We must verify and validate your email address by sending you a message and receiving a response from you.
In addition, you must notify DocuSign, Inc to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in DocuSign.
**To request paper copies from Wall Street Funding**
To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to mikek@wallfunding.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.
**To withdraw your consent with Wall Street Funding**
To inform us that you no longer want to receive future notices and disclosures in electronic format you may:
> i. decline to sign a document from within your DocuSign account, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
> ii. send us an e-mail to mikek@wallfunding.com and in the body of such request you must state your e-mail, full name, IS Postal Address, telephone number, and account number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..


**Required hardware and software**

| Operating Systems: | Windows2000? or WindowsXP? |
|---|---|
| Browsers (for SENDERS): | Internet Explorer 6.0? or above |
| Browsers (for SIGNERS): | Internet Explorer 6.0?, Mozilla FireFox 1.0, NetScape 7.2 (or above) |
| Email: | Access to a valid email account |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | •Allow per session cookies<br><br>•Users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection |

** These minimum requirements are subject to change. If these requirements change, we will provide you with an email message at the email address we have on file for you at that time providing you with the revised hardware and software requirements, at which time you will

have the right to withdraw your consent.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I Agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify Wall Street Funding as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by  Wall Street Funding during the course of my relationship with you.

DocuSign Envelope ID: 35909180-CED6-44F8-97C1-92E8C371A1DC

Global Merchant Cash, Inc.
64 Beaver St., Suite 415, NY, NY 10004 | (877) 851-3880| contracts@wallfunding.com

Contract ID#: 2040

## RECEIVABLES PURCHASE AGREEMENT

This Receivables Purchase Agreement (herein referred to, including as the same may from time to time be amended, supplemented and/or restated, as this "Agreement") is made as of 05/18/2022 between Global Merchant Cash Inc. d/b/a Wall Street Funding ("GMC") and the merchant listed below (the "Merchant").

### MERCHANT INFORMATION

Merchant's Legal Name: Orbit Energy & Power LLC         Federal ID#: █████████

D/B/A: Orbit Energy & Power         State of Incorporation / Organization: NJ

Type of entity (check one): ☐ Corporation ☒ Limited Liability Company ☐ Limited Partnership ☐ General Partnership ☐ Sole Proprietor ☐ Other

Physical Address: 106 MANTUA AVE         City: MANTUA     State: NJ     Zip: 08051

Mailing Address: 106 MANTUA AVE         City: MANTUA     State: NJ     Zip: 08051

Email Address: redacted

### PURCHASE AND SALE OF FUTURE RECEIPTS

<u>Sale and Purchase of Merchant's Future Receipts</u>:  In consideration of payment by GMC to Merchant of the Purchase Price set forth below, Merchant hereby sells, assigns and transfers to GMC (making GMC the absolute owner thereof) all payments, receipts, settlements and funds paid to or received by or for the account of Merchant from time to time on and after the date hereof in payment or settlement of Merchant's existing and future accounts, payment intangibles, credit, debit and/or stored value card transactions, contract rights and other obligations owed to Merchant by Merchant's customers and/or other payers or obligors, whether made by cash, check, clearinghouse settlement, electronic transfer or other form of payment (collectively, the "Receipts"), until the cumulative amount of Receipts received in good funds by GMC equals the Purchased Receipts Amount set forth below.

<u>Delivery of Purchased Receipts</u>:  Merchant will deliver the Receipts purchased by GMC under the previous paragraph (the "Purchased Receipts") to GMC by, among other means, authorizing GMC to withdraw via ACH from the Merchant's bank account designated in Exhibit A (Authorization for Direct Deposit and Direct Payment) as it may be amended or replaced from time to time (the "Account").  Unless an Event of Default shall have occurred and be continuing, in which case the provisions of Article III hereof shall apply, GMC shall make a withdrawal from the Account in the Specific Daily/Weekly Amount ("Specific Amount") set forth below, as the same may be adjusted from time to time as provided in Section 1.14 below.  Unless otherwise agreed to in writing, Merchant agrees to deposit all Receipts into the Account and to direct any processor or issuer of any credit, debit, stored value or other payment source (each, a "Payment Card Processor") effecting payment of any Receipts ("Payment Card Receipts") to Merchant to deposit all Payment Card Receipts into the Account.  Merchant agrees not to make or cause debits to the Account (other than in favor of GMC) at any time that would cause the balance therein on any business day to be insufficient to fund payment in full of the Specific Amount (provided that it shall not be a default if there is an insufficient balance in the Account as a result of a business slowdown that causes a diminution in Receipts).  Merchant shall give GMC 24 hours advance notice (or other reasonable notice as necessitated by the circumstances) that there will be insufficient funds in the Account such that the ACH for the Specific Amount will not be honored by Merchant's bank.  The Account may not be used for any personal, family or household purposes.  Merchant will provide GMC with all required online access codes and monthly bank statements regarding the Account so that GMC may monitor the Account.  Merchant understands that it may not interfere with GMC's right to debit the Specific Amount and will be held responsible for any fees incurred by GMC resulting from a rejected ACH attempt that occurred because Merchant breaches this promise.  GMC is not responsible for any overdrafts or rejected transactions that may result from GMC debiting any amounts from the Account pursuant to the terms of this Agreement.  GMC will debit the Specific Amount each business day where the Specific Amount is daily, or on the agreed day of the week where the Specific Amount is weekly (as designated below).

Notwithstanding anything to the contrary in this Agreement or any other agreement between GMC and Merchant, upon the occurrence of an Event of Default under Article III hereof, GMC shall be entitled to receive one hundred percent (100.00%) of all of Merchant's future Purchased Receipts until it has received the Purchased Receipts Amount.  If Merchant commits an Event of Default by switching Accounts or using multiple depository accounts without GMC's consent, Merchant expressly authorizes any Payment Card Processor to deliver all payments directly to GMC until GMC has received the Purchased Receipts Amount.

Purchase Price: $ 1,400,000.00     Specified Percentage: 10 % Specific Daily/Weekly Amount: $ 54,147.06     Purchased Receipts Amount: $ 1,841,000.00 . The additional terms and conditions set forth on the following pages are incorporated in this agreement.

**FOR MERCHANT**
By: SEAN ANGELINI OWNER                         _Sean Angelini_
                                                302F3597102AF49...
(Print Name and Title)                          (Signature)

**FOR MERCHANT**
By: _____                        _____
(Print Name and Title)                          (Signature)

**Acknowledged and agreed:**

**OWNER/GUARANTOR**
By: SEAN ANGELINI                               _Sean Angelini_
                                                302F3597102AF49...
(Print Name)                                    (Signature)

**OWNER/GUARANTOR**
By: _____                        _____
(Print Name)                                    (Signature)

**Global Merchant Cash, Inc.**
By: _____                        _____
(Company Officer)                               (Signature)

9903570.2

DocuSign Envelope ID: 35909180-CED6-44F8-97C1-92E8C371A1DC

Case 22-19628-ABA    Doc 20   Filed 02/09/26    Entered 02/09/26 18:10:41    Desc
KEY BUSINESS TERMS AND DEFINITIONS
Exhibit 1    Page 75 of 87

| Term | Amount | Description |
|------|--------|-------------|
| *Purchase Price* | $ 1,400,000.00 | The total amount that GMC agrees to pay for the Purchased Receipts Amount. |
| *Purchased Receipts Amount* | $ 1,841,000.00 | The dollar value of the Purchased Receipts that Merchant hereby sells to GMC. |
| *Direct Payments to Third Parties/Renewals* | $ 625,294.92 | Amount paid to prior purchasers of the Receipts, including GMC. |
| *Origination Fees* | $ 21,000.00 | The amount GMC will withhold from the Purchase Price, which represents GMC's due diligence and other costs in performing its analysis for this financing transaction. |
| *Disbursement to Merchant* | $ 753,670.08 | The amount actually disbursed to Merchant, net of Direct Payments to Third Parties and Origination Fees. |
| *Specified Percentage* | 10% | An agreed upon percentage of the Receipts that Merchant shall deliver to GMC until the entire Purchased Receipts Amount is delivered to GMC in accordance with this Agreement. |
| *Discount Factor* | 1.315 | The risk adjustment to the Purchased Receipts Amount that determines the Purchase Price. |
| *Specific Amount (select one):*<br>__ Daily<br>_x_ Weekly   (every Fri _____)<br>__Bi-Weekly (every___ _____) | $ 54,147.06 | A dollar amount that Merchant and GMC agree to be a good faith approximation of the Specified Percentage of Daily/Weekly Receipts as of the date of this Agreement, based upon the information provided by Merchant to GMC regarding Merchant's most recent Receipts. |

## ADDITIONAL TERMS AND CONDITIONS OF RECEIVABLES PURCHASE AGREEMENT

Each of the parties is obligated upon his, her or its execution of the Agreement to all terms of this Agreement and any Guaranty or other related agreement, including these Additional Terms and Conditions. Each person signing above for Merchant represents that Merchant has duly authorized the execution, delivery and performance of this Agreement and that he or she is authorized to sign this Agreement for Merchant, and each person signing above, including each Owner/Guarantor, represents and warrants to GMC that the information provided herein and in all of GMC documents, forms and recorded interviews is true, accurate and complete in all respects, and acknowledges that GMC has materially relied on the truth and correctness of all such information in deciding to enter into this Agreement and the transaction herein provided for. If any such information is false or misleading, Merchant shall be deemed to be in material breach of this Agreement and any other agreements between Merchant and GMC and GMC shall be entitled to all remedies available under law in addition to all remedies expressly provided for herein. An investigative or consumer report may be made in connection with the Agreement with respect to Merchant and each Owner/Guarantor. Merchant and each of the above-signed Owner/Guarantors authorizes GMC, its agents and representatives and any credit reporting agency engaged by GMC, to (i) investigate any references given or any other statements or data obtained from or about Merchant or any of its Owner/Guarantors for the purpose of this Agreement, and (ii) to obtain consumer and business credit reports on Merchant or any of its Owner/Guarantors at any time during the term of this Agreement or for GMC's consideration of Merchant's eligibility to enter into any future agreement with GMC.

### I.   GENERAL TERMS AND CONDITIONS

1.1   **Payment Card Processing**.  Upon request from GMC, Merchant shall execute such forms or agreements acceptable to GMC, with a Payment Card Processor acceptable to GMC, to obtain payment card processing services.  Merchant shall provide GMC and/or its authorized agent with all of the information, authorizations and passwords necessary for verifying Merchant's processing history, including chargeback history, and/or for purposes of enabling GMC to make collections following any Event of Default pursuant to Article III.  Upon the occurrence of an Event of Default, Merchant authorizes GMC and/or its agent to obtain all settlement amounts which would otherwise be due to Merchant from the Payment Card Processor or any new or additional Payment Card Processor until GMC has received one hundred percent (100.00%) of the Purchased Receipts Amount.  For this purpose, GMC shall have the right to notify any Payment Card Processor and to direct any such Payment Card Processor to remit to GMC and/or its agent all Payment Card Receipts received by such Payment Card Processor.  Merchant hereby grants a power of attorney to GMC and hereby appoints GMC and/or its agent to take any and all action to direct each Payment Card Processor or any new or additional processor to remit to GMC and/or its agent the Merchant's Payment Card Receipts or to provide transaction history.  This authorization shall be irrevocable without the written consent of GMC.

1.2   **Fees**. In addition to all other sums due to GMC under this Agreement, Merchant shall pay to GMC the following fees (the sum of all such charges, hereinafter, the "Fee").  GMC may debit Merchant's Account for any of the remaining fees at any time after such fee(s) are incurred by Merchant.

(1)   $100 in each and every instance when Merchant blocks GMC's debit or access (or otherwise prevents GMC from debiting or accessing) to Merchant's bank accounts to cover fees imposed by bank;

(2)   Merchant will be charged UCC Filing Fee of $295.00 both for GMC's filing of UCC-1 Financing Statement and $395.00 for UCC-3 Termination Statement;

(3)   Merchant will be charged a fee of $35.00 for every instance of failing to provide GMC with 24 hours advance notice (or such reasonable notice as may be necessitated by the circumstances) that there will be insufficient funds in the Account such that the ACH of the Specific Amount will not be honored by Merchant's bank.

1.3   **Financial Condition**.  Merchant and Owner/Guarantor(s) authorize GMC and its agents to investigate their financial responsibility and history, and will provide to GMC any bank or financial statements, tax returns, etc., as GMC requests prior to or at any time after execution of this Agreement.  A photocopy of this Agreement's authorization will be deemed acceptable for release of financial information.  GMC is authorized to update such information and financial profiles from time to time as it deems appropriate.

1.4   **Transactional History**.  Merchant authorizes its bank and Payment Card Processor to provide GMC with Merchant's banking and/or processing history.

1.5   **Indemnification**.  Merchant and Owner/Guarantor(s) hereby jointly and severally indemnify and hold harmless GMC and each Payment Card Processor, their respective officers, directors, agents and representatives and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by any such indemnitee as a direct or indirect result of (a) actions taken or claims asserted by GMC in connection with this Agreement and/or (b) actions taken by any Payment Card Processor in reliance upon information or instructions provided by GMC.

1.6   **No Liability**.  In no event will GMC be liable for any claims asserted by Merchant under any legal or equitable theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by Merchant and Owner/Guarantor(s).

1.7   **Nature of Transaction**.  THIS IS NOT A LOAN.  Merchant is selling a portion of its future revenue stream and rights to payment to GMC at a discount, on a nonrecourse basis, and is not borrowing money from GMC.  There is no interest rate or fixed payment schedule and no time period during which the Purchased Receipts must be collected, or the Purchased Receipts Amount realized by GMC.  Absent a modification between the parties, and absent an Event of Default under Article III, the total amount paid by Merchant to GMC will never exceed the Purchased Receipts Amounts (plus any applicable fees as set forth in this Agreement).  If future Receipts are remitted more slowly than GMC may have anticipated or projected or if the full Purchased Receipts Amount is never received by GMC due to adverse changes to or the termination of Merchant's business or otherwise, and Merchant has not breached this Agreement, Merchant

would not owe anything to GMC and would not be in breach of its default under this Agreement. GMC is buying the Purchased Receipts knowing the risks that Merchant's business may not perform as expected, go bankrupt or fail, and GMC assumes these risks based on Merchant's representations, warranties and covenants in this Agreement and the financial and business information previously provided by Merchant. By this Agreement, Merchant transfers to GMC full and complete ownership of the Purchased Receipts as they are created or received, and Merchant retains no legal or equitable interest therein. Remittances made to GMC in respect of the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the remittances therefor by or on behalf of Merchant's customers. GMC is a bona fide purchaser of the Purchased Receipts Amount for fair value. Merchant agrees that the Purchase Price equals the fair market value for the risk undertaken by GMC in consideration for the Purchased Amount of Merchant's Receipts. Merchant agrees that it will treat the Purchase Price and Purchased Receipts Amount in a manner consistent with a sale in its accounting records and tax returns and not as a loan. GMC hereby appoints Merchant, and Merchant accepts appointment, as servicer for and on behalf of GMC for the purpose of collecting and delivering Receipts to GMC as required by this Agreement until GMC has received the Purchased Receipts Amount, and Merchant agrees that all such Receipts shall be received and held in trust for the benefit of GMC for purposes of carrying out the terms of this Agreement. Merchant agrees that it will treat the amounts received and the Purchased Receipts delivered to GMC under this Agreement in a manner consistent with a sale in its accounting records and tax returns. Merchant agrees that GMC is entitled to audit Merchant's accounting records upon reasonable notice in order to verify compliance. Merchant waives any rights of privacy, confidentiality or taxpayer privilege in any such litigation or arbitration in which Merchant asserts that this transaction is anything other than a sale of future receipts. Because the parties acknowledge and rely upon the lawfulness of this transaction under the laws of the State of New York and the fairness of its terms, Merchant knowingly and willingly waives and is estopped from asserting any claim or defense of usury in any legal action or proceeding, whether based on New York law or the law of any other jurisdiction.

1.8 **Power of Attorney**.  Merchant irrevocably appoints GMC as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to GMC from Merchant, or in the case of a violation by Merchant of this Agreement or the occurrence of an Event of Default under Article III by Merchant, including without limitation (i) to obtain and adjust insurance; (ii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) above; (iii) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to GMC; (iv) to file any claims or take any action or institute any proceeding which GMC may deem necessary for the collection of any of the undelivered Purchased Receipts, or otherwise to enforce its rights with respect to the Purchased Receipts; and (v) to contact any Payment Card Processor of Merchant and to direct such Payment Card Processor(s) to remit the Purchased Receipts and any fees directly to GMC upon certain Events of Default set forth in this Agreement and to provide any transaction information regarding Merchant requested by GMC. Each Payment Card Processor may rely on the previous sentence as written authorization of Merchant to provide any information requested by GMC and to remit the Purchased Receipts directly to GMC. Each Payment Card Processor is hereby irrevocably authorized and directed by Merchant to follow any instruction of GMC regarding payment or transfer of funds as instructed by GMC, without inquiry as to GMC's right or authority to give such instructions. Merchant acknowledges the terms of the preceding sentence and agrees not to (a) interfere with GMC's instructions or a Payment Card Processor's compliance with this Agreement or (b) request any modification thereto without GMC's prior written consent.

1.9 <u>Security Agreement</u>.
(I)  To secure Merchant's obligations under this Agreement to make available or deliver Purchased Receipts to GMC and GMC's right to realize the Purchased Receipts Amount, as and to the extent required by the terms of this Agreement, and performance of and compliance by Merchant with its other undertakings and agreements herein, Merchant hereby gives and grants to GMC a security interest in all Merchant's now existing and hereafter arising or existing inventory, equipment, fixtures, accounts, general intangibles, investment property, deposit accounts, cash, documents, chattel paper, instruments, letter-of-credit rights and all proceeds thereof (together, the "Collateral"). This pledge will secure all of GMC's rights under this Agreement and any other agreements now existing or later entered into between Merchant and GMC. Merchant will obtain from GMC written consent prior to granting a security interest of any kind in the Collateral to a third party and any such grant of a security interest without GMC's written consent shall be null and void. Merchant agrees to execute any documents or take any action in connection with this security interest as GMC deems necessary to perfect or maintain GMC's first priority security interest in the collateral, including the execution of any account control agreements. Merchant hereby authorizes GMC to file any financing statements deemed necessary or desirable by GMC to perfect or maintain its security interest without prior notice to Merchant. The UCC filing may state that such sale is intended to be a sale and not an assignment for security and may state that the Merchant is prohibited from obtaining any financing that impairs the value of the future Receipts or GMC's right to collect same.
(II) Upon any Event of Default, GMC may pursue any remedy available at law (including those available under the provisions of the Uniform Commercial Code ("UCC")), or in equity, to collect, enforce or satisfy any obligations then owing to GMC against the Collateral without notice or demand of any kind by making an immediate withdrawal or freezing the Collateral.  GMC shall have the right to notify account debtors at any time. Pursuant to Article 9 of the UCC, as amended from time to time, GMC has control over and may direct the disposition of the Collateral.  Upon the full performance by Merchant of Merchant's obligations under this Agreement, the security interest in the Collateral shall automatically terminate without any further act of either party being required, and all rights to the Collateral shall revert to Merchant.  Upon any such termination, GMC will execute, acknowledge (where applicable) and deliver such satisfactions, releases and termination statements, as Merchant shall reasonably request.  For avoidance of doubt, this security pledge shall not (i) permit GMC to collect the Purchased Receipts Amount in the event that Merchant itself is not required to remit it, such as for the reasons set forth in in this agreement, or (ii) otherwise affect the contingent nature of this transaction.
(III) In the event Merchant, any of its officers or directors or any Owner/Guarantor, during the term of this agreement or while Merchant remains liable to GMC for any obligations under this agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due GMC under this Agreement. With respect to any such entity, GMC shall be deemed to have been granted an irrevocable power of attorney with authority to file, naming such newly formed or existing entity as debtor, an initial UCC financing Statement and to have it filed with any and all appropriate UCC filing offices.  GMC shall be held harmless by Merchant and each Owner/Guarantor and be relieved of any liability as a result of any such authentication and filing of any such Financing Statement or the resulting perfection of its ownership rights or security interests in such entity's assets. GMC shall have the right to notify such entity's payors or account debtor (as defined by the UCC) of GMC's rights, including without limitation, GMC's right to collect all accounts, and to notify any Payment Card Processor or creditor of such entity that GMC has such rights in such entity's assets. Merchant also agrees that, at the GMC's discretion, GMC may choose to amend any existing financing statement to include any such newly formed entity as debtor.

1.10 <u>Protection of Information</u>.  Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner/Guarantor, in respect of himself or herself personally, authorizes GMC to disclose information concerning Merchant's and each Owner/Guarantor's credit standing (including credit bureau reports that GMC obtains) and business conduct only to agents, affiliates, subsidiaries, funding partners and credit reporting bureaus. Merchant and each Owner/Guarantor hereby waives to the maximum extent permitted by law any claim for damages against GMC or any of its affiliates relating to any (i) investigation undertaken by or on behalf of GMC as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

1.11 <u>Publicity</u>.  Merchant and each Owner/Guarantor only authorizes GMC to use its, his or her name in a listing of clients and in advertising and marketing materials with their express written consent.

1.12 <u>D/B/As</u>.  Merchant hereby acknowledges and agrees that GMC may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between GMC and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

1.13 <u>Authority to Contact</u>.  Merchant and Owner/Guarantor(s) explicitly agree to be contacted by GMC and its agents by telephone, email and/or SMS/text messaging or similar messaging application and agree to cover all usual third-party costs or charges that may be associated with such contacts.

1.14 <u>Adjustments to the Specific Amount</u>.

1. The Specific Amount is derived from an estimate of the Specified Percentage of Merchant's expected future Receipts for each calendar month.  Upon 5 calendar days written notice to Merchant, GMC may adjust the Specific Amount so that the amount received by GMC in the future will more closely approximate the then currently realized amount obtained by applying the Specified Percentage to actual monthly Receipts. Additionally, if Merchant has not defaulted under this Agreement, Merchant may request that GMC reconcile Merchant's actual receipts and adjust the Specific Amount so that the amount received by GMC in the future more closely represents the Specified Percentage of future Receipts.  In the event that Merchant desires a reconciliation, it shall be Merchant's sole responsibility to request it in accordance with subparagraph 2 hereof.  Upon receipt of a proper written reconciliation request from Merchant that requires a reconciliation, GMC shall be required to provide the reconciliation within 5 business days, with retroactive effect as of the date the request is received by GMC.

2. Merchant may request a reconciliation by sending GMC a request in writing, including by email, and including a copy of Merchant's most recent bank statements or credit card statements (which statements shall also include the Merchant's bank account report showing transactions in the month to date), as well as any receivables reports maintained by Merchant.  Upon receipt of a written reconciliation request from Merchant, GMC may request any and all financial information from Merchant that GMC reasonably believes is necessary to accurately reconcile the amount GMC has received from Merchant with the actual Specified Percentage.  GMC shall not be required to adjust the Specific Amount until such time as it has received all such requested information.  After each adjustment made pursuant to this paragraph, the new dollar amount shall be deemed the Specific Amount until any subsequent adjustment.

3. GMC may request a reconciliation by sending Merchant a request in writing, including by email.  Upon receipt of a written reconciliation request from GMC Merchant shall send to GMC a copy of Merchant's most recent bank statements or credit card statements (which statements shall also include the Merchant's bank account report showing transactions in the month to date) within five business days.

4. If a reconciliation is required, GMC shall modify the Specific Amount such that the modified Specific Amount is a good faith approximation by GMC of the (a) Specified Percentage, multiplied by (b) the gross revenues of Merchant during the previous two weeks, divided by (c) either ten for a daily Specific Amount (*i.e.*, the number of weekdays in the previous two weeks), or by two for a weekly Specific Amount (*i.e.*, the number of weeks).  The reconciliation shall be made within five business days of Merchant's request and provision of the financial information and shall be effective as of the date of the notice.  Any reconciliation may substantially extend the duration of this Agreement.  Nothing set forth in this Section shall be deemed to provide Merchant with the right to interfere with GMC's right and ability to debit the Account while the request is pending.

5. Nothing set forth in Section 1.14 shall be deemed to: (i) provide Merchant with the right to interfere with GMC's right and ability to debit the Account while the Merchant's request for reconciliation is pending or until the Purchased Amount is collected by GMC in full, (ii) retroactively modify the amount of the initial Specific Amount, or (iii) prevent GMC, in its sole and absolute discretion, from providing any other accommodations, reschedulings or adjustments to Merchant, as may be requested by Merchant from time-to-time.

## II.    REPRESENTATIONS, WARRANTIES AND COVENANTS

2.1    **Financial Condition and Financial Information**.  Merchant's bank and financial statements and other business records, copies of which have been furnished to GMC, and future statements and records which will be furnished hereafter at the request and discretion of GMC, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant.  Merchant has a continuing, affirmative obligation to advise GMC of any material adverse change in its financial condition, operation or ownership.  GMC may request statements at any time during the performance of this Agreement and the Merchant shall provide them to GMC within 5 business days.  Merchant's failure to do so is a material breach of this Agreement.

2.2    **Governmental Approvals**.  Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

2.3    **Authorization**.  Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

2.4    **Payment Card Processing Agreement**.  Merchant will not change its Payment Card Processor, add terminals, add any additional Payment Card Processor or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without GMC's prior written consent.  Any such change shall be a material breach of this Agreement.

2.5    **Change of Name or Location**.  Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Payment Card Processor and GMC or change any of its places of business.

2.6    **Estoppel Certificate**.  Merchant will at any time, and from time to time, upon at least one (1) day's prior notice from GMC to Merchant, execute, acknowledge and deliver to GMC and/or to any other person, person firm or corporation specified by GMC, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates on which the Purchased Receipts or any portion thereof have been delivered to GMC.

2.7    **No Bankruptcy**.  As of the date of this Agreement, Merchant does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant.  Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

2.8    **Working Capital Funding**.  Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves the future Receipts, whether in the form of a purchase of, a loan against, collateral against or the sale or purchase of credits against, future Receipts or future check sales with any party other than GMC.

2.9    **Unencumbered Receipts**.  Merchant has good, complete and marketable title to all Receipts and all collateral in which GMC has been granted a security interest under this Agreement, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever other than in favor of GMC, or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of GMC.

2.10   **Business Purpose**.  Merchant is a valid business in good standing under the laws of the jurisdiction in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and will not use any portion of the Purchase Price for any personal, family or household purposes.

2.11   **Default Under Other Contracts**.  Merchant's execution of and/or performance under this Agreement will not cause or create an event of default by Merchant under any contract with another person or entity.

## III.   EVENTS OF DEFAULT AND REMEDIES

3.1   **Events of Default**. The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) Merchant violates any term or covenant in this Agreement; (b) any representation or warranty in this Agreement is incorrect, false or misleading in any material respect when made; (c) the Owner/Guarantor sends GMC a notice of termination of this Agreement or any Guaranty prior to remittance of the entire Purchased Receipts Amounts; (d) Merchant ceases operations or changes the location of its business without notice to GMC of such change in location; (e) Merchant voluntarily transfers or sells all or any substantial portion of its assets without the consent of GMC; (f) Merchant makes or sends notice of any intended bulk sale or transfer by Merchant; (g) Merchant uses multiple depository accounts without the prior written consent of GMC or takes any other action that intentionally interferes with or prevents GMC from receiving Purchased Receipts in accordance with the terms of this Agreement; (h) Merchant changes its Account or Payment Card Processor without the prior written consent of GMC; (i) Merchant takes any action to discourage the use of Payment Card processing settled through Payment Card Processor, or permits any event to occur that could adversely affect the use, acceptance, or authorization of Payment Card transactions for the purchase of Merchant's services and products; (j) Merchant changes its arrangements with Payment Card Processor in any way that is adverse to GMC; (k) Merchant or any Owner/Guarantor, directly or indirectly, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, which operates a business similar to or competitive with that of Merchant (as described in Section 1.7(III)); (l) Merchant fails to send to GMC a copy of Merchant's most recent bank statements or credit card statements within five business days after request from GMC; (m) on 3 or more occasions, Merchant fails to give GMC 24 hours advance notice that there will be insufficient funds in the Account such that the debit of the Specific Amount will not be honored by Merchant's bank (due to ACH processor rules that may block GMC from further ACH debiting after upon three debits coming back with insufficient funds), or (n) Merchant defaults under any of the terms, covenants and conditions of any other agreement with GMC or any other agreement between Merchant and Payment Card Processor.

3.2   **Remedies**. If any Event of Default occurs, GMC may proceed to protect and enforce its rights through any or all of the following remedies:

1. The full uncollected amount of the Purchased Receipts Amount plus all fees and charges will become due and payable in full immediately, without notice.
2. Merchant shall pay to GMC liquidated damages of the greater of $5,000 or 18% of the then Purchased Receipts Amount outstanding balance (representing, *inter alia*, carrying cost of capital and costs of collection) annually, to be assessed on each anniversary of the default, until such time as all Merchant's obligations under this Agreement have been satisfied in full.
3. GMC may enforce the provisions of the Guaranty of Performance against the Owner/Guarantor(S).
4. GMC may exercise any and all rights and remedies of a secured party under UCC Article 9.
5. GMC may proceed to protect and enforce its rights and remedies by lawsuit or arbitration proceeding (as set forth in Section 4.12). In any such proceeding in which GMC shall recover judgment or an award against Merchant, Merchant shall be liable for all of GMC's costs of the proceeding, including but not limited to all reasonable attorneys' fees, costs and disbursements, as well as the attorneys' fees, costs and disbursements on appeal, attorneys' fees, costs and disbursements incurred in making an application to the court or tribunal for a fee award (so called "fees on fees").
6. GMC may debit Merchant's depository accounts wherever situated in such amounts as determined by GMC in its sole discretion for purposes of collecting funds for application to the unrealized Purchased Receipts Amount and other amounts owed by Merchant to GMC, by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise.
7. In the event Merchant changes or permits the change of the Account approved by GMC or adds an additional bank account, GMC shall have the right, without waiving any of its rights and remedies and without notice to Merchant, to notify Merchant's Payment Card Processor or any new or additional Payment Card Processor of the sale of the future Receipts hereunder and to direct such entity to deliver all amounts due to Merchant directly to GMC.

3.3   **Required Notifications**. Merchant is required to give GMC written notice within 24 hours of any bankruptcy filing under any chapter of the United States Code. Merchant is required to give GMC seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock or as required by applicable law, whichever notice period is greater.

## IV.   MISCELLANEOUS

4.1   **Modifications; Agreements**. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by GMC and Merchant.

4.2   **Assignment**. Merchant is prohibited from transferring or assigning this Agreement, or any of its rights or obligations hereunder, without GMC's prior written consent, which may be withheld in GMC's sole discretion. The rights and obligations of GMC under this Agreement may be transferred or assigned either in whole or in part at any time by GMC without the consent of Merchant, provided that such transferee or assignee takes such transfer or assignment subject to the terms and conditions of this Agreement.

4.3   **Notices**. Except as otherwise provided in this Agreement, all notices required under this Agreement shall be delivered by nationally recognized overnight service or certified mail, return receipt requested, with a copy by email, to the respective parties to this Agreement at the addresses set forth in this Agreement and shall become effective only upon receipt. In the event Merchant's address or mailing address should change, Merchant shall promptly notify GMC by sending notice in accordance with this paragraph.

4.4   **Waiver Remedies**. No failure on the part of GMC to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

4.5   **Binding Effect**. This Agreement shall be binding upon and inure to the benefit of Merchant, Guarantor(s), GMC and their respective successors and assigns, except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of GMC which consent may be withheld in GMC's sole discretion. GMC reserves the right to assign this Agreement with or without prior written notice to Merchant.

4.6   **Governing Law, Venue and Jurisdiction**   This Agreement shall be governed by and construed in accordance with the laws of the State of New York. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if GMC so elects, be instituted in any court sitting in New York (the "Acceptable Forums"). Merchant and Guarantor(s) agree that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant and Guarantor(s) waive any right to oppose any motion or application made by GMC to dismiss such proceeding, to remove and/or transfer such proceeding to an Acceptable Forum, and for an anti-suit injunction against such proceeding (which GMC may make in the Acceptable Forums). Additionally, Merchant and Guarantor(s) waive personal service of any summons and/or complaint or other process to commence any litigation and agree that service of such documents shall be effective and complete if mailed by certified mail, return receipt requested to the address(es) listed on page 1 of this agreement. Service shall be deemed complete upon mailing in accordance with this paragraph. Merchant and Guarantor(s) will then have 30 calendar days after the date of mailing in which to respond.

4.7   **Survival of Representation, etc**. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated. Notwithstanding the foregoing, Sections 1.5, 1.6, 1.9, 1.10, 1.11, 1.12, 1.13, 3.3, 4.5, 4.9 and 4.11 shall survive termination of this Agreement.

4.8   **Severability**. In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired. Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof.

4.9   **Entire Agreement**. This Agreement, the Guaranty of Performance, exhibits hereto and any addenda embody the entire agreement between Merchant and GMC and supersede all prior agreements and understandings relating to the subject matter hereof, whether oral or in writing, as well as any representations made by any broker, or sales agent that may be contrary to or differ from the express representations in this Agreement. In entering this Agreement, Merchant does not rely on any inducements or representations by any person, whether oral or written, other than those expressly set forth in this Agreement.

4.10 **JURY TRIAL WAIVER**.  THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR THE ENFORCEMENT THEREOF.  THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

4.11 **CLASS ACTION WAIVER**.  THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY.  TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT:  (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

4.12 **Arbitration**. GMC shall have the right to request that any dispute, controversy or claim between GMC and Merchant and/or Guarantor(s), whether arising out of or relating to the construction and interpretation of this Agreement or otherwise (including without limitation claims for fraud, misrepresentation, intentional tort, negligent tort or under any local, state or federal statute or rule), be submitted to arbitration before and in accordance with the commercial rules of the American Arbitration Association in New York, New York.  GMC may demand that such dispute be submitted to arbitration either by (i) sending a written notice of intent to arbitrate to all other parties in accordance with the notice provision in paragraph 4.5 of this Agreement, or (ii) sending a written notice of intent to arbitrate to the attorney of record for Merchant and/or Guarantor(s) who has brought any action or proceeding before any court or tribunal against GMC.  Initially, the parties will split the arbitration filing fee, administration fee and arbitrator fee.  If GMC prevails in arbitration, the arbitrator may award to GMC its attorneys' fees (in accordance with paragraph 3.2(5)) and its share of the arbitration filing fee, administration fee and arbitrator fee.  Merchant and/or Guarantor(s) may opt out of this arbitration provision by sending GMC a notice that he, she or it does not want this provision to apply in accordance with paragraph 4.3 within 14 days after the effective date of this Agreement.

4.13 **Facsimile Acceptance**.  Facsimile or electronic signatures shall be deemed acceptable for all purposes.

**GUARANTY OF PERFORMANCE**

| | | | |
|---|---|---|---|
| Merchant's Legal Name: | Orbit Energy & Power LLC | D/B/A: | Orbit Energy & Power |

| | | | | | | |
|---|---|---|---|---|---|---|
| Physical Address: | 106 MANTUA AVE | City: | MANTUA | State: | NJ | Zip: 08051 |

Federal ID#: ██████████████

**Personal Guaranty of Performance.** Global Merchant Cash Inc. ("GMC") is not willing to enter into the Receivables Purchase Agreement ("Merchant Agreement") between GMC and the above named merchant ("Merchant") unless the undersigned Guarantor(s) irrevocably, absolutely and unconditionally guarantees prompt and complete performance to GMC of all of the obligations of Merchant. Guarantor(s) represent that each of them will directly benefit from GMC and Merchant entering into the Merchant Agreement. The undersigned Guarantor(s) hereby absolutely, irrevocably and unconditionally guarantees to GMC the full and timely performance by Merchant of each and all of the representations, warranties, obligations and covenants made by Merchant in the Merchant Agreement, including the Merchant's full and timely delivery of the Purchased Receipts pursuant to (and limited by) the Merchant Agreement, in each case as each agreement may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). GMC agrees to buy the Purchased Receipts described in the Merchant Agreement knowing the risks that Merchant's business may slow down or fail, and GMC assumes these risks based on Merchant's representations, warranties and covenants in the Merchant Agreement, which are designed to give GMC a reasonable and fair opportunity to receive the benefit of its bargain. The undersigned Guarantor(s) hereby unconditionally guarantees to GMC, Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in the Merchant Agreement as each may be renewed, amended, extended or otherwise modified. Guarantor's obligations are due at the time of any Event of Default under the Merchant Agreement. For avoidance of doubt, (i) no guarantor shall be liable to remit the Purchased Receipts in the event that Merchant itself is not required to do so, and (ii) this Guaranty does not otherwise affect the contingent nature of this transaction.

**Guarantor Waivers and Debit Authorization.** In the event that Merchant fails to perform any obligation under the Merchant Agreement, GMC may enforce its rights under this Guaranty without first seeking to obtain performance for such default from Merchant or any other guarantor. Guarantor hereby irrevocably authorizes GMC to ACH Debit all amounts due to GMC under the terms of the Merchant Agreement and/or this Guaranty, from Guarantor's bank account on a daily basis and will provide GMC with all required access codes and monthly bank statements as required by GMC. Guarantor knowingly and willingly waive(s) any claims or affirmative defenses that might otherwise be available to Merchant, including without limitation bad faith, unjust enrichment, usury, duress, unconscionability, unfair business practices, consumer protection statutes, champerty, contract of adhesion or fraud (including fraud in the inducement of this Guaranty), except for the defense of payment.

GMC does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to timely delivery of any amount under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) GMC's acceptance of this Guaranty; and (iv) any renewal, increase, extension or other modification of the Merchant Agreement or Merchant's other obligations to GMC. In addition, GMC may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement: () renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to GMC; and (ii) release Merchant from its obligations to GMC. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant or any other guarantor for any amounts paid by Guarantor, or acts performed by Guarantor, under this Guaranty: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that GMC must return any amount paid by Merchant or any other guarantor of the Merchant Agreement because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor's obligations under this Guaranty shall include that amount.

**Guarantor Acknowledgement.** Guarantor acknowledges that: (i) he/she/it understands the seriousness of the provisions of this Guaranty; (ii) he/she/it has had a full opportunity to consult with counsel of his/her choice; and (iii) he/she/it has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

**Joint and Several Liability.** The liability for obligations hereunder of the persons or entities constituting Guarantor under this Guaranty are joint and several.

**Governing Law, Venue and Jurisdiction.** This Guaranty shall be governed by and construed in accordance with the laws of the State of New York. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if GMC so elects, be instituted in any state or federal court sitting in New York (the "Acceptable Forums"). Guarantor agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Guarantor waives any right to oppose any motion or application made by GMC to transfer such proceeding to an Acceptable Forum.

JURY TRIAL WAIVER. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS GUARANTY IS A PART OR THE ENFORCEMENT THEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

CLASS ACTION WAIVER. THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS GUARANTY); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**OWNER/GUARANTOR**

By: SEAN ANGELINI OWNER
_____
(Print Name and Title)

SS#: ██████

DocuSigned by:
*Sean Angelini*
302E3097103B4C6...
(Signature)

**OWNER/GUARANTOR**

By: _____
(Print Name and Title)

SS#: _____

_____
(Signature)

DocuSign Envelope ID: 35909190-CED6-44F8-97C1-92E8C771A4DC

EXHIBIT A – Page 2 of 2 (2:2)

**AUTHORIZATION FOR DIRECT DEPOSIT (ACH CREDIT)
AND DIRECT PAYMENTS (ACH DEBITS)**

**Global Merchant Cash, Inc.**

64 Beaver St., Suite 415, NY, NY 10004 | (877) 851-3880| contracts@wallfunding.com

**DEFINITIONS**

- **"GMC":**  Global Merchant Cash, Inc.
- **"Merchant":**  ORBIT ENERGY & POWER LLC
- **"Merchant Agreement":**  Receivables Purchase Agreement between GMC and Merchant, dated 05/18/2022
- **"Designated Account":**
  Bank Name: REPUBLIC BANK                                    Branch:
  Tax ID:
  ABA: ▮▮▮▮    Routing: ▮▮▮▮    DDA:              Account: ▮▮▮▮
- Capitalized terms used in this Authorization Form without definition shall have the meanings set forth in the Merchant Agreement.

This Authorization for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Merchant Agreement.  Merchant should keep a copy of this important legal document for Merchant's records.

**DISBURSEMENT OF ADVANCE PROCEEDS.**  By signing below, Merchant authorizes GMC to disburse the advance proceeds less the amount of any applicable fees upon advance approval by initiating ACH credits to the Designated Account, in the amounts and at the times specified in the Merchant Agreement.  **By signing below, Merchant also authorizes GMC to collect amounts due from Merchant under the Merchant Agreement by initiating ACH Debits from the Designated Account. The initial authorized amount is as follows, which may be adjusted by GMC from time to time in accordance with the Merchant Agreement:**

In the amount of: $ 54,147.06              (subject to reconciliation in accordance with the Merchant Agreement)
On the following days:  Friday

If any payment date falls on a weekend or holiday, Merchant understands and agrees that the payment may be executed on the next business day.  If a payment is rejected by Merchant's financial institution for any reason, including without limitation insufficient funds, Merchant understands that GMC may, at its discretion, attempt to process the payment again as permitted under applicable ACH rules.  Merchant also authorizes GMC to initiate ACH entries to correct any erroneous payment transaction.

**MISCELLANEOUS.**  GMC is not responsible for any fees charged by Merchant's bank as the result of credits or debits initiated under this Authorization Agreement.  The origination of ACH Debits and Credits to the Designated Account must comply with applicable provisions of state and federal law, and the rules and operating guidelines of NACHA (National Automated Clearing House Association). This Authorization Agreement is to remain in full force and effect until GMC has received written notification from Merchant at the address set forth above at least five banking days prior of its termination to afford GMC a reasonable opportunity to act on it. The individual signing below on behalf of Merchant certifies that he/she is an authorized signer on the Designated Account. Merchant will not dispute any ACH transaction initiated pursuant to this Authorization Agreement, provided the transaction corresponds to the terms of this Authorization Agreement. Merchant requests the financial institution that holds the Designated Account to honor all ACH entries initiated in accordance with this Authorization Agreement.

By signing below, Merchant attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes. Merchant further certifies that it shall comply with all state and federal laws and shall be bound by the ACH Rules as set by NACHA.

FOR THE MERCHANT (#1)                                    FOR THE MERCHANT (#2)

SEAN ANGELINI                                            _____
[Merchant's Legal Name]                                   [Merchant's Legal Name]


DocuSigned by:
*Sean Angelini*

By: ___2D2-4887103B4C6...___                            By: _____
Title: OWNER                                             Title: _____
Date: 05/18/2022                                         Date: _____

Merchant hereby agrees that "Merchant" is defined to include the following related entities:

Entity Name: _____
Address: _____ EIN: _____

Signature: _____ Name: _____ Title: _____ Date: _____

Entity Name: _____
Address: _____ EIN: _____

Signature: _____ Name: _____ Title: _____ Date: _____

Entity Name: _____
Address: _____ EIN: _____

Signature: _____ Name: _____ Title: _____ Date: _____

Entity Name: _____
Address: _____ EIN: _____

Signature: _____ Name: _____ Title: _____ Date: _____

Entity Name: _____
Address: _____ EIN: _____

Signature: _____ Name: _____ Title: _____ Date: _____

Entity Name: _____
Address: _____ EIN: _____

Signature: _____ Name: _____ Title: _____ Date: _____

Entity Name: _____
Address: _____ EIN: _____

Signature: _____ Name: _____ Title: _____ Date: _____

FOR THE MERCHANT (#1)                          FOR THE MERCHANT (#2)

SEAN ANGELINI                                  _____
[Merchant's Legal Name]                        [Merchant's Legal Name]

By: _____           By: _____
    *Sean Angelini*
    DocuSigned by:
    97103B4C6...
Title: OWNER                                   Title: _____
Date: 05/18/2022                               Date: _____

# Global Merchant Cash

## ADDENDUM #1 TO THE PURCHASE AND SALE OF FUTURE RECEIVABLES AGREEMENT

This is an addendum to that Purchase and Sale of Future Receivables Agreement dated on the day of 05/18/2022 by and between, Global Merchant Cash, Inc. hereinafter referred to as "Purchaser," and ORBIT ENERGY & POWER LLC . (The "Business") and SEAN ANGELINI (Owners), collectively hereinafter referred to as "Seller" (Purchase Agreement).

Now, therefore, in consideration of the premises and the mutual representations, covenants, undertakings, and agreements hereinafter contained Seller and Buy represent, Covenant, undertake and agree as follows:

Seller and Purchaser agree to discount the amount of the purchased price according to the following schedule.

| Early Repurchase Date | Discount RTR Amount |
|---|---|
| Calendar Days 1-30 | $ 1,582,000.00 |
| Calendar Days 31-60 | $ 1,624,000.00 |
| Calendar Days 61-90 | $ 1,666,000.00 |

RTR Must be received either in the manner described in the agreement or via wire transfer to the Purchasers Bank Account and funds cleared prior to 12 AM on the above-mentioned date. The funds must be received from Merchant's business bank account, this addendum is not valid if funds received from any other third party.

Execution of this Addendum is made as of this 05/18/2022 .

Purchaser:
By: Global Merchant Cash Inc
X._____

Seller:
By: SEAN ANGELINI _____

X._____
DocuSigned by: Sean Angelini
302F3097103B4C6...

**DocuSign**

| **Certificate Of Completion** | | |
|---|---|---|
| Envelope Id: 35909190CED644F897C192E8C771A1DC | | Status: Completed |
| Subject: Please Complete and Sign DocuSign Contract for ORBIT ENERGY & POWER LLC ID# 117176 | | |
| Source Envelope: | | |
| Document Pages: 10 | Signatures: 6 | Envelope Originator: |
| Certificate Pages: 4 | Initials: 0 | Wall Funding |
| AutoNav: Enabled | | 30 Broad Street |
| EnvelopeId Stamping: Enabled | | 14th Floor |
| Time Zone: (UTC-05:00) Eastern Time (US & Canada) | | New York, NY  10004 |
| | | redacted |
| | | IP Address: ▮▮▮▮▮▮ |

| **Record Tracking** | | |
|---|---|---|
| Status: Original | Holder: Wall Funding | Location: DocuSign |
| 5/18/2022 2:18:05 PM | redacted | |

| **Signer Events** | **Signature** | **Timestamp** |
|---|---|---|
| Sean Angelini | *Sean Angelini* | Sent: 5/18/2022 2:18:07 PM |
| redacted | 302F3097103B4C6... | Viewed: 5/18/2022 2:19:51 PM |
| President/ CEO | | Signed: 5/18/2022 2:24:42 PM |
| ORBIT ENERGY & POWER, LLC | | |
| Security Level: Email, Account Authentication (None) | Signature Adoption: Pre-selected Style | |
| | Signed by link sent to redacted | |
| | Using IP Address: ▮▮▮▮▮▮ | |
| **Electronic Record and Signature Disclosure:** | | |
| Accepted: 5/18/2022 2:19:51 PM | | |
| ID: 5e4fe828-1f03-40e2-91a0-c225ad152e91 | | |

| **In Person Signer Events** | **Signature** | **Timestamp** |
|---|---|---|

| **Editor Delivery Events** | **Status** | **Timestamp** |
|---|---|---|

| **Agent Delivery Events** | **Status** | **Timestamp** |
|---|---|---|

| **Intermediary Delivery Events** | **Status** | **Timestamp** |
|---|---|---|

| **Certified Delivery Events** | **Status** | **Timestamp** |
|---|---|---|

| **Carbon Copy Events** | **Status** | **Timestamp** |
|---|---|---|

| **Witness Events** | **Signature** | **Timestamp** |
|---|---|---|

| **Notary Events** | **Signature** | **Timestamp** |
|---|---|---|

| **Envelope Summary Events** | **Status** | **Timestamps** |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 5/18/2022 2:18:07 PM |
| Certified Delivered | Security Checked | 5/18/2022 2:19:51 PM |
| Signing Complete | Security Checked | 5/18/2022 2:24:42 PM |
| Completed | Security Checked | 5/18/2022 2:24:42 PM |

| **Payment Events** | **Status** | **Timestamps** |
|---|---|---|

| **Electronic Record and Signature Disclosure** | | |
|---|---|---|

Electronic Record and Signature Disclosure created on: 4/16/2017 4:06:52 PM
Parties agreed to: Sean Angelini

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Wall Street Funding (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through your DocuSign, Inc. (DocuSign) Express user account. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. For such copies, as long as you are an authorized user of the DocuSign system you will have the ability to download and print any documents we send to you through your DocuSign user account for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of your DocuSign account. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use your DocuSign Express user account to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through your DocuSign user account all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Wall Street Funding:**
You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
 To contact us by email send messages to: mikek@wallfunding.com


**To advise Wall Street Funding of your new e-mail address**
To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at mikek@wallfunding.com and in the body of such request you must state: your previous e-mail address, your new e-mail address. We must verify and validate your email address by sending you a message and receiving a response from you.
In addition, you must notify DocuSign, Inc to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in DocuSign.

**To request paper copies from Wall Street Funding**
To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to mikek@wallfunding.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Wall Street Funding**
To inform us that you no longer want to receive future notices and disclosures in electronic format you may:
> i. decline to sign a document from within your DocuSign account, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;
> ii. send us an e-mail to mikek@wallfunding.com and in the body of such request you must state your e-mail, full name, IS Postal Address, telephone number, and account number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..


**Required hardware and software**

| Operating Systems: | Windows2000? or WindowsXP? |
| --- | --- |
| Browsers (for SENDERS): | Internet Explorer 6.0? or above |
| Browsers (for SIGNERS): | Internet Explorer 6.0?, Mozilla FireFox 1.0, NetScape 7.2 (or above) |
| Email: | Access to a valid email account |
| Screen Resolution: | 800 x 600 minimum |
| Enabled Security Settings: | •Allow per session cookies<br><br>•Users accessing the internet behind a Proxy Server must enable HTTP 1.1 settings via proxy connection |

** These minimum requirements are subject to change. If these requirements change, we will provide you with an email message at the email address we have on file for you at that time providing you with the revised hardware and software requirements, at which time you will

have the right to withdraw your consent.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I Agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC RECORD AND SIGNATURE DISCLOSURES document; and

- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and

- Until or unless I notify Wall Street Funding as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by  Wall Street Funding during the course of my relationship with you.